UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

I.S.T. NORTH AMERICA, LLC,

                  Plaintiff,

     v.

TRELLEBORG PIPE SEALS MILFORD INC.,
TRELLEBORG SEALING SOLUTIONS US INC.,
TRELLEBORG PIPE SEALS US, INC., TRELLEBORG
CORPORATION, TRELLEBORG AB, TRELLEBORG
SEALING PROFILES GMBH, CRISTOFFER
LJUNGBACK, ANDREAS RENULF, SIMON BURKE,
JOHN DOE 1-10, and XYZ COMPANIES 1-10,

                  Defendants.

CASE NO. _____

**COMPLAINT AND JURY DEMAND**

Plaintiff I.S.T. North America, LLC ("ISTNA," "Plaintiff," or the "Company"), by and through its undersigned counsel, for its complaint against Defendants Trelleborg Pipe Seals Milford Inc. ("Trelleborg Pipe Milford"), Trelleborg Sealing Solutions US Inc. ("Trelleborg Sealing"), Trelleborg Pipe Seals US, Inc. ("Trelleborg Pipe US"), Trelleborg Corporation ("Trelleborg Corp" and, with Trelleborg Pipe Milford, Trelleborg Sealing, and Trelleborg Pipe US, the "U.S. Entities"), Trelleborg AB, Trelleborg Sealing Profiles GmbH ("Trelleborg Germany" and, with Trelleborg AB, the "Foreign Entities") (with the Foreign Entities and the U.S. Entities collectively referred to as the "Entity Defendants"), Cristoffer Ljungback, Andreas Renulf, and Simon Burke (Ljungback, Renulf, and Burke collectively with the Entity Defendants referred to as the "Defendants" or "Trelleborg"), hereby alleges as follows:

## NATURE OF THE ACTION

    1.    ISTNA brings this action to expose and hold accountable the multinational Trelleborg conglomerate for a calculated campaign of deception and corporate sabotage that

destroyed ISTNA's business.  What began as a lawful commercial relationship was methodically weaponized by Trelleborg into a covert takeover operation—executed through lies, concealment, and bad-faith manipulation of contractual obligations—to eliminate ISTNA and seize control of its markets, customers, and technology.

2.      ISTNA pioneered trenchless pipe repair technology in North America, a field vital to the maintenance of public water infrastructure.  Through its exclusivity agreement with its supplier and joint venture partner IST Germany (the "Exclusivity Agreement"), ISTNA and its founder, Eugene "Geno" Camali, invested millions of dollars and years of effort developing the United States and Canadian market on its, and IST Germany's, behalf.  Yet while ISTNA was building its market, Defendants were conspiring to steal it.

3.      Behind ISTNA's back, Trelleborg AB, its subsidiaries and affiliates, and the executives of those companies schemed to acquire IST Germany under the false pretense of partnership, all while plotting to strip IST Germany of its assets and extinguish its obligations to ISTNA.  The goal was simple but devastating—eliminate ISTNA's exclusivity, render IST Germany judgment-proof, and then install Trelleborg in ISTNA's place.

4.      The plan was executed with surgical precision and shameless deceit.  Trelleborg executives—including Defendants and Trelleborg executives Cristoffer Ljungback, Andreas Renulf, and Simon Burke—cultivated Mr. Camali's trust, promising that Trelleborg would honor ISTNA's rights and integrate its operations into the Trelleborg "Group."  They said one thing to ISTNA and the opposite to one another and IST Germany.  Even as they smiled across a dinner table in Piermont, New York, assuring Mr. Camali that his company's future was secure, they were finalizing documents that would gut IST Germany, exclude ISTNA's contract, and leave ISTNA without a supplier or recourse.

5.      Trelleborg's duplicity did not stop there.  Having induced ISTNA's reliance and obtained its confidential business plans under the guise of a nondisclosure agreement, Trelleborg used those plans as a roadmap for its own market invasion.  Once the takeover was complete, Trelleborg carried on IST Germany's operations seamlessly—except for honoring the Agreement it had deliberately destroyed.  Defendants moved into ISTNA's territory, contacted ISTNA's customers directly, and claimed ISTNA's assets and goodwill as their own.

6.      A three-member arbitral tribunal (the "Tribunal") has already found that IST Germany's breach of the Exclusivity Agreement was willful, malicious, and conducted "with the assistance and at the behest of Trelleborg."  The Tribunal awarded nearly $10 million in damages, concluding that IST Germany's sale of its operations "lock, stock, and barrel" to Trelleborg while "carefully excluding ISTNA's exclusive contract" was a textbook act of bad faith.

7.      Defendants' conduct was not a business dispute.  It was an ambush—a calculated act of economic predation executed by an international enterprise that viewed legal obligations as inconveniences to be engineered around.  This case seeks to hold Defendants accountable for their deliberate campaign to destroy ISTNA's business through fraud, deceit, and tortious interference, and to recover the millions of dollars in damages that Defendants' actions have caused.

## SUMMARY OF ALLEGATIONS

8.      ISTNA is a leading company in the "trenchless" pipe repair and rehabilitation industry.  Generally speaking, trenchless pipe repair allows for buried municipal pipes to be rehabilitated without the need to excavate the surface to reach them.  Instead, the trenchless repair process encompasses the insertion of a new liner inside the existing pipe, "curing" that liner to transform it into a rigid, durable new pipe, and then cutting openings in the new liner to restore access to the other existing pipes that branch from the repaired pipe as part of its distribution network.

9.     The trenchless pipe repair business is booming—according to one industry publication, it is forecast to increase by $3 billion by 2030, at a compound annual growth rate of 5.1%.

10.     ISTNA was formed in 2019 as a joint venture between Geno Camali, a second-generation leader in the industry, and IST Germany, a supplier of trenchless products and services.

11.     To memorialize the joint venture, ISTNA and IST Germany entered into an Exclusivity Agreement that appointed ISTNA as IST Germany's "exclusive representative for the sale of [certain] equipment and parts manufactured by [IST Germany]" as well as "any and all other equipment and parts manufactured by Company currently or at any future time."  The Agreement also authorized ISTNA to service the products ISTNA sold and specified that ISTNA was the exclusive supplier for IST Germany's products in the United States (initially) and then, starting in 2020, Canada as well.  The Agreement had no stated term.

12.     Given the language of the Exclusivity Agreement, and the parties' roles as joint venturers, ISTNA invested millions of dollars and years worth of effort into making the Company a success.  After a year of operations, Mr. Camali acquired from IST Germany the rest and remainder of ISTNA that he did not already own.

13.     Unbeknownst to ISTNA and Mr. Camali, however, IST Germany and executives employed by and affiliated with Trelleborg—including Trelleborg AB, Trelleborg Germany, and each of the U.S. Entities—began scheming to covertly takeover IST Germany's business, and cut ISTNA out, from the very start of ISTNA's venture.

14.     Specifically, and as ISTNA first learned in the Arbitration, in late 2020 Defendant Trelleborg AB made a secret offer to purchase all of IST Germany's stock.  Trelleborg did so at a time when IST Germany had been mismanaged by its CEO, Jorg Vogt, and its principal

shareholder, Mathias Wettstein, had been arrested for tax fraud. In need of a "bailout," Vogt turned to his personal friend, Jean Paul Mindermann, a senior executive of Defendant Trelleborg AB.

15.    Evidence produced in the Arbitration demonstrates why Defendants wanted to acquire IST Germany and keep it a secret from ISTNA—Defendants needed a way around ISTNA's exclusivity to access the United States and Canada, which ISTNA was dominating. Trelleborg also wanted access to Mr. Camali's customers and potential customers in the United States, including a number of the largest domestic water infrastructure companies.

16.    Trelleborg continued to conduct due diligence and covertly negotiate with IST Germany behind ISTNA's back for the better part of two years.

17.    To keep Mr. Camali from uncovering that his supplier would be rendered unable to perform and stripped for parts, and his exclusivity compromised, IST Germany and Trelleborg misled him into believing that Trelleborg would merely serve as an "investor" in IST Germany, or would buy IST Germany outright, and then be a potential business partner for or parent to ISTNA. All the while, and without disclosing it to Mr. Camali, Trelleborg intended for its acquisition of IST Germany (the "Takeover") to actually be an asset purchase—leaving IST Germany a non-performing shell—thereby preventing IST Germany from performing the Exclusivity Agreement and dealing a fatal blow to ISTNA (which would be totally without a supplier).

18.    This non-disclosure was an integral part to the Takeover scheme—had Mr. Camali known that the Entity Defendants and Ljungback, Renulf, and Burke intended to terminate the Exclusivity Agreement, he would have challenged the Takeover. Instead, he acquiesced and in fact continued to invest substantial time and money into ISTNA, all on the false belief that Defendants would honor his Agreement.

19.    Defendants went even further to keep Mr. Camali in the dark and string him along while Trelleborg finalized the Takeover.  For example, Defendants Ljungback and Renulf made misleading and outright false statements to Mr. Camali at a dinner in Piermont, New York on August 10, 2022, which was being held to discuss a purported and contemplated business combination between ISTNA and Trelleborg.

20.    During this dinner, Ljungback and Renulf told Mr. Camali, among other things, that Trelleborg intended to absorb IST Germany (rather than just acquire its assets and effectively "strip it for parts," rendering it unable to perform); that Trelleborg also intended to purchase or invest in ISTNA; and that Trelleborg would honor ISTNA's Exclusivity Agreement with IST Germany even after Trelleborg consummated the IST Germany "acquisition."

21.    All of these statements, however, were false and misleading when made and omitted material facts.  Indeed, while Trelleborg executives were telling Mr. Camali in person that Trelleborg intended to honor his Agreement and support his business—including by integrating it into the Trelleborg group and giving ISTNA access to Trelleborg's facilities in the United States —they were (in secret) changing the corporate documents that would effectuate the Takeover to expressly *exclude* the Agreement.  Renulf in fact was aware that ISTNA's Agreement had been or was about to be excluded from the Takeover when he was meeting with Camali in Piermont and promising him Trelleborg's support and integration into its business.  Yet, at no point until after the Takeover was effectuated was Mr. Camali informed about the decision to exclude him.

22.    In addition to this duplicity Defendant Renulf went so far as to dupe Mr. Camali into sending them ISTNA's confidential and proprietary business plans and projections, all under the auspices of a non-disclosure agreement.  As Mr. Camali would find out only later, that information was used by Trelleborg to gain access to ISTNA's former customers in the United

6

States and Canada market—*after* the Exclusivity Agreement had been terminated.  Mr. Camali, however, was told before sending Defendants this information that it would be used to evaluate how to integrate ISTNA in the Trelleborg "Group" after the Takeover was consummated.

23.    Defendants' scheme culminated in an October 11, 2022 Share and Asset Purchase Agreement ("SAPA") —signed by Renulf—in which Trelleborg purchased all of IST Germany's assets while specifically excluding the Exclusivity Agreement—yet again under the cover of darkness and without anything being disclosed to Mr. Camali until the SAPA became effective more than a month later.

24.    By virtue of this agreement, Trelleborg effectively left IST Germany entirely unable to perform as ISTNA's exclusive supplier.  And to make matters worse, Trelleborg continued after the SAPA to carry on IST Germany's operations—except of course for supplying ISTNA or otherwise complying with the Agreement.

25.    In the Arbitration, the Tribunal found unequivocally that as a result of the Takeover IST Germany repudiated and materially breached the Exclusivity Agreement in bad faith, explaining that

> IST [Germany] did not simply discontinue its manufacturing operations but instead sold them, lock, stock and barrel, to another entity [*i.e.*, Trelleborg] that continued those very same operations, . . . while carefully excluding ISTNA's exclusive contract from the rest of the transferred assets.  These circumstances do not raise the question of what the consequences would be for the [Exclusivity] Agreement and MOU if IST [Germany] had simply gone out of business in good faith.

(*See* Final Award ¶ 140).  The Tribunal specifically highlighted that "the facts at issue demonstrate an even more compelling case for finding repudiation than" precedential New York Appellate Division case law, including because "Trelleborg" "plainly chose not to honor ISTNA's contractual entitlement to exclusivity even temporarily."  (*See id.* ¶ 136).

26.     There can be no doubt—none—that Trelleborg and IST Germany knew that the Takeover would cause IST Germany to breach the Exclusivity Agreement and that they acted maliciously in knowing that once IST Germany broke the Agreement, it would be the death knell for ISTNA.

27.     How do we know this?  Because Trelleborg executives and agents, and IST Germany executives, wrote as much in damning emails produced in the Arbitration.

28.     For example, on November 4, 2022 when Trelleborg executives and IST Germany CEO Jorg Vogt were discussing the impact of the Takeover on IST, Mr. Vogt—soon to be a Trelleborg employee—wrote as follows, which comments Burke and Renulf, executives of the Foreign Defendants, agreed with:

From Genos point of view we took him the illusion to be part of Trelleborg shortly and additionally we will tell him that his agreement will not be transferred -  it's a nightmare what falls upon him and in this context you can´t expect him to do a great job for us in the future.

After all Geno has invested 2.5 Mio euros in demo equipment in the meantime and that's only because he is exclusive in the US.

So finally Trelleborg is on the driver seat and every decision is ok for me but please do not expect that Geno will do anything for IST in the future when we will take everything away from him without offering him anything concrete for the future same time. Even than it will be difficult but I see an option if we explain it to him understandably.

(Final Award ¶ 141).

29.     As the panel in the Arbitration noted, these comments demonstrate the validity of ISTNA's claims regarding Trelleborg's bad faith. Vogt acknowledges to Trelleborg executives that it will be a "nightmare" for Mr. Camali when Trelleborg tells him that it is acquiring IST Germany's assets but not acquiring ISTNA and that ISTNA's Agreement "will not be transferred"—contrary to the "illusion" that Trelleborg conveyed to him.

30.     Vogt also highlights that Mr. Camali invested 2.5 million Euros in the business "only because he is exclusive in the" United States.  Vogt then emphasizes that Trelleborg "is [in] the driver['s] seat" and "will take everything away from" Mr. Camali.

31.     Incredibly, this is not the only email that admits to Defendants inducing a breach of the Agreement to undermine ISTNA's exclusivity.

32.     Just the day prior to the "nightmare" email, Trelleborg's outside merger consultant, Felix Schaefer, wrote the following about Mr. Camali to Vogt:

```
Of course, he wants to keep his contract, especially the exclusivity, but Trelleborg
will not do that. They would like to offer him a new contract, but no longer
exclusive, but with a verbal agreement that he will not use any other distribution
partner as long as the performance is right.
```

(*See* Final Award ¶ 142 n.8).

33.     This is yet more documented proof that Defendants knew about the Exclusivity Agreement, knew that by their actions it would be repudiated and no longer honored, and—most troublingly—intended for such an outcome despite knowing the devastating impact their conduct would have on ISTNA.

34.     Had it not been through ISTNA's diligent efforts in pursuing IST Germany in the Arbitration—even after IST Germany filed an insolvency proceeding in Germany and attempted to stay the proceedings—this and other incriminating evidence would have never been uncovered and the scope of Trelleborg's wrongdoing never exposed.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000.00.

36.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

67903/0001-51533357

37.     Venue in this district is proper based on 28 U.S.C. § 1391(b), because (among other things) a substantial part of the events or omissions giving rise to ISTNA's claims occurred herein and a substantial part of the property that is the subject of this action is situated herein.

## PARTIES

### A.    Plaintiff

38.     Plaintiff ISTNA is a single-member New York limited liability company with its principal offices in Tappan, New York.  ISTNA's sole member is Geno Camali, a citizen of New Jersey.

### B.    Defendants

39.     Defendant Trelleborg Pipe Seals Milford Inc. is a Delaware corporation with its principal place of business in New Hampshire.

40.     Defendant Trelleborg Sealing Solutions US Inc. is a Delaware corporation registered to do business in New York State with its principal place of business in Indiana.

41.     Defendant Trelleborg Pipe Seals US, Inc. is a Delaware corporation registered to do business in New York State with its principal place of business in New Hampshire.

42.     Defendant Trelleborg Corporation is a Delaware corporation registered to do business in New York State with its principal place of business in Delaware.  Trelleborg Pipe Seals Milford and Trelleborg US are wholly owned by Trelleborg Corporation.  Trelleborg Pipe Seals US is owned by non-party Trelleborg Max Seal Holding AB, a Swedish entity.

43.     Defendant Trelleborg AB is Swedish company with its headquarters in Trelleborg, Sweden.

44.     Defendant Trelleborg Sealing Profiles Germany GmbH is a German limited liability company whose members are, on information and belief, either German or Swedish.

45. Trelleborg Pipe Seals Milford, Trelleborg Corporation, Trelleborg Pipe Seals US, and Trelleborg US are direct or indirect subsidiaries and/or affiliates of Trelleborg AB and Trelleborg Germany. Trelleborg AB wholly owns Trelleborg Corporation, which in turn wholly owns Trelleborg Pipe Seals and Trelleborg US.

46. Defendant Cristoffer Ljungback is a director of Trelleborg Pipe Milford and, on information and belief, an employee of Trelleborg Pipe US. Ljungback is a resident of the State of New York.

47. Defendant Andreas Renulf is an executive with Trelleborg AB and Trelleborg Germany and holds himself out as a "Business Unit President" of Trelleborg Seals and Profiles (defined below). Renulf is a resident of Sweden.

48. Defendant Simon Burke is an executive with Trelleborg AB and Trelleborg Germany and holds himself out as a "Managing Director" of Trelleborg Seals and Profiles (defined below). Burke is a resident of the Netherlands.

49. ISTNA is presently unaware of the true names and capacities of the individual Defendants sued herein as John Doe 1-10, inclusive, and therefore sues such Defendants by fictitious names. ISTNA is informed and believes, and thereon alleges, that each of the Doe Defendants is liable to ISTNA for the wrongful acts alleged herein. ISTNA will amend this Complaint to allege the true names and capacities of the Doe Defendants when they have been ascertained. The citizenship of each of the Doe Defendants is presently unknown, but upon information and belief ISTNA alleges that none of these Defendants is a citizen of the State of New Jersey. This information and belief is based, at least in part, on the fact that no Trelleborg- or IST Germany-affiliated entity or individual is a citizen of the State of New Jersey. In all events,

the citizenship of these Defendants shall be disregarded for purposes of subject matter jurisdiction under 28 U.S.C. § 1332.

50.     ISTNA is presently unaware of the true names and capacities of the corporate Defendants sued herein as XYZ Companies 1-10, inclusive, and therefore sues such Defendants by fictitious names.  ISTNA is informed and believes, and thereon alleges, that each of the XYZ Company Defendants is liable to ISTNA for the wrongful acts alleged herein.  ISTNA will amend this Complaint to allege the true names and capacities of the XYZ Company Defendants when they have been ascertained.  The citizenship of each of the XYZ Company Defendants is presently unknown, but upon information and belief ISTNA alleges that none of these Defendants is a citizen of the State of New Jersey.  This information and belief is based, at least in part, on the fact that no Trelleborg or IST Germany-affiliated entity or individual is a citizen of the State of New Jersey.  In all events, the citizenship of these Defendants shall be disregarded for purposes of subject matter jurisdiction under 28 U.S.C. § 1332.

C.     **Summary of Alter Ego and Jurisdiction Allegations**

(i)     ***Trelleborg's Affiliated Entities are Indistinguishable from One Another and are all Part of One Undivided Trelleborg "Group"***

51.     The scheme outlined herein is a result of each of the named Defendants and other Trelleborg-affiliated entities and individuals abusing the corporate form to benefit each of the Entity Defendants in an attempt to prevent ISTNA—and other industry participants—from uncovering their true identities.

52.     In the course of the Discovery Proceeding, however, ISTNA uncovered the manner and means through which Trelleborg and the named Defendants operate interchangeably to avoid responsibility and—with respect to ISTNA in particular—take advantage of the bad faith breach of the Exclusivity Agreement.

53.     Indeed, as detailed below, each of the Entity Defendants failed to observe corporate formalities such that each are alter egos of one another.

54.     Moreover, Defendant Trelleborg AB, including through its executives Burke and Renulf, dominated each of the other Entity Defendants such that each functioned as a mere instrumentality of Trelleborg AB, their parent.  These include Trelleborg AB dictating the day-to-day operations and decision making of each other Entity Defendant, sharing office space and operational locations, as well as sharing executives and centralizing decision-making.  Trelleborg AB so dominated and controlled the business, finances, and policies of each of the other Entity Defendants that any separate corporate existence between these Defendants ceased to exist.  This domination and disregard of corporate formalities was used to commit the tortious wrongdoing and fraud outlined here.

55.     As a result, in the Discovery Proceeding the Honorable Hal Greenwald, J.S.C., found personal jurisdiction over the U.S. Entities (none of whom are headquartered in New York and each of whom challenged personal jurisdiction).  The Discovery Proceeding never reached and did not decide the question of personal jurisdiction over Trelleborg AB and the other Foreign Defendants.

56.     ISTNA is familiar with Trelleborg and its business through many years of working with and around Trelleborg in the trenchless pipe repair field and from Mr. Camali's direct dealings with Trelleborg and its agents and employees, some of which are described below.

57.     Trelleborg's affiliated entities are indistinguishable from one another and are all part of one undivided Trelleborg "group."

58.     Trelleborg is a large multinational company, headquartered in Sweden, which generates more than $3 billion of in revenue annually.  More than $1 billion of that business is generated in North America.

59.     As detailed below, ISTNA first became familiar with Trelleborg in or around July 2021, after IST Germany's main shareholder was arrested and ISTNA was told that Trelleborg would be contacted to serve as an investor in or financial backer for IST Germany.

60.     Throughout ISTNA's interactions with Trelleborg, the company held itself out, and conducted business as, one operating entity, rather than being managed by divisible and separate entities.

61.     Trelleborg touts that its business units operate within "One" Trelleborg, and has explained that Trelleborg operates "as a global organization" with the "One Trelleborg Sealing Solutions" initiative acting as a "vital bridge" to connect all teams.  Indeed, Trelleborg touts that all of its entities operate as one part of the "Trelleborg World."

62.     Trelleborg's own website, moreover, identifies the company as the "Trelleborg Group" and references "Trelleborg" in the context of various "stories" regarding the company.

63.     "Trelleborg Group" is synonymous with the concept of "One" Trelleborg—*i.e.*, Trelleborg operating as a single worldwide business conglomerate whose constitute parts are indistinguishable.  The LinkedIn profile for the "Trelleborg Group" notes that "[i]n 2023, the Trelleborg Group had annual sales of approximately SEK 34 billion in around 40 countries."

64.     Moreover, Trelleborg entities and indeed the Entity Defendants here share senior executives.  By way of example, the general counsel of Trelleborg AB, Katarina Olsson, is the president of Trelleborg Corporation.  Tellingly, Olsson signed on behalf of Trelleborg AB the acceptance and acknowledgment of service in the Discovery Proceeding.

67903/0001-51533357

> **(ii)** *Defendants Conduct Trelleborg Business Through A Trade Name Called "Trelleborg Seals & Profiles," Which Furthered The Wrongdoing Alleged Herein*

65.     During interactions with Trelleborg, Plaintiff became familiar with a group called "Trelleborg Seals & Profiles."  As depicted on its website:



66.     Defendants conduct Trelleborg business through this trade name, and the use of the trade name makes it impossible for market participants, like ISTNA, to understand which part of the Trelleborg Group they are doing business with and (for instance) which entity employs "Trelleborg" employees.  This blurring of the lines allows for all members of the so-called "Group" to benefit from the wrongdoing alleged herein.

67.     According to Trelleborg's own overview of its Seals & Profiles Americas division, Seals & Profiles is a world leader in, among other things, pipe seals, including trenchless pipe repair (ISTN's exact line of business).  These "[p]ipe [r]epair solutions allow existing pipes to be repaired without the need for excavation."

68.     In 2022, Seals & Profiles generated annual sales of approximately 76 million Euro (equivalent to approximately $90 million at today's exchange rate).  That number has increased substantially—more than 16%—year over year.

69.     Unbeknownst to ISTNA until the Discovery Proceeding, however, Seals & Profiles was not an actual operating entity but rather a trade name through which certain Trelleborg entities do business in the United States, including in New York.

70.     Two of the entities through which Seals & Profiles conducts business are Trelleborg Pipe Milford and Trelleborg Pipe US.

71.     Both are headquartered in Milford, New Hampshire.

72.     One of their principal lines of business is trenchless pipe repair and the provision of parts and equipment to support that service.

73.     This is the *identical* business that ISTNA was engaged in and—as detailed herein— the business that Trelleborg sought to gain an advantage in when it induced IST Germany to breach its contracts and its fiduciary duty to ISTNA.

74.     Thus, Trelleborg Pipe Milford and Trelleborg Pipe US directly benefited from Trelleborg causing IST Germany to breach its contracts.

75.     The way in which Trelleborg's employees conduct business further demonstrates that "Seals & Profiles" is conducting business through actual Trelleborg entities, including Trelleborg Pipe Milford and US.

76.     For example, Mark Yanzo was a Trelleborg employee who held himself out as the Product Group Manager for Pipe Repair in the United States for "Trelleborg Seals & Profiles." Yanzo's email signature reflects as follows:

Mark Yanzo

Product Group Manager
Pipe Repair, USA
Trelleborg Seals and Profiles
Mobile 603-801-0976
mark.yanzo@trelleborg.com
https://www.trelleborg.com/en/seals-and-profiles/products-and-solutions/pipe-rehabilitation

77.     Yanzo, however, was employed by, and based out of, Trelleborg Pipe Milford's and Pipe US's offices in Milford, New Hampshire.  Trelleborg Pipe Milford, Trelleborg Pipe US, and Seals & Profiles are thus interchangeable—Seals & Profiles is the name of the unit in which

Trelleborg's trenchless pipe repair business is housed, but Pipe Milford and Pipe US are the actual entities conducting that business.

78.     Consequently, as ISTNA and others in the industry understood (and continue to understand) it, all of Yanzo's business and interactions (for example) —which were actually being carried out by and for the benefit of Pipe Milford and Pipe US—were done under the umbrella of the "Seals & Profiles" label.

79.     Trelleborg Sealing also conducts business under the Seals & Profiles label.

80.     According to its own marketing materials, Seals & Profiles meaningfully contributed to the construction of Hudson Yards, including by providing the "gaskets and seals" used on the elements of the buildings' facades (like the windows).

81.     These products are the identical types of "sealing solutions" provided by Trelleborg Sealing.   Thus, based on Trelleborg's own materials and as uncovered in the Discovery Proceeding, it is apparent that Trelleborg Sealing operates as part of the "Seals & Profiles" business unit as well.

     **(iii)**     ***ISTNA's Direct Business Dealings with Trelleborg in New York, all of Which are Carried Out Under Inscrutable Trade Names and Interchangeable Entities***

82.     There are even more glaring (and personal) examples of how specific Trelleborg legal entities—like Trelleborg Pipe US and Trelleborg Sealing—hold themselves out and conduct business through Trelleborg trade names (like Seals & Profiles) and otherwise are treated as one and the same for business purposes and with clients and customers.

83.     As detailed below, when Trelleborg discussed with ISTNA in August 2022 Defendants' promises to acquire ISTNA and honor the Exclusivity Agreement, the conversation occurred (at least in part) with Trelleborg's representatives, Ljungback and Renulf, and Mr. Camali at a restaurant in Piermont, New York.

84.    During that conversation, Ljungback, Renulf, and Mr. Camali discussed, among other things, the trenchless pipe repair business in North America; the market for those services more broadly; ISTNA's business, customers, and operations in New York; ISTNA's Exclusivity Agreement; and Trelleborg's plans for working with ISTNA to grow the trenchless pipe repair business in New York (and North America more broadly).

85.    During these conversations, Ljungback and Renulf did not say that they were speaking on behalf of any one specific Trelleborg entity and in fact led Mr. Camali to believe that any and all Trelleborg entities were one and the same "Trelleborg Group" —a belief ISTNA continues to hold to this day.  Moreover, as detailed below, each of Ljungback and Renulf told Mr. Camali that ISTNA would be able to take advantage of Trelleborg's main manufacturing facility in Aurora, Ohio, and that in this additional way ISTNA would be integrated into and could take advantage of the Trelleborg apparatus.

86.    Also during these (and other) conversations, Mr. Camali sought clarification about Trelleborg's structure, its use of trade names, and the proper names of the legal entities with which its legal entities (like, for instance, how Yanzo's email signature noted above referenced "Seals & Profiles" when he was actually an employe out of Trelleborg Pipe's New Hampshire offices).

87.    Ljungback and Burke explained that all Trelleborg entities conducting business in North America—including the U.S. Entities and Trelleborg AB—operate as a "single conglomerate" as part of the Trelleborg "brand."  Moreover, each of these entities use Trelleborg trade names, like Seals & Profiles, interchangeably in correspondence and at trade show and with clients, business partners, and customers.

88.    Moreover, this Complaint describes *infra* how Defendants induced IST Germany to breach its Agreement with ISTNA.  This allowed Trelleborg to step in and, in contravention of

ISTNA's exclusivity, access the United States and Canada trenchless pipe repair market by pushing ISTNA out and swooping in.

89.    Trelleborg Pipe Milford and Trelleborg Pipe US, holding themselves out as Trelleborg Seals & Profiles, were the specific entity that swooped in.

90.    Indeed, in a July 20, 2023 email to ISTNA's customers following Trelleborg's coup, Simon Burke—the "Global Director" in the Pipe Repair product area for Trelleborg Seals & Profiles and an employee of Trelleborg AB—acknowledged that Trelleborg was taking over ISTNA's business.

91.    Burke wrote that "[d]ue to a change in business model, [trenchless pipe repair] products will no longer be available via IST North America.  Trelleborg will support and service all existing and new end customers of IST equipment and products directly in the USA.  We believe by working directly with our customers we can ensure clear communication & support whilst aiming to develop long term partnerships."

92.    In his email, Burke identified "[o]ur" (referring to Trelleborg's) "main office and contact details" as those affiliated with Trelleborg Pipe Milford—specifically: "Trelleborg Pipe Seals Milford Inc., 250 Elm Street, Milford, NH 03055."  Burke then identified Mark Yanzo as the "main contact" for Trelleborg.

93.    This email demonstrates that Trelleborg Pipe Milford and Trelleborg Pipe US benefitted from the breaches of contract described herein—it was Pipe Seals that began servicing and working with ISTNA's former customers after purchasing IST Germany's assets, generating revenue and goodwill it would not have been able to in the absence of the breach and attendant crippling of ISTNA's business.

94.    This email also makes apparent that Trelleborg (collectively) treats its affiliates and subsidiaries as interchangeable—Burke used "our" to refer to all of Trelleborg (including the Seals & Profiles business unit and Trelleborg Pipe).

95.    Perhaps most tellingly, when IST Germany and Trelleborg announced the very acquisition at the center of this case, they highlighted that IST Germany had "signed an agreement with *Trelleborg Group*" for the Group to "take over" IST's business operations.

96.    This reaffirms that Trelleborg holds itself out as operating, and actually operates, as one indistinguishable Group and indeed that IST Germany and the trenchless pipe repair business that Defendants have stolen from ISTNA were taken over by that "Group."

97.    Trelleborg and its affiliated entities, including the Defendants here, also conduct regular and continuous business in New York.

98.    Most obviously, Trelleborg—through Trelleborg Pipe Milford and Pipe US (operating under the Seals & Profiles trade name) —has done substantial business with ISTNA in New York.  Among other things, Trelleborg replaced IST Germany after the takeover and began acting as ISTNA's counterparty on various transactions ISTNA had previously undertaken with IST Germany.

99.    ISTNA is also aware that Trelleborg transacts with other entities in the pipe repair business.  Indeed (and by way of just one example), in June 2024 Trelleborg agreed to repair certain robots operated by 11EnviroGroup, a company then owned by Mr. Camali's sister.  That company directed to send the robots for repair to Trelleborg Pipe Milford and Trelleborg Pipe US at its address in New Hampshire.  These repairs cost approximately $30,000 in total.  Trelleborg entities, including Trelleborg Pipe Milford and Trelleborg Pipe US, continue to work with 11EnviroGroup and Aegion/MTC (defined below) to the present day.

100.     Trelleborg—again through Trelleborg Pipe Milford and Trelleborg Pipe US—also frequently services other clients in New York.

101.     In just the past year, Trelleborg technicians traveled to Brooklyn, New York to repair a truck operated by a Aegion/MTC, a leading domestic water infrastructure company (described in more detail below).  Trelleborg frequently and routinely makes such repair trips to facilities in New York to provide service and support to Aegion (as well as other clients).

102.     The foregoing are just examples of the various ways in which Trelleborg—through the U.S. Entities among other companies—does substantial and continuous business in New York as well as how that business has been furthered, benefitted, and otherwise relates to IST Germany's breaches of the Exclusivity Agreement and its fiduciary duties.

**D.     Summary of Bases for ISTNA's Information and Belief**

103.     ISTNA's information and belief is based on, among other things, an investigation by its attorneys, which investigation includes, among other things, a review and analysis of:  the pleadings, filings, and discovery produced in connection with the arbitration proceeding captioned *I.S.T. North America LLC v. Simba GmbH f/k/a I.S.T. Innovative Sewer Technologies, GmbH* (the "Arbitration"); the June 23, 2025 Final Award in the Arbitration (the "Final Award"); correspondence with, concerning, and generated by, Defendants and their agents; and the documents produced to ISTNA by certain of the Defendants in connection with ISTNA's action commenced under CPLR § 3102(c) for Pre-Action Discovery and Preservation (the "Discovery Proceeding") as well as the pleadings and other filings in the Discovery Proceeding.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody or control.  ISTNA believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

67903/0001-51533357

## FACTUAL BACKGROUND COMMON TO ALL COUNTS

I.    **Events Prior to Trelleborg's Interference**

A.    **ISTNA's Business**

104.    ISTNA was created on April 17, 2019 as a joint venture owned in equal shares by Geno Camali and IST Germany.  The Company was created to serve as IST Germany's exclusive North American sales representative.  Mr. Camali was ISTNA's sole manager.

105.    ISTNA's business is to manufacture and sell equipment and materials used in the rehabilitation of damaged underground sewer pipes.

106.    IST Germany's products are used for "trenchless" pipe repairs, which allow the buried pipes to be rehabilitated without the need to excavate the surface to reach the pipes; instead, the trenchless repair process encompasses the insertion of a new liner inside the existing pipe, "curing" the liner to transform it into a rigid, durable new pipe, and then cutting openings in the new liner to restore access to the other existing pipes that branch from the repaired pipe as part of its distribution network.

107.    Trenchless rehabilitation technology involves liners, typically resin-impregnated felt or fiberglass, and the use of two key pieces of equipment: a "light train" that directed ultraviolet light onto the liner's surface to cure it, and a robotic power cutter that cut the portions of the liner that blocked the lateral openings to the branch pipes.

B.    **The Exclusivity Agreement and MOU with IST Germany**

108.    On April 17, 2019, ISTNA and IST Germany entered into the Exclusivity Agreement governing ISTNA's sale and service in the United States of IST Germany's trenchless pipe rehabilitation equipment and parts.

109.    The Exclusivity Agreement is governed by and subject to New York law and jurisdiction.

22

110.     Under Article 2.1 of the Exclusivity Agreement, ISTNA was appointed IST Germany's "exclusive representative for the sale of equipment and parts manufactured by [IST Germany], including, without limitation, the equipment and parts [identified by the Exclusivity Agreement], and any other equipment and parts manufactured by [IST Germany] currently or at any future time . . . ."  ISTNA's exclusive territory consisted of the United States and was, as of January 1, 2020, expanded to included Canada.

111.     The Exclusivity Agreement obliged IST Germany to take certain actions in its role as ISTNA's supplier (and to allow ISTNA to distribute and service IST Germany's products exclusively in the United States and Canada).

112.     These included (for instance, in Article 3.4) IST Germany's covenant to ship its equipment and parts to ISTNA in specific timeframes, including one to four weeks for robots and between six and twelve weeks for different types of ultraviolet light ("UV") equipment (for use in trenchless repair).

113.     The Exclusivity Agreement also set forth an express anti-assignment provision in Section 9.1 that prohibits each party from assigning "any right" or delegating "performance" without the prior written consent of the other party.

114.     The Agreement had no stated term.  Instead, it authorized either party to terminate if the other committed a material breach that was not cured within thirty days of notice by the terminating party.  The Agreement also allowed IST Germany to terminate the exclusivity provision, but not the contract as a whole, if ISTNA failed to purchase at least $2 million from IST Germany in any calendar year starting with 2022.

115.    Under a December 31, 2020 Memorandum of Understanding ("MOU") between ISTNA and IST Germany, IST Germany sold its 50% stake in ISTNA to Mr. Camali, making Mr. Camali the sole and exclusive owner of ISTNA as of that date.

116.    Pursuant to Section 3 of the MOU, IST Germany agreed that ISTNA would remain its exclusive sales representative for the equipment and parts identified in the Exclusivity Agreement.    In addition, ISTNA's exclusive representation was expanded to include "consumables" products (which in industry parlance are those small parts, like pipe liners and fittings, used in residential and other non-municipal water infrastructure jobs).

117.    The MOU thereby continued, and reaffirmed, IST Germany's obligations to, among other things, deliver its UV equipment and robots to ISTNA under certain prescribed timeframes and confirmed ISTNA's exclusivity in the U.S. and Canada.

118.    In reliance on IST Germany's conduct and the covenants set forth in the Exclusivity Agreement and the MOU, ISTNA invested millions of dollars and thousands of man-hours in hiring and training employees, securing office space, purchasing equipment and parts from IST Germany, and marketing ISTNA's services—and IST Germany's part and equipment—in the United States and Canada.

119.    In 2020, IST Germany's majority shareholder, Mathias Wettstein, had been arrested in Germany for tax fraud in connection with a different business.

120.    Moreover, at or around that time IST Germany began suffering significant financial difficulties.  As the Arbitration showed, these problems were attributable to (among other things) Vogt's mismanagement, loss of key staff, and its inability to service and maintain its own products and technologies.

## II. Trelleborg Induces IST Germany to Repudiate and Breach the Exclusivity Agreement

121.    At or around the time ISTNA was entering into agreements to make it the exclusive distributor of IST Germany's parts and equipment, Defendants were—unbeknownst to ISTNA—acting to take over IST Germany and cut off the supply of its parts and equipment to ISTNA to undermine ISTNA's exclusivity in the United States (and Canada thereafter).

122.    As documents produced in the Arbitration demonstrate, this was done for the specific and bad faith purpose of destroying ISTNA's business and diverting its customers to Trelleborg.

### A.    The Initial Outreach

123.    As early as 2020 Trelleborg was interested in potential business opportunities in the trenchless pipe repair business in the United States and Canada.  Documents produced in the Arbitration in fact demonstrated that in early 2020 Jean Paul Mindermann wrote to Jorg Vogt of IST Germany that Trelleborg was specifically interested in acquiring IST Germany as a way to access the United States market.

124.    Trelleborg could not, however, break into the market because ISTNA was the exclusive distributor of IST Germany's equipment and parts in those markets, and thus ISTNA secured an outsized market share and its presence prevented Trelleborg from growing Trelleborg's services independently.

125.    At this time and thereafter, Trelleborg AB's President of Industrial Solutions, Jean Paul Mindermann, spoke to and negotiated directly with IST Germany—through Vogt, its CEO—regarding ISTNA's business, its private and sensitive financial information, and its customers (along with other confidential business information), as well as the eventual asset sale that rendered IST Germany unable to perform under the Exclusivity Agreement.

126.    Mindermann and Trelleborg were attempting to seize on IST Germany's ongoing financial troubles, caused by Vogt's mismanagement, that created an opportunity for Trelleborg to acquire IST Germany's assets "on the cheap."   Furthermore, as ISTNA learned at the Arbitration, Mindermann and Vogt were long-time friends, and Mindermann in particular spearheaded the Takeover as a means to "bail out" Vogt and provide a personal benefit to him.  So instead of "doing well by doing good," Mindermann and Vogt were scheming to "do well by doing bad."

127.    Defendants also knew that they could take advantage of IST Germany's pioneering technology—including electronic cutters ("e-cutters") and light trains (robots that generated UV light to "cure" pipe liners) —and made headway in the United States market.  The only thing standing in their way, however, was ISTNA.

128.    Defendants also wanted access to Aegion Corporation, the parent company of Manufactured Technologies Company, the leading water infrastructure enterprise in the United States.[1]  Specifically, and given his contacts in the industry, Mr. Camali and ISTNA were intending to sign and in fact signed (as Vogt recounted in an email in the Arbitration) an "exclusive" agreement that would guarantee "10 million in sales" by the third year and which was "ambitious" but "not impossible with Aegion."

129.    And, even though there were other ways to develop a trenchless repair business —like inventing new technology or buying another business—the fastest and cheapest way to make headway into the market was through IST Germany's assets (especially at a time that IST Germany could be had "on the cheap").

---

[1] Aegion has since rebranded as "Azuria Water Solutions."

67903/0001-51533357

130.     Thus, Trelleborg AB, spearheaded by Mindermann, saw an opportunity and shortly before the end of 2020 Defendant Trelleborg AB entered into a non-binding offer to acquire all of Respondent's outstanding stock for 14 million Euro.

131.     After that time, IST Germany and Trelleborg engaged in months of undisclosed negotiations in furtherance of a potential transactions, including (according to Vogt's sworn statements in the Arbitration), entering into a six-month exclusivity agreement to explore the feasibility of an acquisition by Trelleborg.

132.     ISTNA was never told about either the initial offer or any follow-up negotiations between IST Germany and Trelleborg, all of which were conducted in secret and with the intent of ultimately usurping for Trelleborg ISTNA's role as a leading provider of trenchless rehabilitation services and products in North America (and exclusive distributor of IST Germany's technology).

**B.     Trelleborg and IST Germany Cover Up the True Nature of Their Negotiations and Contemplated Transaction**

133.     Mr. Camali was never told about the true nature of the Takeover and the discussions going on behind his back until (as noted below) the SAPA had been signed and the die cast. Indeed, ISTNA and Mr. Camali were duped by IST Germany and Trelleborg providing to Mr. Camali snippets of information regarding a potential transaction while intentionally omitting to disclose critical information—including that Trelleborg contemplated acquiring all of IST Germany's assets while repudiating IST Germany's Agreement with ISTNA.

134.     One reason for this cover-up was, as Mr. Camali testified at the Arbitration, that Defendants and their agents, including Mindermann, Burke, and Renulf, wanted to use Mr. Camali's relationship with Aegion/MTC and wait for ISTNA to sign a lucrative contract with them, which Mr. Camali did only in mid-2022. Until that point, Defendants and their agents,

including Burke, Renulf, and Vogt kept ISTNA in the dark about Trelleborg's true intent and convinced Mr. Camali that his contract would survive the Takeover and ISTNA would be integrated into Trelleborg.

135.    For example, and to keep the ruse alive, Vogt approached ISTNA's Mr. Camali in 2021 to ask Mr. Camali if he would invest in IST Germany, creating the façade that IST Germany was seeking independent support and was not (as was actually the case) being induced into an acquisition with Trelleborg.

136.    In contemporaneous emails produced in the Arbitration, however, Vogt wrote (for example, on July 21, 2021), that he knew Mr. Camali did not "have the financial resources for something like that." Here again, Mr. Camali was being told one thing when Defendants and their affiliates (as well as IST Germany's executives) were saying the opposite privately.

137.    Furthermore, and as detailed herein, to the extent Mr. Camali was ever told about Trelleborg entering into a transaction with IST Germany, he was misled to believe that Trelleborg would only be an "investor" in the business or would acquire the business as a whole—in each case, preserving ISTNA's Exclusivity Agreement.

138.    Again by way of example, on February 10, 2022, Vogt of IST Germany wrote to Mr. Camali that its new "investor," Trelleborg, wanted to know about the scope of ISTNA's Exclusivity Agreement, specifically with respect to the sale of "consumables" products. And, less than two months later Mr. Camali was again told Trelleborg would be an investor, while Vogt was telling IST Germany employees (documented in a series of emails on April 7, 2022) that the Takeover would "definitely" be an "asset" deal.

139.    This was further sleight of hand, because Trelleborg AB (nor any Trelleborg-affiliated entity) was never going to be an "investor" in IST Germany—indeed, its very first outreach and term sheet contemplated an acquisition of the entire company.

**C.    Trelleborg Dupes Mr. Camali Into Providing Confidential Business Information Under False Pretenses**

140.    While it was secretly negotiating the Takeover with IST Germany, Trelleborg —principally through Renulf—also expressed to Mr. Camali an interest in purchasing ISTNA (starting in earnest in early 2022).  The acquisition would have taken place through one of the U.S. Entities, including either Trelleborg Pipe Milford or Trelleborg Pipe US.

141.    As part of those discussions, Mr. Camali provided Trelleborg (again through Renulf) with his business plans for the market, projections for sales, and ISTNA's financial statements.

142.    Most documents were provided to Trelleborg under a non-disclosure agreement dated June 17, 2022.  Others, like those providing ISTNA's sales numbers, were asked for by and provided to Trelleborg before ISTNA had provided an NDA (behind Mr. Camali's back, as documented in, for instance, an April 6, 2022 email between Simon Burke and Jorg Vogt produced in the Arbitration).

143.    In response to this information Renulf said to Mr. Camali that he was impressed with ISTNA's market study and said that the study was within a single digit percentile of Trelleborg's own market reports (for the United States and Canada).

144.    Mr. Camali and Trelleborg executives, including Renulf, had at least four separate meetings to discuss ISTNA's financial information and future business projections, including specifically (either in person or via Zoom) on June 30, 2022, July 4, 2022, August 10, 2022, and August 17, 2022.

145.    As more temporal proof of Defendants' duplicity, Renulf continued to ask Mr. Camali for ISTNA's financial information even after the Exclusivity Agreement had been cut out of the SAPA (which occurred in August 2022), with such questions coming as late as September 2022.  Perhaps more perniciously, Renulf even went so far as to send Mr. Camali a draft press release in October 2022, after the SAPA had been signed, which talks about Trelleborg "buying" ISTNA.

146.    In the end, and as detailed below, Trelleborg ended talks to purchase ISTNA —which were, as noted, merely part of Trelleborg's ruse.

147.    Trelleborg, with Vogt's aid, then used ISTNA's confidential business plans, including customer contact lists, to expand into the United States and Canada markets.

148.    For example, through discovery in the Arbitration, ISTNA has learned that Trelleborg simply altered Mr. Camali's business plan, added a "Strictly Confidential" marking to it, and then used that plan to map out its business expansion.

149.    This use of ISTNA's confidential information was without Mr. Camali's permission or, until the Arbitration, knowledge.

150.    As Mr. Camali also later came to learn, Defendants and their agents, including Burke, Renulf, and Ljungback, acting on behalf of the Entity Defendants, used his unique contacts with Aegion Corporation and MTC, the leading water infrastructure company in the United States, when they reached out it in an effort to generate business (after the Exclusivity Agreement had been terminated).

151.    Indeed, documents produced in the Arbitration demonstrated that as early as March 9, 2022, more than six months prior to the SAPA, Vogt had sent to Burke information about ISTNA's deal with Aegion/MTC for consumables.

152.    These communications continued over the spring and early summer of 2022. Thus, for example, on June 9, 2022, Vogt emailed Mindermann and Renulf information about the strength of the United States market and to update on the status of ISTNA's agreement with Aegion/MTC, including its favorable economics.

153.    Thus, and as summarized herein, not only did Defendants induce a breach of the Exclusivity Agreement, they did so while misusing ISTNA's confidential business plans and to access ISTNA's customers.

### D.    Trelleborg Executives Made Misrepresentations to Mr. Camali During a Dinner in Piermont, New York

154.    Perhaps the most pernicious and disingenuous of Defendants' actions came on August 10, 2022, when Mr. Camali, Ljungback, and Renulf met in person for dinner at a restaurant in Piermont, New York (the "Piermont Dinner") to discuss Trelleborg's purported acquisition of IST Germany and potential acquisition of ISTNA.

155.    Ljungback and Renulf, not Mr. Camali, had asked for the meeting. Prior to dinner, each had toured ISTNA's facilities in Closter, New Jersey, during which tour Mr. Camali personally showed Ljungback and Renulf his business plans

156.    During the Piermont Dinner, Ljungback and Renulf, acting on behalf of Defendants and their affiliated entities, made a series of material misrepresentations to Mr. Camali in order to lull him into believing that his business with ISTNA would remain intact and secure following Trelleborg's acquisition of IST Germany.

157.    Specifically, Ljungback and Renulf stated to Mr. Camali without qualification that:

(a)    the Foreign Entities were acquiring IST Germany in its entirety, including all subsidiaries and contractual obligations, and that the acquisition would not alter IST Germany's ability or obligation to supply ISTNA;

(b) Trelleborg, through the U.S. Entities, intended to acquire or invest directly in ISTNA, thereby ensuring continuity of operations and strengthening ISTNA with Trelleborg's global resources;

(c) Defendants would honor ISTNA's Exclusivity Agreement with IST Germany and that "nothing was going to change" in terms of ISTNA's rights, except that IST Germany's performance would improve the backing of a "$40 billion company like Trelleborg" behind it;

(d) that ISTNA would be integrated into Trelleborg, including that it would be able to take advantage of Trelleborg's large domestic manufacturing facility in Aurora, Ohio;

(e) that the two companies would issue a joint press release to announce the acquisition; and

(f) the Foreign Entities and ISTNA would jointly announce the acquisition through a coordinated press release, thereby signaling to the industry that ISTNA remained the exclusive North American distributor for IST Germany's products under Trelleborg's ownership.

158.    At the time these statements were made, they were false and omitted to disclose contrary material facts.

159.    These misstatements and omissions of material fact harmed ISTNA.  This includes by enabling IST Germany's repudiation of the Agreement, because IST Germany could only do so by Defendants inducing in Mr. Camali the false belief that he should do nothing—including foregoing asking questions about or challenging the Takeover—until the "ink was dry" on the deal. In other words, the repudiation could not have happened but for these misstatements.

160.    As contemporaneous emails and drafts of the SAPA show, and as otherwise alleged herein, Trelleborg was actively finalizing a transaction structure that excluded ISTNA's

Exclusivity Agreement, left IST Germany unable to perform, and positioned Trelleborg to take ISTNA's customers for itself.

161.    Ljungback and Renulf knew or were aware of these facts when they spoke, but deliberately concealed them to perpetuate the illusion that ISTNA's rights were secure.

### E.    Trelleborg Acquires IST Germany's Assets Knowing that it Will Cause IST Germany to Breach the Exclusivity Agreement and Intending for the Acquisition to Do So

162.    Defendants interfered with ISTNA's business even before it finalized the Takeover—all to hamper ISTNA's performance and in contravention of the Exclusivity Agreement.

163.    As ISTNA learned in the Arbitration, by the summer of 2022 IST Germany started to take directions from Burke to increase prices for equipment and parts, which IST Germany was foreclosed from doing under the Exclusivity Agreement.

164.    Thus, as set forth in an agenda for a June 15, 2022 conference call with Vogt, Burke identified  Trelleborg's "'Golden rule' where we increase prices to offset all cost increases related to inflation such as salaries, energy, logistics, packaging, raw materials (resins, liner/cal hose materials), components etc."

165.    Vogt promptly complied with Trelleborg's directive and implemented a 9.5% price increase, noticed to ISTNA on June 23, 2022, and with an effective date of July 6, 2022 (only thirteen days later).

166.    Later, with Trelleborg agents, including Burke, fully in control of IST Germany's business operations in 2023, price increases continued, with a (for example) 10% increase being demanded on only six days' notice.

167.    Ultimately, Defendants' scheme culminated in an October 11, 2022 SAPA by which it acquired all of IST Germany's assets but expressly excluded ISTNA's Exclusivity Agreement.

168.    In addition to the SAPA, Foreign Defendant executives, including Burke and Renulf, specifically directed IST Germany (through Mr. Vogt) to stop performing on and under the Exclusivity Agreement.

169.    Trelleborg Germany's act of acquiring IST Germany's assets, and excluding the Agreement, resulted in IST Germany repudiating and breaching the Agreement.  Each of the individual Defendants—Renulf, Burke, and Ljungback, along with Mindermann—along with their affiliated entities played an active role in inducing this breach (as detailed herein).

170.    IST Germany in fact could not perform (even had it wanted to), because it no longer possessed any assets and could not (for instance) provide any products or services to ISTNA.

171.    Defendants also themselves repudiated the Agreement by refusing to buyback defective equipment from ISTNA, as the Agreement itself provided for.  These Defendants include each of the Foreign Defendants as well as Burke and Jorg Vogt (who at this point was employed by and an agent for Trelleborg Germany).

172.    In the Arbitration, the Tribunal concluded that there was—in connection with the SAPA—a bad faith repudiation and material breach of the Exclusivity Agreement, explaining that

> IST [Germany] did not simply discontinue its manufacturing operations but instead sold them, lock, stock and barrel, to another entity that continued those very same operations, . . . while carefully excluding ISTNA's exclusive contract from the rest of the transferred assets.  These circumstances do not raise the question of what the consequences would be for the [Exclusivity] Agreement and MOU if IST [Germany] had simply gone out of business in good faith.

(*See* Final Award ¶ 140).

173.    This repudiation was induced by Defendants in bad faith, with the intent that it would cause a breach of the Agreement and knowledge such breach would be a fatal blow to ISTNA.

174.    This is demonstrated in, for example, a November 3, 2022 email in which Trelleborg AB's outside merger consultant, Felix Schaefer, writes the following about Mr. Camali to Vogt (who was soon to become a Trelleborg employee as a result of the Takeover):

```
Of course, he wants to keep his contract, especially the exclusivity, but Trelleborg
will not do that. They would like to offer him a new contract, but no longer
exclusive, but with a verbal agreement that he will not use any other distribution
partner as long as the performance is right.
```

(*See* Final Award ¶ 142 n.8).

175.    In other words, Schaefer is saying that Trelleborg AB knew about the Exclusivity Agreement, knew that by its actions IST Germany would repudiate and be unable to honor it, and—most troublingly—intended for such an outcome despite knowing the devastating impact their conduct would have on ISTNA.

176.    Then, the following day (November 4, 2022) Vogt wrote a damning email (provided to ISNTA for the first time in the Arbitration) in which he and Foreign Defendant executives Renulf and Simon Burke discuss the impact of the Takeover on ISTNA.

177.    Vogt writes as follows, which comments Burke and Renulf agree with:

I thought a lot last night about Geno/IST NA and from my point of view we have to make a decision what we want to do in the future in the US.

I´m 100% sure that we do not have a bigger legal problem, especially not Trelleborg.

Genos concerns are mostly regarding not being part of Trelleborg very soon and losing his contract also.

He really exspected until last week that IST NA will be part of Trelleborg as soon as possible – your decision not to do it right now is absolutely understandable and Geno has to accept.

The legal risk for Trelleborg is that Geno will not pay his open debt about 400K but he will also know that he will not be our dealer anymore when he will not pay – so there is some room to negotiate and finally I would agree to change his 4 Schropp cutters to Spering cutters when available (That's discussed already with Geno).

If the agreement will stay with old IST, Trelleborg is legally out if any discussions. Additionally he will not do anything against old IST when he will get info that IST old is under liquidation and there is nothing to get.

    * * *

But the main problem is not a possible compensation claim from Geno its more or less the questions what you/we want to do in the future with Geno.

If we think he is not necessary to fulfill our US plans and we can make it also with Trelleborg USA or somebody else then its ok for me and we can go the hard way.

If we think it's worth go the next steps with Geno and IST NA we have to offer something from my point of view.

From Genos point of view we took him the illusion to be part of Trelleborg shortly and additionally we will tell him that his agreement will not be transferred -  it's a nightmare what falls upon him and in this context you can`t expect him to do a great job for us in the future.

After all Geno has invested 2.5 Mio euros in demo equipment in the meantime and that's only because he is exclusive in the US.

So finally Trelleborg is on the driver seat and every decision is ok for me but please do not expect that Geno will do anything for IST in the future when we will take everything away from him without offering him anything concrete for the future same time. Even than it will be difficult but I see an option if we explain it to him understandably.

(Final Award ¶ 141).

       178.    As the panel in the Arbitration noted, these comments show bad faith.  Mr. Vogt

acknowledges to Burke and Renulf that it will be a "nightmare" for Mr. Camali when Trelleborg

tells him that it is acquiring IST Germany, not acquiring ISTNA, and that ISTNA's Agreement

"will not be transferred" —all of this being contrary to the "illusion" that Trelleborg conveyed to Mr. Camali.  Vogt also highlights that Mr. Camali invested 2.5 million Euros "only because he is exclusive in the" United States, and emphasizes that Trelleborg "is [in] the driver['s] seat" and "will take everything away from" Mr. Camali "without offering him anything concrete for the future . . . ."

179.    This email also captures yet another element of IST Germany's and Trelleborg's scheme—dump IST Germany into bankruptcy (or at least render it judgment proof) so that ISTNA cannot recover and will be dissuaded from pursuing it rights and remedies once Mr. Camali learns the Agreement would be repudiated.  As Vogt writes to Burke and Renulf, Mr. Camali "will not do anything against old IST when he will get info that IST old [sic] is under liquidation and there is nothing to get."

180.    Following this conversation, Renulf, Burke, and Vogt divulged to Mr. Camali for the first time that (i) the Takeover was an asset deal, and not an investment, as he had been previously told, and (ii) that Trelleborg would not honor the Exclusivity Agreement.  Indeed, during this conversation Burke said to Mr. Camali that the Agreement was "void."  Burke further cavalierly said to Mr. Camali, in response to Mr. Camali's statement that ISTNA needs money, that "well, Trelleborg has plenty of it."

181.    As Mr. Camali testified in the Arbitration, this revelation truly was a "nightmare" —precisely what Vogt had written to Burke and Renulf—and contrary to the "illusion" Defendants had concocted.  To quote Mr. Camali directly:  "I put my life into this, . . . and I got left high and dry."  "It was just a horrible thing they did.  It really was a nightmare."

67903/0001-51533357

III.    **Events Following IST Germany's Breach**

    A.    **Trelleborg Continues its Bad Faith Treatment of ISTNA Following the Breach**

182.    Unfortunately, Defendants' inducement of IST Germany's breach was not the end of their improper and bad faith actions.

183.    From November 2022 onward, Trelleborg continued to string Mr. Camali along by representing to him that Trelleborg would provide to him a new agreement to distribute IST Germany's products and services in the United States and Canada.

184.    For instance, in the November 4, 2022 call in which Trelleborg and Mr. Vogt told Mr. Camali for the first time that Trelleborg was excluding the Exclusivity Agreement from the Takeover, Mr. Burke assured Mr. Camali that Trelleborg "intended to honor" the terms of the Agreement in a new contract between Trelleborg.

185.    Then, on January 9, 2023, Burke wrote to Camali and said that "it is Trelleborg's intention to provide a new distribution agreement between Trelleborg and ISTNA," and that this "draft agreement is currently being prepared" and will be "shared shortly."

186.    Later, on March 8, 2023, Burke again wrote to Camali that it is "Trelleborg's intention . . . to appoint ISTNA as a distributor" and that Mr. Camali should "please be assured Trelleborg's intention is to still supply & support ISTNA until a distribution agreement can be put in place[.]"

187.    Consistent with these representations, Trelleborg requested that ISTNA prepay for parts and equipment that Trelleborg stated would be part of the new partnership.  ISTNA made these prepayments—more than 150,000 Euro in total—in reliance on Trelleborg's statements that a formal distribution agreement would be forthcoming and also because it needed access to

Trelleborg's (formerly IST Germany's) parts and equipment to service ISTNA's own customers in the United States.

188.    Moreover, and as Mr. Camali explained at the Arbitration, he had no choice but to prepay and otherwise agree to Trelleborg's demands, because ISTNA needed to access the parts and equipment that Trelleborg was selling (formerly IST Germany's) in a last-ditch effort to keep the Company afloat.

189.    These prepayments were made to the Foreign Defendants.

190.    In addition, the Foreign Defendants took receipt of hundreds of thousands of dollars' worth of defective equipment delivered to it by ISTNA, and never paid for or reimbursed ISTNA for it.

191.    Defendants' statements were false and misleading when made and omitted to disclose material facts.

192.    Trelleborg, including through their agents Burke, Renulf, and Mindermann, never actually intended to enter into a new agreement with Mr. Camali and no such draft agreement was ever being prepared (or was ever shared).  Moreover, Trelleborg never intended to appoint ISTNA as a distributor (and in fact never did so).

193.    They were motivated, at least in part, by personal animus to Mr. Camali (along with the other ill intent outlined herein).  As Burke admitted to Mr. Camali in a face-to-face meeting after the Takeover, Trelleborg did not want to do business with, and in fact decided to keep an "illusion" over, ISTNA because of Mr. Camali's and his family's background and experience in the industry (including Mr. Camali's father's Italian heritage).

194.    And there was yet more to Trelleborg's "illusion."  For example, Trelleborg actually took substantial steps to avoid entering into any distribution agreement with ISTNA and

39

in fact undermined and interfered with ISTNA's relationships with its customers in the United States.

195.    Starting in March 2023, Trelleborg employees and executives, including Burke, began contacting ISTNA's customers directly to provide them with price lists for products and services that were previously distributed exclusively (via the Agreement) through ISTNA.  Burke also stated to ISTNA customers that these prices were subject to change (which they could not do under the Agreement).

196.    These include specifically Aegion/MTC as well as SAK Construction and PermaLiner, two other well-established pipeline rehabilitation contractors.

197.    Moreover, with respect to PermaLiner in particular, ISTNA learned at the Arbitration that Vogt was specifically touting to Trelleborg executives, including Burke, how much money in parts IST Germany was making behind ISTNA's back and in violation of the Exclusivity Agreement.  This was plainly done by Vogt to impress his soon to be bosses at Trelleborg and, of course, was yet another breach of the Agreement.

198.    At the same time, Trelleborg—again through Burke—refused to provide replacement or repaired equipment, including defective pipe cutting robots.  This prevented ISTNA from servicing customers, SAK Construction, and resulted in delayed delivery of consumables products (to Aegion/MTC).

199.    And (again just by way of example) Trelleborg Pipe Seals Milford and Pipe Seals US tried to hire away ISTNA's salesmen, Jose Salinas, at a time when they were otherwise saying that Trelleborg wanted to support and work together with ISTNA.  Because Salinas was ISTNA's only salesman, this means that Trelleborg "took" ISTNA's entire sales force.  ISTNA only ever

found out about these efforts after Trelleborg had put it out of business and Salinas announced that he was going to work for Trelleborg Seals & Profiles.

200.    Then, in a July 20, 2023 email to ISTNA's customers following Trelleborg's coup, Burke—the "Global Director" in the Pipe Repair product area for Trelleborg Seals & Profiles —acknowledged that Trelleborg was taking over ISTNA's business.

201.    Burke wrote that "[d]ue to a change in business model, [trenchless pipe repair] products will no longer be available via IST North America.  Trelleborg will support and service all existing and new end customers of IST equipment and products directly in the USA.  We believe by working directly with our customers we can ensure clear communication & support whilst aiming to develop long term partnerships."

202.    According to Burke's emails to ISTNA's customers, Trelleborg would do so out of the headquarters of Trelleborg Pipe Milford and Trelleborg Pipe US in New Hampshire, and Yanzo (a Trelleborg Pipe Milford employee) would be the principal contact person.

**B.    The Arbitration Tribunal Unequivocally Finds Breach, Calls Out Trelleborg's Involvement, and Awards Nearly $10 Million in Damages**

203.    Having been effectively put out of business by IST Germany's breach and Trelleborg's subsequent bad faith conduct, ISTNA had no choice but to bring claims against IST Germany in arbitration (as it was required to do under the Exclusivity Agreement).

204.    Trelleborg resisted and would not provide discovery during the Arbitration.

205.    IST Germany, however, produced tens of thousands of documents, many of which involved or were authored by Trelleborg employees.  These documents revealed, for the first time, the scale of Trelleborg's involvement in IST Germany's breach and its bad faith and intentional conduct in inducing that breach and undermining ISTNA's business.

206.    IST Germany, then under Trelleborg's control, and—with its legal defense in the Arbitration being financed by Trelleborg—filed for insolvency in Germany on the eve of the Arbitration's evidentiary hearing.

207.    This last-ditch effort to avoid an adjudication of ISTNA's claims on the merits was unsuccessful, because the Tribunal rejected IST Germany's request for a stay in light of the German insolvency and ordered the evidentiary hearing to go forward.

208.    During the hearing, ISTNA introduced scores of documents and Mr. Camali testified for hours regarding the scope of the breach, ISTNA's performance of the Exclusivity Agreement, and Trelleborg's role.

209.    At the conclusion of the Arbitration, the Tribunal issued a comprehensive Final Award finding that IST Germany had breached the Agreement and awarding ISTNA nearly $10 million in damages (before the application of mandatory prejudgment interest).

210.    The Tribunal found without qualification that ISTNA's performance under the Agreement and that Trelleborg's Takeover caused IST Germany to repudiate it, which repudiation caused a material breach.

211.    The Tribunal highlighted specifically that Trelleborg "failed to agree to ISTNA's express request to honor the existing exclusivity provisions of" the Agreement and that ISTNA "was entitled to have IST [Germany's] acquiror [Trelleborg] commit to be bound by its existing contracts with IST [Germany], as absent that commitment IST [Germany] was breaching the contracts." (*See* Final Award ¶ 139).

212.    The Tribunal also recounted in technicolor IST Germany's and Trelleborg's bad faith. IST Germany's Vogt traded emails with Trelleborg executives and agents in the period after signing the SAPA that highlighted the "illusion" they had pulled on Mr. Camali and the

"nightmare" that would befall ISTNA when the Exclusivity Agreement was repudiated. (*See* Final Award ¶¶ 140-142).

213.    Furthermore, the Tribunal detailed Trelleborg's misconduct **after** the Agreement was repudiated, explaining that Trelleborg had extensive "delays in deliveries" and conditioned "faster shipment activities on prepayments that ISTNA initially made but ultimately lacked the financial capacity to sustain," terms that were ultimately "unacceptable." (*See* Final Award ¶ 144). It also took pains to note that "Trelleborg . . . plainly chose not to honor ISTNA's contractual entitlement to exclusivity even temporarily," finding that this conduct, along with IST Germany's ceasing production of "any of the products it was obligated to sell ISTNA," was an "even more compelling case for finding repudiation than the facts of" precedential appellate division case law in which the courts upheld claims for breach. (*See id.* ¶ 136).

214.    After summarizing the evidence of bad faith, the Tribunal adopted ISTNA's analysis of its lost profits acknowledging the future that Defendants and IST Germany robbed from Mr. Camali and awarding nearly $10 million in damages.

## FIRST CAUSE OF ACTION

### For Tortious Interference With Contractual Relations
### (Against All Defendants)

215.    ISTNA repeats and realleges each and every paragraph contained above as if set forth herein.

216.    The Exclusivity Agreement between ISTNA and IST Germany was a viable and enforceable contract, governed by New York law, at all relevant times.

217.    Each of the Defendants had knowledge of the Exclusivity Agreement. Trelleborg expressly excluded the Exclusivity Agreement from the SAPA, and Trelleborg executives were parties to correspondence discussing ISTNA's contracts and whether Trelleborg would honor them

after the Takeover.  Moreover, each of the Individual Defendants were aware of the Exclusivity Agreements from in person meetings with Mr. Camali, at which the Agreement was discussed.

218.    Defendants induced IST Germany to breach and render performance of the Exclusivity Agreement impossible.  As the Tribunal has already found, IST Germany's repudiation of the Exclusivity Agreement in connection with the Takeover was a breach of the Agreement. Each of the named Defendants participated in the fraudulent inducement.  For example, each of Ljungback, Renulf, and Burke personally made misrepresentations to Mr. Camali to hide the Takeover from him.  In addition, each was involved in, or aware of, Defendants' act of excluding the Agreement from the SAPA.  Moreover, Burke in particular induced IST Germany to increase prices in contravention of the Exclusivity Agreement and duped Mr. Camali into providing confidential business information to Trelleborg, which information was used against ISTNA later to usurp customers.  The actions of each of these individuals is imputable to the Entity Defendants.

219.    Defendants' inducement was knowing, intentional, fraudulent, and done with actual malice.  Each of the Defendants was aware of the Agreement and knew or should have known that by excluding it from the Takeover, and refusing to honor the Agreement, IST Germany would breach the contract.

220.    Defendants in fact intended for the Agreement to be breached so it would rob ISTNA of exclusivity and allow for Trelleborg to gain a foothold in the North American market (that ISTNA previously dominated).  Defendants acted maliciously to induce the breach, including by scheming to keep the true nature of the SAPA a secret and duping Mr. Camali into sending Trelleborg confidential and proprietary information about ISTNA's customers (to be utilized by Defendants after the Exclusivity Agreement was repudiated).

221.    Trelleborg executives affiliated with each of the Entity Defendants, as well as the Individual Defendants, all knew that the result of excluding the Agreement from the Takeover, and then refusing to reasonably provide products and services to ISTNA after the Takeover, would be a "nightmare" for ISTNA and Mr. Camali.  Moreover, documents produced in the Arbitration show that Trelleborg executives were aware of and took part in an "illusion" that mislead Mr. Camali and ISTNA and prevented  him from knowing—until after the Takeover—that Trelleborg was stripping IST Germany of assets and rendering it unable to perform.

222.    Defendants' tortious interference has caused ISTNA substantial damages.  As the Tribunal found, ISTNA suffered nearly $10 million in damages as a result of the breach of the Exclusivity Agreement.

## SECOND CAUSE OF ACTION

### For Tortious Interference With Prospective Economic Relations
### (Against All Defendants)

223.    ISTNA repeats and realleges each and every paragraph contained above as if set forth herein.

224.    After Defendants induced IST Germany to breach the Exclusivity Agreement, they continued to cause ISTNA substantial economic harm by tortiously interfering with its economic relations with its longtime U.S.-based customers, with whom ISTNA had business relationships.

225.    These include business and ongoing customer relationships with ISTNA customers including Aegion/MTC, SAK, and PermaLiner.

226.    Defendants did so by refusing to honor ISTNA's requests for parts and equipment for these longtime customers, and did not provide a justifiable basis or reason to do so. Furthermore, Trelleborg (as the Tribunal found) forced ISTNA to proceed on "unacceptable" business terms, including by increasing prices without warning or justification and requiring as a

condition precedent to shipping parts and equipment (formerly of IST Germany) that ISTNA prepay hundreds of thousands of Euros—which ISTNA did until it could no longer afford to do so.

227.    Defendants also tortiously interfered by contacting ISTNA's customers directly and cutting ISTNA out altogether, stating (as noted above) that Trelleborg would be servicing and working with these customers to the exclusion of ISTNA.

228.    Defendants were aware of these customer relationships.  Among other things, Mr. Camali had provided to Trelleborg executives, including Ljungback, Mindermann, Burke, and Renulf, ISTNA's proprietary business information and customer lists.  Mr. Camali, however, provided this information believing that it would be used by Trelleborg to assist it in acquiring IST Germany and ISTNA, not so that Trelleborg could—after the Takeover—have access to ISTNA's former customers and begin direct commercial relationships with them

229.    Defendants used dishonest, unfair, and improper means to interfere with these relationships.

230.    Indeed, to keep ISTNA in the dark during Trelleborg's scheme, Defendants —including Trelleborg executive Burke—repeatedly and falsely told Mr. Camali that Trelleborg would enter into a new agreement with ISTNA to replace the repudiated Exclusivity Agreement and that Trelleborg would serve as ISTNA's distributor (for ISTNA's eventual sale to its own customers).  Instead, Trelleborg never actually provided a new agreement to ISTNA and never intended to, and shortly after the Takeover began selling—behind ISTNA's back—to ISTNA's customers.  This was maliciously misleading and dishonest.

231.    Defendants' interference caused injury to ISTNA's business relationships with its customers.  This fact is self-evident, because Trelleborg usurped those relationships and took them

for itself, creating self-evident harm and causing ISTNA millions of dollars in damages in lost sales and profits.

## THIRD CAUSE OF ACTION

### For Fraudulent Misrepresentation and Concealment
### (Against All Defendants)

232.    ISTNA repeats and realleges each and every paragraph contained above as if set forth herein.

233.    Defendants made numerous misstatements of material fact and concealed material facts that they had a duty to disclose.

234.    Ljungback and Renulf made numerous statements of fact to Mr. Camali during the Piermont Dinner that were false and misleading when made.  These include representations that Trelleborg was purchasing IST Germany; that Trelleborg was purchasing ISTNA; and that Trelleborg was honoring, and would honor in any takeover of IST Germany, ISTNA's Exclusivity Agreement.

235.    These statements were false and misleading because, among other things, Trelleborg was not purchasing IST Germany but rather was only acquiring all of its assets, a fact that Ljungback and Renulf knew at the time but did not disclose to Mr. Camali.  Moreover, Trelleborg was not intending to purchase ISTNA and in fact never had such an intent, yet another material fact Ljungback and Renulf knew but did not disclose.  Finally, Trelleborg was not intending and in fact never into to honor the Exclusivity Agreement and contemporaneous with the Piermont Dinner was actually revising the SAPA to exclude the Agreement.

236.    The Entity Defendants, by and through their executives (including Andreas Renulf and Simon Burke), also made numerous material misstatements, and omitted to disclose material facts, to Mr. Camali.  These include Renulf's statements, made on at least June 30, July 4, and

August 17, 2022, on behalf of the Entity Defendants, that Trelleborg was preparing a new distribution agreement for ISTNA and otherwise and in the meantime intended to honor ISTNA's prior Agreement with IST Germany. They also include statements made to Mr. Camali by Renulf, who falsely stated to Mr. Camali that Trelleborg wanted ISTNA's propriety and confidential business information to evaluate a potential acquisition of ISTNA in conjunction with the Takeover—when in fact Trelleborg never intended to acquire ISTNA and in fact used this information to usurp ISTNA's customers.

237.    The statements were material. The Takeover's scope and import was "mission critical" for ISTNA, because it was exclusively supplied by IST Germany and thus needed to know whether, and how, that supplier relationship would continue a transaction with Trelleborg. It was critically important for Mr. Camali to know, for instance, that Trelleborg was acquiring all of IST Germany (and then ISTNA), because that fact ensured IST Germany would remain viable able to supply ISTNA with the necessary part, equipment, and services. That is why it was so damaging for Trelleborg to conceal the truth, namely, that it was actually just acquiring IST Germany's assets and leaving IST Germany fundamentally unable to perform under the Agreement.

238.    ISTNA relied on these misstatements and omissions and that reliance was justifiable under the circumstances. Trelleborg was in a superior position with respect to the truth or falsity of its statements regarding the contours of the Takeover, and Mr. Camali had no reason to doubt their veracity. Moreover, it would have and indeed did make sense for Defendants to say that all of IST Germany (and ISTNA) were being acquired, because Trelleborg's business model is to "bolt on" existing companies and use its size and expertise to grow those entities. Finally, reliance was also reasonable because the messaging and statements from each of the Individual

Defendants and Trelleborg executives was consistent—*i.e.*, that Trelleborg would honor the Agreement—and thus Mr. Camali had no reason to doubt that Defendants were telling the truth.

239.    For these same reasons—the relationship of trust and confidence between ISTNA and Trelleborg, and the fact that Trelleborg chose to speak on the topic of the nature of the Takeover—Defendants had a duty to disclose material information about the Takeover and in all events enough information to make their disclosures about the nature of the Takeover not misleading.  Defendants wholeheartedly and unequivocally violated that duty.  Moreover, as detailed above, Trelleborg withheld material information in the course of negotiations surrounding a business transaction, while Trelleborg executives possessed superior knowledge about the scope of that transaction and knew that ISTNA and Mr. Camali had been provided, and was acting under and on the basis of, false and misleading information (e.*g.*, that his Agreement would survive the Takeover).

240.    These misstatements and omissions caused ISTNA substantial injury.  This includes by enabling IST Germany's repudiation of the Agreement, because IST Germany could only do so by Defendants inducing in Mr. Camali the false belief that he should do nothing —including foregoing asking questions about or challenging the Takeover—until the "ink was dry" on the deal.  In other words, the repudiation could not have happened but for these misstatements.

241.    Moreover, ISTNA paid hundreds of thousands of dollars in "advancements" to Trelleborg for product that Trelleborg promised was being delivered under a "new" distribution agreement that never materialized (and was a fallacy to begin with).  Mr. Camali also made further and substantial investments in ISTNA leading up to and following the Takeover on the belief

—falsely induced by Defendants' misstatements—that the Exclusivity Agreement would be honored and his business would remain viable.

## FOURTH CAUSE OF ACTION

### For Negligent Misrepresentation
### (Against All Defendants)

242.     ISTNA repeats and realleges each and every paragraph contained above as if set forth herein.

243.     ISTNA and Trelleborg had a special and privity-like relationship that imposed a duty on Defendants to impart correct information to ISTNA and extended well beyond the typical arm's length relationship between counterparties or business competitors.

244.     Despite having caused the Exclusivity Agreement to be repudiated, Trelleborg repeatedly stated to ISTNA that it should rely on Trelleborg providing a new distribution agreement to ISTNA and the parties continuing to act as if the prior Exclusivity Agreement was in place.  Moreover, Trelleborg appeared to possess and held itself out as actually possessing superior knowledge about the Takeover and ISTNA's role after it.  Trelleborg executives met with Mr. Camali personally, described to him how the Takeover would work, and induced Mr. Camali to trust what Defendants were telling him.  Finally, and critically, Defendants knew Mr. Camali sought specific information from Trelleborg about the Takeover to assist in his business planning and future investment, and to determine how his business would be supplied (and indeed whether it would remain viable after the Takeover).

245.     Defendants made false representations that they should have known were incorrect. Ljungback and Renulf made numerous statements of fact to Mr. Camali during the Piermont Dinner that were false and known to be incorrect.  These include representations that Trelleborg

was purchasing IST Germany; that Trelleborg was purchasing ISTNA; and that Trelleborg was honoring, and would honor in any takeover of IST Germany, ISTNA's Exclusivity Agreement.

246.    The Entity Defendants, by and through their executives (including Andreas Renulf), also made numerous false misstatements, and omitted to disclose material facts, to Mr. Camali.  These include Renulf's statements, made on at least June 30, July 4, and August 17, 2022, that Trelleborg was preparing a new distribution agreement for ISTNA and otherwise and in the meantime intended to honor ISTNA's prior Agreement with IST Germany.  They also include statements made to Mr. Camali by Renulf, who falsely stated to Mr. Camali that Trelleborg wanted ISTNA's propriety and confidential business information to evaluate a potential acquisition of ISTNA in conjunction with the IST Germany Takeover.

247.    The false information supplied in Defendants' representations was known by Defendants to be needed by ISTNA for a serious purpose.  Defendants were well aware that ISTNA's future hinged on whether Trelleborg would acquire IST Germany in full, whether it would acquire ISTNA, and—critically—what Trelleborg would do with the Exclusivity Agreement.  Consequently, they also knew that ISTNA was planning its future, investments, and customer relationships based on these factors.  To that end, any information about the Takeover was critical to ISTNA and Mr. Camali because it dictated the future of the Company and any business or investment decisions Mr. Camali had to make.

248.    ISTNA relied upon Defendants' misstatements and that reliance was justifiable.  Trelleborg was in a superior position with respect to the truth or falsity of its statements regarding the contours of the Takeover, and Mr. Camali had no reason to doubt their veracity.  Moreover, it would have and indeed did make sense for Defendants to say that all of IST Germany (and ISTNA) were being acquired, because Trelleborg's business model is to "bolt on" existing companies and

use its size and expertise to grow those entities. Finally, reliance was also reasonable because the messaging and statements from each of the Individual Defendants and Trelleborg executives was consistent—*i.e.*, that Trelleborg would honor the Agreement—and thus Mr. Camali had no reason to doubt that Defendants were telling the truth. Moreover, as detailed above, Trelleborg withheld material information in the course of negotiations surrounding a business transaction, while Trelleborg executives possessed superior knowledge about the scope of that transaction and knew that ISTNA and Mr. Camali had been provided, and was acting under and on the basis of, false and misleading information (e.g., that his Agreement would survive the Takeover).

249. Defendants' false statements and omissions caused ISTNA substantial injury. This includes by enabling IST Germany's repudiation of the Agreement, because IST Germany could only do so by Defendants inducing in Mr. Camali the false belief that he should do nothing —including foregoing asking questions about or challenging the Takeover—until the "ink was dry" on the deal. In other words, the repudiation could not have happened but for these misstatements.

250. Moreover, ISTNA paid hundreds of thousands of dollars in "advancements" to Trelleborg for product that Trelleborg promised was being delivered under a "new" distribution agreement that never materialized (and was a fallacy to begin with), including a substantial "down payment" for a consumables products order that Trelleborg did not fulfill. Mr. Camali also made further and substantial investments in ISTNA leading up to and following the Takeover on the belief—falsely induced by Defendants' misstatements—that the Exclusivity Agreement would be honored and his business would remain viable.

## FIFTH CAUSE OF ACTION

**For Aiding and Abetting Breach of Fiduciary Duty**
**(Against All Defendants)**

251.    ISTNA repeats and realleges each and every paragraph contained above as if set forth herein.

252.    IST Germany had a fiduciary duty to ISTNA and Mr. Camali under New York law.

253.    IST Germany was ISTNA's joint venturer and business partner.  IST Germany and ISTNA entered into a series of contracts to consummate their relationship and worked closely together for many years.  ISTNA and Mr. Camali trusted IST Germany and in particular its CEO, Jorg Vogt, in whom Mr. Camali reposed substantial trust.  This trust was necessary and justifiable under the circumstances, because IST Germany was ISTNA's exclusive supplier and thus Mr. Camali had no choice but to trust IST Germany and Vogt.  Indeed, Vogt benefitted the most from Defendants' scheme and IST Germany's breaches of duty.  He received a job with Trelleborg, was able to sustain an otherwise defunct company, and received a personal payout of hundreds of thousands of dollars in "earn-out" funds from the Takeover.  In other words, Vogt benefitted personally and financially from the Takeover and Defendants' specific assistance and inducement in carrying it out.  This was at least one substantial motivating factor in Vogt keeping his breaches of duty secret from Mr. Camali.

254.    IST Germany materially breached that duty.  Among other things, and as detailed above, IST Germany and Vogt pulled an "illusion" on Mr. Camali by duping him into believing the Exclusivity Agreement would survive the Takeover, only to cause Mr. Camali a "nightmare" by repudiating the Agreement and driving him out of business.  Vogt made numerous misstatements to Mr. Camali and concealed numerous material facts, including the structure of the Takeover—Vogt knew it was going to an asset-only purchase yet told Mr. Camali it would either

be an investment or a wholesale purchase. Moreover, IST Germany at Trelleborg's behest increased the prices for parts and equipment sold to ISTNA without warning and at the behest of Trelleborg, in bad faith and without any consideration for the best interests of ISTNA. Indeed, as detailed above, at virtually no point in the venture did IST Germany or Vogt ever take ISTNA's or Mr. Camali's best interests into consideration.

255.    Defendants induced IST Germany's breaches by substantially assisting in it, affirmatively enabling it, concealing it, and ultimately enabling such breaches to occur. Among other things, Trelleborg executives—including Burke, Renulf, and Mindermann—worked hand in hand with IST Germany and Vogt to exclude the Exclusivity Agreement from the SAPA. As Vogt documented, Defendants assisted and were part of the "illusion" that Defendants and IST Germany pulled on Mr. Camali. Moreover, Defendants usurped ISTNA's customers when the Exclusivity Agreement was terminated. Defendants also made numerous material misstatements of fact to hide the scheme and induce in Mr. Camali the false belief that the Agreement would survive the takeover. And, Trelleborg employed Vogt as part of the Takeover, inducing his loyalty and enabling IST Germany's part in the scheme.

256.    Put bluntly, Trelleborg did not stand idly by while IST Germany undermined and cut out its partner. Defendants were the very bad actors who cut ISTNA out, knowing the whole time that in doing so they were aiding IST Germany, ISTNA's joint venturer, in compromising and injuring Mr. Camali's business.

257.    ISTNA suffered substantial harm as a result of these breaches of fiduciary duty and Defendants' aiding and abetting of those breaches. As the Tribunal found, ISTNA suffered nearly $10 million in damages when IST Germany repudiated the Agreement, which repudiation was the culmination of IST Germany's scheme and a direct result of its breaches of fiduciary duty.

## PRAYER FOR RELIEF

WHEREFORE, ISTNA respectfully requests relief and judgment, as follows:

(a)  Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)  Awarding punitive damages against Defendants;

(c)  Awarding ISTNA its reasonable costs and expenses incurred in this action; and

(d)  Such other relief as the Court may deem just and proper.

## JURY DEMAND

ISTNA hereby demands a trial by jury on all issues so triable.


Dated: October 8, 2025

**COLE SCHOTZ P.C.**


/s/     *Joseph Barbiere*
Joseph Barbiere
Eric S. Latzer
Brandon Fierro
1325 Avenue of the Americas
New York, NY 10019
(212) 752-8000
jbarbiere@coleschotz.com
elatzer@coleschotz.com
bfierro@coleschotz.com

*Counsel for Plaintiff*
*I.S.T. North America LLC*