# EXHIBIT B

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**

International Arbitration Tribunal

_____

**I.S.T. North America LLC,**

               **Claimant,**

**v.**                              **ICDR Case No. 01-23-0001-1729**

**Simba GmbH f/k/a I.S.T. Innovative Sewer Technologies, GmbH,**

               **Respondent.**

_____

**FINAL AWARD**
_____
**June 23, 2025**
_____

                                        *Richard F. Ziegler, Chair*
                                 *Frederick R. Fucci, Arbitrator*
                                 *Michele S. Riley, Arbitrator*

**WE, THE UNDERSIGNED ARBITRATORS**, having been duly designated in accordance with the arbitration agreement contained in the Sales Representation Agreement dated April 17, 2019 (the "**Sales Representation Agreement**" or "**Agreement**") between I.S.T. North America LLC ("**Claimant**" or "**IST NA**")) and I.S.T. Innovative Sewer Technologies, GmbH, now known as Simba GmbH ("**Respondent**" or "**IST GmbH**"), and having been duly sworn, and having duly considered the submissions and heard the proofs and allegations of the parties on the subject matter, do hereby issue this **FINAL AWARD**.

## I.      INTRODUCTION

1.      This dispute arose from the breakdown in the relationship between Claimant, a U.S.-based sales representative, and Respondent, a German producer of sewer rehabilitation equipment.  After a few years of performance marked by some complaints on both sides, the German manufacturer sold substantially all of its assets to a Swedish company and ceased its manufacturing operations.   In the asset sale transaction, Respondent did not obligate the acquiror to assume or continue to honor the Sales Representation Agreement, which remained in full force and effect.  As a result, we conclude under applicable law that Respondent effectively repudiated the Agreement.

2.      We also conclude that Claimant established that Respondent breached the Agreement in other respects before the repudiation, by selling some of its products in the United States in violation of the Agreement's exclusivity obligations and by selling some products that were defective.   We also conclude that after the repudiation Respondent failed to honor the Agreement's inventory re-purchase provision.

3.      The Parties disputed during the proceedings the extent of the damages to which Claimant would be entitled if Claimant prevailed on its case.  In addition to key differences concerning Claimant's entitlement to and calculation of lost profits damages, another dispute affecting the extent of damages turns on whether the exclusivity obligation encompassed "consumables" and not solely equipment; we interpret the Agreement to include consumables as Claimant contends.  A second dispute concerns whether Claimant is entitled to compensation for Respondent's alleged failure to comply with the Agreement's provision extending Claimant's territory to include Canada; we resolve that disagreement in Respondent's favor for the period prior to the repudiation.

-2-

4.  The reasons that support our determinations in Claimant's favor also lead us to dismiss Respondent's counterclaims.

5.  We find that Claimant has established reasonable lost profits and other damages in the amount of $7,772,713 and award that sum, together with pre-award interest at 9% from the date of the repudiation to the date of this award, totaling $957,913.39.

6.  We also require Respondent to reimburse Claimant for the administrative fees and costs of this proceeding paid to date by Claimant.

7.  This arbitration proceeding was vigorously contested by the Parties and their counsel for well more than a year when on October 8, 2024, a week before the evidentiary hearing was then scheduled to begin, Respondent initiated a provisional insolvency proceeding in Germany and requested that the Tribunal stay this proceeding. After adjourning the evidentiary hearing that was to have been conducted on October 15-18, 2024, the Tribunal conducted three status conferences on this issue in October and November, 2024 and February, 2025. Respondent's German counsel participated in all such conferences and its insolvency administrator participated in the November conference. The Tribunal requested and reviewed multiple written submissions from the Parties concerning the nature and appropriate consequences of Respondent's insolvency proceeding.

8.  To allow the court-appointed administrator the time she requested to evaluate the claims and counterclaims in this proceeding as well as to investigate the financial circumstances of Respondent, the Tribunal suspended this proceeding for four months (from October 11, 2024 to February 12, 2025). Respondent on February 7, 2025 asked the Tribunal "for a permanent stay" of this proceeding, reporting that it would no longer participate. Respondent contended that under German law its impecuniousness freed it from any continuing obligation to arbitrate its dispute with Claimant because this proceeding would be more costly than a suit in the pertinent German court, where Respondent claimed it would enjoy government-funded counsel. Respondent reported that Claimant was free to pursue its claims by initiating litigation in a court in Bochum, Germany.

9.  The Tribunal addressed Respondent's position at a conference held on February 12, 2025, hearing from the Parties' respective German counsel. The Tribunal determined to resume this arbitration proceeding, explaining – as discussed in greater detail below – that Respondent had not offered any evidence that it would receive Government-funded counsel in the German judicial forum and consequently no proof that a new lawsuit

would be materially less expensive than completing the pending arbitration. The Tribunal also offered various suggestions on how the costs associated with the impending evidentiary hearing could be reduced, including conducting it remotely.

10. Respondent chose not to participate thereafter (with one exception described below at paragraphs 18 and 98) but was copied on all communications. In compliance with Rule R-32 of the Commercial Arbitration Rules (as defined below in paragraph 20), which prohibits the entry of any award "made solely on the default of a party" and provides that "[t]he arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award," the Tribunal conducted an evidentiary hearing in which Claimant presented three fact witnesses and an expert witness on damages.

11. The evidentiary hearing proceeded for more than a day and a half on March 3 and 12, 2025. Since all four of Claimant's witnesses had submitted their direct testimony in the form of written statements, as was contemplated by the procedural orders entered with both Parties' consent prior to Respondent's insolvency proceeding, the substantial majority of the hearing time was devoted to the Tribunal's questioning of Claimant's witnesses. Moreover, the hearing record also included the written testimonial statements that Respondent had submitted of its fact and expert witnesses while it was still participating in this proceeding, as well as Respondent's Pre-Hearing Brief, which it had filed on October 4, 2024 (four days before it began its insolvency proceeding in Germany).

12. In view of Respondent's decision not to participate in the hearing and post-hearing proceedings, this Final Award includes an unusually detailed recitation of the procedural aspects of this arbitration to facilitate potential assessment and review by a court of competent jurisdiction to which this award may be submitted for confirmation and enforcement.

## II.    THE PARTIES, THE CONTRACTS AND THE COUNSEL

### A.    <u>The Parties and their Contracts</u>

13.  Claimant IST NA is a New York limited liability company with offices at the time of entry into the Sales Representation Agreement at 377 Western Highway, Tappan, New York 10983. Mr. Eugene A. ("Geno") Camali is the Chief Executive Officer of Claimant ("**Geno Camali**").

14.  Respondent IST GmbH was known as I.S.T. Innovative Sewer Technologies, GmbH), a German *Gesellschaft mit beschänkter Haftung*, with offices at Rombacher Huette 17-19 44795 Bochum, Germany at the time of entry into the Sales Representation Agreement. Subsequently, upon the closing on or about November 30, 2022 of the Share and Asset Purchase Agreement entered into by IST GmbH, Trelleborg Sealing Profiles Germany GmbH ("**Trelleborg Germany**"), Mathias Wettstein and Jörg Vogt on October 11, 2022, Ex. J-4 ("**Trelleborg Acquisition Agreement**"), the corporate designation of Respondent was changed to Simba GmbH without change of legal personality. Ex. J-4, ¶ 9.4(ix). The current address of Respondent, based on the filings in the insolvency action discussed in the Procedural History below, appears to be Koksstrasse 45, 44879 Bochum, Germany. Mr. Jörg Vogt was the CEO of Respondent at nearly all times relevant to these proceedings.

15.  At the time IST NA and IST GmbH entered into the Sales Representation Agreement on Apr. 17, 2019 (Ex. J-6), Respondent was a fifty percent owner of Claimant together with Geno Camali as the other fifty percent owner, with their rights and obligations as equal co-venturers set forth in an Operating Agreement dated as of the same date. Ex. J-5. On December 31, 2020, the Parties entered into a Memorandum of Understanding, Ex. J-7 (the "**Memorandum of Understanding**" or "**MOU**") whereby Respondent transferred the entirety of its ownership interest in Claimant to Geno Camali in exchange for payment to Respondent of €400,000 for its shares and an immediate payment of €500,000 to defray partially an open balance owed by IST NA, with a commitment for IST NA to pay the remainder of the balance owed, without interest, in installments of US$ 150,000 on each of June 30 and December 31, 2021 and a final payment of $295,480 to be paid over time as IST NA determined with a payment in full due by December 31, 2025. Ex. J-7[1]. The Memorandum of Understanding included other provisions as discussed below.

---

[1] Although Geno Camali's witness statement states that "I purchased the Respondent's 50% interest in the Claimant and took full ownership of the Claimant," ¶ 158, the Memorandum of Understanding itself provides that the "[t]ransfer [of Respondent's interest] will be to Eugene J. Camali," Geno Camali's father.  J-7 § 1.  The elder Camali testified at the hearing that "I put up

B. **Legal Counsel**

16.  At all times during this arbitration, Claimant has been represented by Mr. Henry A.H.
     Rosenzweig of the law firm Holland & Knight LLP with offices in New York, New York.
     In September of 2024, Claimant also engaged the law firm of Cole Schotz P.C. based in
     Hackensack, New Jersey as co-counsel.  Mr. Brandon Fierro and Mr. Eric Latzler of Cole
     Schotz P.C. have appeared on behalf of that firm in this arbitration.  In addition, Claimant
     has been advised on German law issues by Addleshaw Goddard (Germany) LLP based in
     Frankfurt, Germany, through Dr. Markus Perkams, a partner of that firm.

17.  From the time of Respondent's filing of its answer to Claimant's demand for arbitration
     until December 2024, Respondent was represented by the law firm of Tannenbaum Helpern
     Syracuse & Hirschtritt, LLP based in New York, New York through one of its partners,
     Mr. Vincent J. Syracuse, and other attorneys of that firm.

18.  Subsequent to Respondent's filing of an application to open insolvency proceedings in
     Germany on October 7, 2024 with a court based in Bochum, Germany (discussed in the
     Procedural History below), Ms. Dorothee Madsen of the law firm Boege Rohde
     Luebbehuesen, also based in Bochum, was appointed as the provisional insolvency
     administrator of Respondent and Mr. Christian Slota of the law firm Meilicke Hoffman &
     Partner, based in Bonn, Germany, was designated as Respondent's counsel.  Mr. Syracuse
     informed the Tribunal on December 17, 2024 that he and his firm were no longer authorized
     to act on behalf of Respondent because of the opening of the insolvency proceeding in
     Germany and the appointment of the provisional insolvency administrator.  Mr. Slota
     continued to appear on behalf of Respondent until he informed the Tribunal on February
     18, 2025 that Respondent was discontinuing its participation in this arbitration.  However,

---

the money."  Transcript of Arbitration Hearing, March 3, 12, 2025 ("**Tr.** ") 314:6-7; 302:19-23
(Mr. E.J. Camali to Joerg Vogt: "I'll buy out your half.").  Respondent's witness Joerg Vogt
testified (in his written witness statement submitted before IST GmbH ceased its participation in
the arbitration) that as a result of the MOU "by the end of 2020, Mr. [Geno] Camali possessed
complete ownership of IST NA."  Witness Statement of Joerg Vogt, Sept. 20, 2024 ("**Vogt
Witness Stmt.**") ¶ 23.  This discrepancy of whether Claimant, post-MOU, was owned entirely
by Geno Camali or by the Messrs. Camali in two equal shares does not affect any of the
Tribunal's analysis and accordingly need not be resolved.

the Tribunal continued to copy Mr. Slota and Ms. Madsen on all of its communications relating to these proceedings after that date. Even after the evidentiary hearing at which Respondent did not appear, Mr. Slota on March 26, 2025 submitted an opposition on behalf of IST GmbH to a request by Claimant to remove the confidentiality designation assigned by Respondent to certain documents produced during these proceedings, as noted below.

## III.    THE ARBITRATION AGREEMENT AND THE APPLICABLE LAW

19.    Clamant submitted with its demand for arbitration in this case on March 21, 2023 a copy of the Sales Representation Agreement. Section 9.7 of that Agreement provides in full:

> *Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration in New York in accordance with the commercial arbitration rules of the American Arbitration Association then in effect. Judgment may be entered on the arbitrator's award in any court having jurisdiction. The parties shall share equally the expense of the arbitration.*

20.    Given the terms of the Sales Representation Agreement quoted above, the Commercial Arbitration Rules and Mediation Procedures, including Procedures for Large, Complex Commercial Disputes, amended and effective September 1, 2022 (the "**Commercial Arbitration Rules**") of the American Arbitration Association ("**AAA**") apply to this case.

21.    Section 9.6 of the Sales Representation Agreement provides that "[t]he laws of New York shall govern all matters arising under the Agreement."

## IV.    THE CLAIMS AND COUNTERCLAIMS

22.    Claimant filed its demand for arbitration in this case on March 21, 2023, together with certain documents related to its claim, including a copy of the Sales Representation Agreement and the Memorandum of Understanding. Claimant's demand asserted that the Sales Representation Agreement appointed Claimant as its exclusive representative in the United States and Canada for the sale and servicing of equipment and parts manufactured by Respondent for use in underground pipe repair using a technique called "cured-in-place" pipe rehabilitation, that is to say the repair of underground pipes without the need to dig trenches to expose them. This technique involves the insertion of a resin impregnated felt/fiberglass liner into an existing damaged underground pipe that is then cured in place using an ultraviolet light curing technology performed by a robotic "light train" that is

passed through the pipe.  After the resin is hardened, robotic cutters are inserted into the pipes to retore the pre-existing openings to the residential or commercial customers.[2]

23.     Claimant's Demand for Arbitration alleged several material breaches of the Sales Representation Agreement by Respondent, including:

    (A) failing to deliver or timely deliver equipment, parts and consumables to Claimant;

    (B) delivering defective equipment and parts, failing to provide warranty support for defective equipment and parts and failing to compensate Claimant for expenses incurred to perform warranty work on behalf of Respondent;

    (C) failing to procure and maintain product liability insurance, including coverage for product recalls;

    (D) selling equipment and consumables (such as pipe liners) in the United States in violation of Claimant's exclusive rights to sell same;

    (E) Failing to provide Claimant with the exclusive rights to sell and service Respondent's equipment, parts and consumables in the territory of Canada; and

    (F) Breaching the anti-assignment provision of the Sales Representation Agreement by selling in October 2022 all or substantially all of Respondent's assets to a third party, Trelleborg Germany, a German affiliate of  Trelleborg AB, a Swedish company ("**Trelleborg Group**"), one or more of whose affiliates were said to be competitors of Claimant.

Claimant's Demand for Arbitration asserted that as a proximate result of Respondent's breaches of the Sales Representation Agreement, Claimant had suffered and continued to suffer significant damages in an amount not yet fully calculated but estimated to be approximately eight million dollars ($8,000,000).  Claimant sought an award in an amount to be determined at the evidentiary hearing plus interest at nine percent (9%), as permitted by law.[3]   Claimant also demanded judgement against Respondent declaring that Respondent's sale of all or substantially all of its assets to Trelleborg Germany was void *ab initio* pursuant to Section 9.1 of the Sales Representation Agreement.

---

[2] Claimant's Demand for Arbitration, pp. 1-2.
[3] Claimant's Demand for Arbitration, p. 9

24.    Respondent filed its answer to the Demand for Arbitration on May 5, 2023 in which Respondent presented defenses to Claimant's claims, alleging that Claimant's demands were designed to mask its own ineptitude in handling Respondent's otherwise functional equipment and inability to meet the sales targets in the Sales Representation Agreement. Among other defenses, Respondent (1) disputed that its equipment was defective, (2) denied that the Sales Representation Agreement gave Claimant exclusive rights to sales in Canada, (3) justified any delays in shipment of equipment to the U.S. on the basis of COVID-related disruptions and (4) argued that the sale of certain of its assets to Trelleborg Germany did not violate the anti-assignment provisions of the Sales Representation Agreement in that the assets sold did not include any agreements relating to Claimant or the Sales Representation Agreement, such that they remained with Respondent.

25.    Respondent alleged that IST NA's unsubstantiated claims that IST GmbH's equipment was faulty caused it to incur substantial damages, including transportation costs for the allegedly flawed equipment and their replacements, costs for testing and to repair damage that Claimant's improper handling had inflicted, and the cost of replacement products. Respondent also alleged that Claimant's failure to meet sales targets had damaged it, currently estimating its damages at approximately $2,750,000.

26.    Respondent's counterclaims also asserted that Claimant had failed to obtain the $1 million of financing required by the Sales Representative Agreement, and failed to pay numerous invoices in the total amount of €1,016,957.35, constituting accounts stated under applicable New York law.  Respondent alleged that due to these breaches by Claimant, Respondent intended to terminate the Sales Representative Agreement absent a cure within 30 days of service of the Counterclaims.  As a result, Respondent asked that the tribunal to be constituted dismiss Claimant's claims in their entirety and award Respondent €4,645,456 in damages on its counterclaims (plus interest).

27.    On May 19, 2023, Claimant filed a response to Respondent's Answer and Counterclaims, denying all of Respondent's allegations and arguing that Respondent's counterclaims were barred by various legal theories.  On June 26, 2023, Claimant amended its Demand for Arbitration ("Amended Demand for Arbitration"), adding claims that Respondent (1) failed to repurchase defective equipment as it was obligated to, (2) its second generation of cutting equipment did not work properly and that it failed to revert to the first generation, (3) failed to give Claimant required notices of price increases and (4) breached the implied

covenant of good faith and fair dealing by selling substantially of its assets to Trelleborg Germany, thereby rendering Respondent unable to perform its obligations under the Sales Representation Agreement and depriving Claimant of the benefits of its agreement. Claimant maintained the same damages claims as were stated in its original Demand for Arbitration.

28. On July 28, 2023, Respondent further amended its responses to Claimant's demands as supplemented by its Amended Demand for Arbitration, maintaining and expanding upon its denials of liability and reiterating Respondent's counterclaims in the amount originally stated. Respondent reported in its answer, defenses and counterclaims to Claimant's Amended Demand that it had terminated the Sales Representative Agreement in light of Claimant's failure to cure its defaults within 30 days of the service of its earlier counterclaims. Claimant responded in turn on August 12, 2023, reiterating the arguments in its original response and requesting dismissal of all of Respondent's counterclaims.

29. On July 29, 2024, Claimant submitted a report from its damages expert, Mr. Kevin Flaherty, partner of Matson, Driscoll & Damico, LLP, a forensic accounting firm. He concluded that Claimant's lost profits resulting from Respondent's breaches of the Sales Representation Agreement amounted to $30,368,301 for the 15-year period from 2019 to 2033, maintaining that it was reasonable to assume that Claimant would be deprived of profits for a period of fifteen years (as the Sales Representation Agreement did not have a fixed term). These lost profits were broken into four periods: (1) $2,995,585,285 for 2019 to 2022, (2) $6,371,421 for 2023-2025, (3) $8,060,494 for 2026 to 2028 and $12,041,101 for 2029 to 2033. He also asserted that Claimant was entitled to $792,084 in damages for equipment purchased from Respondent that was defective and $787,179 in inventory held. He also estimated that Mr. Geno Camali was entitled to unpaid salary in the amount of $2,147,179 at present value through 2033.

30. On August 23, 2024, Respondent submitted a Rebuttal of Mr. Flaherty's report and a calculation of damages claimed by Respondent as a result of its counterclaims by Mr. Christopher W. Young of Resolution Economics, LLC. Mr. Young contended that if any damages were due to Claimant as a result of the termination of the Sales Representation Agreement, they would be at most the enterprise value of Claimant, which he calculated to be $737,561 as of July 1, 2019. Based on the methodologies expounded in Mr. Young's report, he concluded that Respondent would instead be owed damages by Claimant in the

range of $6,047,085 to $55,941,751 by operation of Respondent's affirmative defenses and counterclaims.

31.     By letter dated January 15, 2025 from Mr. Slota, counsel to Respondent's insolvency administrator, Respondent stated that Respondent's counterclaims had been reduced from € 4,645,456 plus interest to € 922,941.

32.     On March 4, 2025, Mr. Flaherty submitted a supplemental damages report on behalf of Claimant. Based on information discovered since his initial report, he presented a range of damages for lost profits to which Claimant would be entitled from $7,739,703 to $12,055,116, in each case before the application of statutory pre-award interest.

33.     In the post-hearing submission from Claimant's counsel dated April 11, 2025, Claimant reasserted that it was entitled to damages from Respondent for breach of contract and breach of the implied covenant of good faith and fair dealing in the amount of $30,368,301 and for the unpaid salary of Mr. Geno Camali in the amount of $2,147,179, together with pre-award interest at the rate of nine percent (9%) per annum from December 1, 2022 to April 9, 2025 in the amount of $6,895,063.

## V.     PROCEDURAL HISTORY

### A.     <u>Appointment of the Tribunal</u>

34.     By letter dated June 15, 2023, the International Center for Dispute Resolution ("ICDR"), the international division of the AAA responsible for administering this case, invited Richard F. Ziegler, Michele S. Riley and Frederick R. Fucci to serve as arbitrators in this case. Said letter indicated that the Parties would attempt to agree on which arbitrator would serve as chair, failing which the ICDR would contact the arbitrators and ask that they select the chair amongst themselves.

35.     On June 17, 2023, Arbitrator Ziegler submitted his Arbitrator Oath along with his standard disclosures. Arbitrators Fucci and Riley did the same on June 19, 2023 and June 20, 2023, respectively, along with their own disclosures. Arbitrator Ziegler submitted a supplemental disclosure on June 20, 2023.

36.     Claimant's counsel noted by e-mail dated June 28, 2023 to the ICDR that the Parties had conferred and agreed to designate Arbitrator Ziegler as the chair of the tribunal.

37.    On July 13, 2023, the ICDR case manager confirmed that there were no objections filed in response to the disclosures and supplemental disclosures submitted by the arbitrators and that the appointment of the three tribunal members (the "Tribunal") was affirmed.

## B.    The Preliminary Conference and First Procedural Order

38.    On July 20, 2023, the Parties supplied a joint report (the "Joint Report") to the Tribunal of their positions on a number of topics on a preliminary conference agenda checklist prepared by the Tribunal and previously supplied to the Parties by the case manager. The preliminary conference was held on July 21, 2023 (via the Zoom remote videoconferencing platform) with representatives of counsel to the Parties and Elizabeth Robertson, the ICDR case manager. During the preliminary conference, the Tribunal noted the areas of agreement of the Parties on the various procedural issues addressed in the Joint Report and discussed with the Parties' representatives the points on which agreement was not reached. The Tribunal requested that the Parties confer further on points of disagreement and report any remaining disagreements to the Tribunal by August 16, 2023. The Parties also agreed to supply a revised procedural timetable reflecting the discussion at the preliminary conference and did so on July 24, 2023.

39.    Based on the Joint Report, the discussions during the preliminary conference and the revised procedural timetable submitted by the Parties, the Tribunal issued Procedural Order No. 1 on July 26, 2023 with a procedural timetable that called for document production to be completed by November 14, 2023 and an evidentiary hearing to be held during the week of January 22, 2024.

40.    Procedural Order No. 1 also addressed a number of other points including the Parties' agreement that (i) New York law would be applied to interpretation of the Sales Representation Agreement "and all matters arising under the Agreement" based on the terms of Section 9.6 of the Sales Representation Agreement cited above, (ii) the seat of the arbitration would be the City of New York, New York, (iii) the arbitration would be conducted in English, (iv) the procedural rules of the arbitration would be the Commercial Arbitration Rules, (v) that for issues not dealt with in the Commercial Arbitration Rules, the Tribunal was to apply rules on which the Parties might agree or the Federal Arbitration

Act and, to the extent not inconsistent with the Federal Arbitration Act, the arbitration law of the State of New York.

41. Procedural Order No. 1 also gave directions on document disclosure, namely that when considering matters of disclosure, the Tribunal would follow Rules R-23 and R-24 of the Commercial Arbitration Rules and would also be guided, but not bound by, the Rules on Taking of Evidence in International Arbitration as adopted by the International Bar Association Council on December 17, 2020. Each Party would be afforded the opportunity to request documents from the other in compliance with the criteria for the exchange of documents set out in Rule R-23 of the Commercial Arbitration Rules. The Parties were instructed to seek agreement on document production requests to the greatest extent possible. In that regard, the Tribunal reminded the Parties of their duty to act in good faith in the exchange of documents, consistent with the rules and procedures contemplated by Procedural Order No. 1.

42. As directed in Procedural Order No. 1, the Parties entered into discussions over the terms of an agreement relating to the confidentiality and use of the documents submitted and exchanged by the Parties in the course of this arbitration. After one disagreement over the terms of this draft agreement, which was resolved by the Tribunal in August 2023, the Tribunal issued the Stipulated Confidentiality Agreement in this arbitration on August 25, 2023 (the "**Protective Order**").

### C.  Extension of Document Production Deadlines

43. During the preliminary hearing, Claimant raised a request that Respondent produce a copy of the Trelleborg Acquisition Agreement, the agreement by which Trelleborg Germany had acquired certain of the assets of Respondent, since a part of Claimant's claims in its Demand for Arbitration, as amended, was that Respondent's sale of those assets amounted to a breach of the Sales Representation Agreement, as well as a request that the Tribunal issue judgment voiding the Trelleborg Acquisition Agreement. Respondent's counsel was not amenable to its production without an order from the Tribunal and prior to the entry of a confidentiality agreement on the grounds that it was a confidential document and the scope of its use needed to be defined. In Procedural Order No. 1 the Tribunal directed that Respondent would be permitted by July 28, 2023 to submit a draft order compelling

Respondent's production of the Trelleborg Acquisition Agreement.  Subsequent to the issuance of the Protective Order, Claimant requested on September 1, 2023 that the Tribunal enter the order compelling such production.  The Tribunal did so and thereafter Respondent produced the Trelleborg Acquisition Agreement.

44.     By e-mail dated October 5, 2023 from Claimant's counsel, the Parties jointly requested an extension of the October 6, 2023 deadline for the submission to the Tribunal of discovery disputes to November 1, 2023 to allow the Parties additional time to resolve certain open discovery issues.  The Tribunal granted the request.

45.     By e-mail dated November 1, 2023, Claimant's counsel asked for an additional extension to November 15, 2023 of the deadline to submit discovery disputes to the Tribunal, as well as the extension of other pre-hearing deadlines while maintaining the January 2024 scheduled evidentiary hearing dates.  Claimant's counsel stated that a production of an unknown number of documents had been received from Respondent at 2:00 pm on that day, November 1, 2023, which was the original deadline for submitting document production disputes to the Tribunal.  Counsel also reported that all of the 824 documents received from Respondent prior to that date either were not responsive to Claimant's document production requests or were already in the possession of Claimant, and that only one of those documents was an e-mail.

46.     Claimant's counsel further related that part of the delay experienced stemmed from Respondent's objections that Claimant's August 18, 2023 document demands were overly broad and burdensome (among other things), which Respondent asserted on September 28, 2023.  The Parties then developed and agreed on search terms to run for electronically stored information on October 9, October 12 and October 19, 2023.  Respondent also agreed to prepare and run select searches for some document demands in the German language, also taking time. Respondent's counsel also reported that delays were experienced due to differences between German and US law (first reported on October 27), and related difficulties in its ESI vendor gaining access to Respondent's e-mails.  Language barriers and time zone differences were also cited by Respondent as causes of the delay.

47.     The request for the extension of the deadline to submit document production disputes to the Tribunal submitted by Claimant was not mutual, according to Claimant's counsel.  In spite of several conferences, the Parties had not been able to agree on a mutual request for an extension of time.  Further, Claimant's counsel related what they said was Respondent's

-14-

counsel's commitment to proceeding with productions on a rolling basis without further delay such that efforts would be made for production on or before the November 14, 2023 deadline set forth in Procedural Order No. 1. Claimant's counsel further claimed prejudice given the shortened time in which to review documents, thus justifying the request for the extension of the interim milestone dates, and reserved the right to request appropriate relief if Respondent did not comply with the production deadline.

48.    By e-mail dated November 2, 2023, Respondent's counsel did not oppose Claimant's request for an extension of the deadline to submit document production disputes to the Tribunal, but stated their view that all deadlines in the procedural timetable in Procedural Order No. 1, including the hearing dates, should be extended for four weeks for several reasons related in the e-mail. Respondent's counsel reported that they had run into delays with respect to their collection and review of the documentation requested since Claimant's requests implicated certain consumer information or data which would be subject to the General Data Protection Regulation ("**GDPR**") of the European Union. Respondent explained the delays in document production since production of sensitive data across foreign borders was being asked and consultation with German and Swiss counsel was required to analyze the complexities of the requests.

49.    Respondent's counsel also blamed the number and the sporadic nature of Claimant's requests for playing a significant role in the delay of Respondent's production, citing examples, and disputed any accusation from Claimant that Respondent was not proceeding in good faith.

### D. Rescheduling of the Evidentiary Hearing

50.    The Tribunal conducted a status conference on November 10, 2023 at which the above-referenced adjournment requests were discussed and the Tribunal determined that good cause had been shown to reschedule the evidentiary hearing from January to April, 2024. Subsequent to the status conference, the Parties submitted a revised timetable with the evidentiary hearing to take place in the period from April 1, to May 1, 2024. The Parties also reported that the evidentiary hearing would be conducted at the offices of the AAA at 150 East 42nd Street, New York, New York. The Tribunal memorialized these revisions in Procedural Order No. 2 dated December 5, 2023.

51.    At a status conference conducted by the Tribunal on February 1, 2024, counsel discussed the need to revise certain interim deadlines in preparation for the evidentiary hearing. The Tribunal directed the Parties to jointly submit proposed timetable revisions by February 7, 2024. The Parties complied with this request, but also raised a possible request to reschedule the evidentiary hearing a second time because of ongoing delays with document production. At a further conference on February 15, 2024, after hearing the Parties, the Tribunal agreed to adjourn the evidentiary hearing to October 15-18, 2024. The Tribunal directed the Parties to propose an agreed-upon revised timetable of interim deadlines by February 23, 2024. The Parties jointly submitted a revised timetable on February 22, 2024. On the same date the Tribunal requested modifications in the timetable for reasons stated in the Tribunal's e-mail of that date. The Tribunal requested that the Parties submit a revised timetable by February 28, 2024. The Parties complied and the Tribunal approved the revised schedule by Procedural Order No. 3 dated March 1, 2024.

### E.  **Additional Document Production**

52.    The Parties proceeded to produce additional documents according to the schedule established in Procedural Order No. 3. The Parties were unable by meeting and conferring to resolve disagreements over certain of Claimant's document production requests. Claimant submitted requests for relief to the Tribunal by letter dated April 30, 2024. Respondent replied on May 6, 2024. The Tribunal conducted a conference with the Parties on May 7, 2024 at which it made various rulings and the Parties reached various agreements during the conference that appeared to resolve the matters in dispute. The Tribunal memorialized its rulings and the agreements reached at the May 7 conference in an e-mail dated May 13, 2024.

53.    By letter dated June 14, 2024, Claimant reported that despite additional discussions by the Parties, five disputes over document production requests required adjudication by the Tribunal. Respondent replied by letter dated June 26, 2024. The five disputed areas related to whether (1) Respondent was entitled to withhold communications with Mr. Felix Schaefer, described as a "Project Manager" on Respondent's behalf in the process of the sale of certain of its assets to Trelleborg Germany, ultimately consummated by the Trelleborg Acquisition Agreement (described in more detail below) on the grounds of

attorney-client privilege because Mr. Schaefer is also an attorney by profession; (2) Claimant was entitled to production of documents related to Respondent's sales of certain products to customers in Canada, in violation of Claimant's claimed entitlement to exclusive sales representation rights in Canada; (3) "release notes" existed from Respondent's vendor, a company called Schropp GmbH ("Schropp"), related to software and hardware upgrades of its computer systems and, if so, whether Respondent should produce them; (4) Respondent would be required to produce agendas and meeting notes from Respondent's virtual and in-person meetings with representatives of the Trelleborg Group in connection with the negotiation of Trelleborg Germany's acquisition of certain of Respondent's assets; and (5) the Tribunal's directions on the equal sharing of the costs of document production would be maintained. Based upon the Tribunal's review of the Parties' communications on these disputes, the Tribunal on July 1, 2024 delivered Procedural Order No. 4 making rulings on the five disputed requests.

54.  Further disputes between the Parties on document production issues were brought to the Tribunal's attention by letters from Claimant dated August 9 and 13, 2024, to which Respondent replied on August 20, 2024. The Tribunal issued additional directions to the Parties by Procedural Order No. 5 dated August 28, 2024. The first of Claimant's objections related to Respondent's practice of designating every document it had produced to date as confidential. Claimant asserted that this blanket confidentiality designation was inconsistent with the criteria for confidential treatment set out in the Protective Order. The Tribunal noted that Claimant was effectively seeking an order de-designating as confidential the entire group of documents Respondent had produced. The Tribunal denied this request on the basis that Claimant had not followed the procedure laid out in paragraph (h) of the Protective Order for challenging confidentiality designations made by a Party and because Claimant had until that point not challenged the confidentiality designations of the some 160,000 documents Respondent had produced by then. However, the Tribunal permitted Claimant to identify to Respondent by September 6, 2024 a specific subset of up to 25 documents that Claimant did not believe warranted confidential treatment under the Confidentiality Order. Respondent was afforded the opportunity to respond by September 16, 2024. If the Parties were unable to resolve their disputes, they were given the opportunity to seek the Tribunal's intervention.

55.     The second issue addressed by the Tribunal related to Claimant's complaints that Respondent's compliance with the Tribunal's directions in Procedural Order No. 4 on supplemental document production was inadequate, in particular those relating to software upgrades by Schropp, meetings between Respondent's representatives and the Trelleborg Group bearing on Claimant and the existence of the Sales Representation Agreement and sales reports relating to Canada.  Respondent objected to these requests principally on the grounds that they were untimely new requests to produce, but also because the documents/electronic records of Respondent's software vendor Schropp and of Trelleborg were in the possession of a non-party and thus not in Respondent's control.  The Tribunal granted Claimant's request, noting that to the extent any of the documents sought by Claimant were not in Respondent's custody, Respondent was directed to request that the non-party controlling the documents produce them given that Respondent's relationship with the Trelleborg Group and Schropp gave it some measure of control over the documents.  To the extent Respondent was unable to obtain those documents in spite of Respondent's requests for them, Respondent was directed to provide an affidavit to Claimant identifying the time and content of the requests it had made and the responses received.  The Tribunal further noted that it was making this order because Claimant was seeking information that was plainly relevant to the pending disputes, which Claimant had previously requested repeatedly and which had been subject to previous rulings by the Tribunal.  It was the view of the Tribunal that although the previous phrasing of Claimant's requests had evolved over time in response to information belatedly produced by Respondent, the scope of the requested information had consistently encompassed relevant information about (a) changes to the software in Respondent's products, (b) Respondent's sales of products in the territory covered by the Sales Representation Agreement and (c) Respondent's communications with Trelleborg Germany, the acquiror of the majority of its assets, concerning Respondent's post-acquisition relationship with Claimant.  It was the view of the Tribunal that Respondent had consistently interpreted Claimant's requests too narrowly, leading to the sequential, evolving nature of Claimant's requests.  It appears that Respondent ultimately produced sufficient responsive documents, as noted below in Par. 188.

**F.  The Pre-Hearing Conference, Procedural Order Governing the Hearing and Witness Statements and Exhibits**

56.     The Parties made preparations in September 2024 for the evidentiary hearing scheduled for October 15-18, 2024, conferring and reporting to the Tribunal on a number of logistic and other details concerning the conduct of the hearing.  The Tribunal held the scheduled pre-hearing conference on September 30, 2024.  Procedural Order No. 6 dated October 4, 2024 recorded the points agreed and determined in preparation for the evidentiary hearing. These included (i) establishing the venue for the hearing at the offices of the AAA in New York, (ii) the order of examination of the fact witnesses based upon the witness statements exchanged by the Parties on September 20, 2024 and whether those witnesses would be testifying in person or remotely, (iii) the hearing of testimony from both Claimant and Respondent's damages experts based on the reports they had submitted, (iv) the timetable for the Tribunal's hearing objections from the Parties as to the admissibility of exhibits, (v) the timing of Claimant's submissions of a supplemental expert report and hearing exhibits attributable to Respondent's recent, tardy document productions, (vi) the protocols for receiving testimony for those witnesses testifying remotely by Zoom videoconference and (vii) other matters relating to the manner of submissions to the Tribunal.

57.     Shortly after the Pre-Hearing Conference each of the Parties submitted their Pre-Hearing Briefs, on October 4, 2024.  Those briefs referenced the documentary exhibits that each side had submitted as well as their respective written witness statements, which served as the witness' direct testimony.  Claimant submitted fact witness statements for Geno Camali and his father, Eugene J. Camali, both dated September 20, 2024 and William Schumacher, dated September 6, 2024.  Respondent submitted such statements for Axel Spering dated August 28, 2024, Joerg Vogt dated September 20, 2024 and Thomas Reutemann dated August 30, 2024.  The Parties also submitted reports of their respective expert witnesses concerning the analysis and calculation of damages.  Claimant submitted the report of Kevin Flaherty dated July 29, 2024 and Respondent submitted the report of Christopher Young dated August 23, 2024.  As noted at Par. 95, Claimant was permitted to file a supplemental report of Mr. Flaherty because of Respondent's tardy document production, and it did so on March 4, 2025.

**G.  Respondent's Insolvency Filing and Initial Stay of the Proceedings**

58.   On October 8, 2024, Respondent reported to the Tribunal that it had commenced the day before an insolvency proceeding in a court in Bochum, Germany, the place of its registered office.   Respondent requested by letter that the Tribunal stay the arbitral proceedings. Respondent submitted that "[a]s a matter of international comity … that the Tribunal should recognize the stay imposed by German law and direct that this proceeding be stayed until Claimant or the insolvency trustee is able to continue the proceeding pursuant to the German Insolvency Statute." Respondent supplemented its filing on October 9, 2024, reporting that attorney Dorothee Madsen of the law firm Boege Rohde Luebbehuesen, also based in Bochum, Germany, had been appointed as the provisional insolvency administrator of Respondent.

59.   The Tribunal directed Claimant to respond to Respondent's request, which it did on October 10, 2024.  Claimant opposed Respondent's request for a stay but nonetheless asked that the Tribunal "stay these proceedings to allow the parties to fully brief the Stay Application on a complete record."   Claimant further noted that it was "hesitant to proceeding with the fact-finding hearings next week without knowing whether they are impacted by German law … and it would not be an efficient use of the Tribunal's or the parties' resources to proceed in this posture."   Later that day, Respondent filed a brief response to Claimant's filing.

60.   The Tribunal, by e-mail on October 11, 2024, adjourned the evidentiary hearing in light of the Parties' apparent agreement that the evidentiary hearing should not take place the following week to a date to be determined in the future in consultation with the Parties. The Tribunal also suspended all interim deadlines.  The Tribunal stated that it had not yet acted upon Respondent's request for a stay and scheduled a procedural conference with the Parties on October 15, 2024, which was held on that date by Zoom videoconference. Respondent had not responded to a question the Tribunal asked before the conference as to whether Respondent would find it inappropriate or improper for the Tribunal to conduct the proposed conference.

61.   Respondent was represented at that conference by Mr. Syracuse, its usual counsel since the commencement of the arbitral proceedings.   The Tribunal was advised during the conference that the filing was provisional, that the appointed provisional administrator was expected to investigate the circumstances and advise whether the proceeding should be

terminated or pursued as a formal insolvency proceeding. The Tribunal was also advised that there was no stay at that time imposed by the German court or German law of any proceedings other than compulsory enforcement proceedings, including attachments of assets.

62.    In response to the Tribunal's questions, the Parties briefly addressed whether an order of recognition by a U.S. Bankruptcy Court of the foreign representative of Respondent's insolvency estate pursuant to 11 U.S.C. § 1515 was a prerequisite for the stay requested by Respondent. The discussion reiterated the Parties' difference of views on that subject reflected in their submissions of October 10, 2024.

63.    Respondent further requested that the Tribunal stay the arbitral proceedings for a brief period of about 30 days to "preserve the status quo" pending the completion of the investigation by the provisional administrator. Claimant did not object to a limited stay but requested that the Tribunal set adjourned dates for the conduct of the evidentiary hearing as promptly as possible thereafter.

64.    By Procedural Order No. 7 dated October 15, 2024, the Tribunal, after having considered the Parties' written submissions and the discussion at the procedural conference earlier that day, agreed to institute the temporary stay and found that there was no prejudice to Respondent in setting revised, prompt dates for the evidentiary hearing. In contrast, deferring scheduling the hearing until after greater clarity had been provided concerning the insolvency proceeding in Germany would risk a considerably longer adjournment than would otherwise be needed and therefore could be prejudicial to Claimant. As a result, the Tribunal ordered that all proceedings in the arbitration be stayed until November 14, 2024. The Tribunal set new dates for the evidentiary hearing to be held - December 10-12, 2024 - but asked the Parties to report if those dates were not available for any party or witness. The Tribunal directed that the Parties report to the Tribunal on the status of the German insolvency proceedings in writing by November 8, 2024 and convey their positions on whether the stay should continue after November 14, 2024; if so, for how long and under what conditions. If pertinent, the Tribunal further instructed that these written submissions should also address the issue of whether an order of recognition under 11 U.S.C. § 1515 would be a pre-requisite to a stay of the arbitral proceeding. The Tribunal requested that a further procedural conference be conducted during the week of November 12, 2024 to discuss the issues addressed in the written submissions. The Tribunal authorized each of

the Parties to invite Ms. Madsen, the provisional administrator, to attend the procedural conference.

65.    On October 22, 2024, Respondent advised that the proposed dates in December 2024 for the evidentiary hearing established in Procedural Order No. 7 were not convenient for it. The Tribunal responded by e-mail on the same day that if Respondent demonstrated good cause to adjourn the December hearing dates, the hearing would be held from January 21 to January 24, 2025.

### H.  <u>Report of the Insolvency Administrator and Extension of Stay</u>

66.    Respondent's November 8, 2024 submission in response to the Tribunal's direction reported that insolvency proceedings were opened on November 6, 2024 and that Ms. Madsen, previously appointed the provisional insolvency administrator on October 9, 2024, had been confirmed by the Bochum District Court (*Landgericht*) as insolvency administrator (the "Administrator") and that the District Court set February 5, 2025 as the date by which she must either recognize or dispute creditors' claims. Respondent's November 8 submission also reported that the Administrator was the legal representative of Respondent in this proceeding, that she had retained Meilicke Hoffmann & Partner, a German law firm, to represent Respondent in this matter and that Respondent's United States counsel, Tannenbaum Helpern Syracuse & Hirschtritt LLP, was no longer authorized to act on its behalf. Respondent did not contend that the Tribunal was obligated under German law to stay the arbitration but requested that the Tribunal continue the stay through February 5, 2025 to allow the Administrator time to discharge her obligations to examine all claims. Claimant's November 8 submission asked that the Tribunal continue the stay through December 10, 2024 and confirm the hearing dates of January 21-24, 2025, contending that by that date the Administrator would have had sufficient time (more than two months) to examine the claim.

67.    On November 12, 2024, the Tribunal conducted a procedural conference by Zoom videoconference where Claimant's counsel was assisted by its German counsel, Dr. Marcus Perkhams of Addleshaw Goddard (Germany) LLP, based in Frankfurt. Respondent was represented by the Administrator and by Mr. Christian Slota of Meilicke Hoffman & Partner.

68.     In the course of the discussion at the conference, Mr. Slota noted that although German law generally respects a contracting party's obligation to comply with an arbitration agreement, Respondent may nonetheless be entitled under German law to reject the obligation to arbitrate under certain circumstances, typically involving insufficient resources. Claimant's German counsel reported that he did not necessarily agree with that legal proposition but would wish to research the matter.

69.     The Tribunal advised during the conference that it would grant Respondent's request to continue the current stay of the arbitration proceeding through February 5, 2025, the date on which the Administrator's report was due to the Bochum District Court. The Tribunal also requested that Respondent advise Claimant and the Tribunal as much in advance of February 5, 2025 as possible whether it would be asserting the position that, in the event the Administrator were to dispute the claim, Respondent would not be obligated to continue to participate in the pending arbitration. In response, the Administrator agreed that she would be able to make and report that determination by mid-January 2025.

70.     By Procedural Order No. 8 dated November 12, 2024, based upon the Parties' submissions and the discussion during the conference earlier that day, the Tribunal ordered that the arbitration proceeding be stayed until the next procedural conference to be conducted during the week of February 10, 2025.[4] The Tribunal also identified specific dates in March and May, 2025 on which it would be able to conduct the rescheduled evidentiary hearing and directed the Parties to report by November 19, 2024 which of the offered dates were acceptable. The Tribunal also directed Respondent to report no later than January 15, 2025 whether it planned to assert the position under German law that it was not bound to comply with its agreement to arbitrate disputes contained in the Agreement and, if so, the legal and factual basis for that assertion. Claimant was also permitted, if it chose, to submit a letter brief reporting its view of this aspect of German law prior to January 15, 2025. The Tribunal indicated that if Respondent were to assert that it is no longer bound by the arbitration agreement, Claimant was to submit its response within fourteen days after

---

[4] In granting this stay, the Tribunal adopted the view of Claimant's counsel in its letter of November 8, 2024 that the issue of whether Respondent was obligated to initiate a proceeding under Chapter 15 of the U.S. Bankruptcy Code before its foreign insolvency proceeding could be recognized in the United States had become moot, particularly as no German court had actually issued a stay of the arbitration proceeding.

receiving Respondent's assertion. Finally, the Tribunal directed that Respondent report no later than February 7, 2025 the status of Respondent's insolvency proceeding and whether the Administrator had determined by that date whether the stay of this arbitration proceeding should be lifted. The Tribunal then directed that Claimant submit its response to this report no later than two days before the date of the following status conference to occur during the week of February 10, 2025.

71.    In mid-November 2024, the Parties had agreed to February 12, 2025 as the date of the following procedural conference and March 3-6, 2025 as the dates for the evidentiary hearing, but then the Tribunal was informed that Respondent's damages expert, Mr. Christopher Young, was not available for those hearing dates since he was in the U.S. Army Reserves and had been called up for active duty, which would last through the end of April, 2025. As a result, Mr. Slota by e-mail dated November 20, 2024 stated that Respondent and its witnesses would be available for the evidentiary hearing during the May 6-9 time frame suggested    The Tribunal requested that Respondent provide further details concerning Mr. Young's service.

72.    On November 27, 2024, Mr. Slota reported that Mr. Young was a Major in the U.S. Army Civil Affairs and Psychological Operations Command and that there was no possibility of rescheduling his service under orders that were to be issued in mid-December. Mr. Slota subsequently communicated a copy of Mr. Young's orders dated December 9, 2024 which showed that Mr. Young was ordered to active duty for a period of 87 days starting on January 12, 2025.

### I.   Claimant's Request for Leave to Make a Dispositive Motion

73.    On December 11, 2025, Claimant submitted a request that it be permitted to make a dispositive motion on the issue of contract liability on the grounds that documents produced by Respondent following the prior deadline for making a dispositive motion request revealed information that was highly relevant to the question of Respondent's liability, including Claimant's Ex. 104 (discussed below at Par. XXX). Claimant had moved for leave to file a partially-dispositive motion on September 6, 2024; the Tribunal declined leave on September 17, 2024 because the evidentiary hearing was scheduled to start on October 15, 2024 and motion practice would not have been efficient. Claimant highlighted

in its renewed submission that Respondent had made 23 piecemeal document productions of over 46,000 pages of documents after the original August 24, 2024 deadline for applications to file dispositive motions had elapsed.

74.    By e-mail dated December 13, 2024, the Tribunal denied Claimant's renewed request for leave to file a dispositive motion on liability due principally to the Tribunal's concern that it was inappropriate to lift the stay determined to be in effect until February 5, 2025.  On that date the Tribunal also determined that the evidentiary hearing would be bifurcated due to the unavailability of Respondent's damages expert until the end of April, such that the hearing on liability would take place from March 3 to 6, 2025 and that a subsequent hearing would take place on May 29-30, 2025 (if all relevant participants were available) on damages if liability to Claimant was determined due to Respondent's breach or to Respondent from Claimant if Respondent's counterclaims were found to have merit.

75.    On December 17, 2024, Mr. Syracuse, having been copied on the Tribunal's e-mail of December 13, 2024, confirmed that he was no longer authorized to act on behalf of Respondent.

76.    On December 18, 2024, both Claimant's and Respondent's counsel confirmed that the May 29-30, 2025 dates were acceptable for the damages phase of the hearing.

### J.    Parties' Positions on Respondent's Continued Participation in the Arbitration

77.    In compliance with Procedural Order No. 8, Mr. Slota on behalf of Respondent submitted a letter brief on January 15, 2025 outlining Respondent's position that under German law it was no longer able to participate in the arbitration proceedings if Claimant wished to pursue its claim against Respondent in the event the Administrator disputed that claim.  Mr. Slota maintained that the German Federal Court (*Bundesgerichtshof*) had ruled in 2000 that a party to an arbitration agreement is not bound by that agreement if that party is unable to pay the costs of the arbitration due to lack of funds.  He also maintained that § 1032 of the German Code of Civil Procedure (*Zivilprozessordung*) should be interpreted to mean that an agreement to arbitrate is incapable of being performed (*undurchführbar*) if one party does not have enough assets to pay for the proceedings as well as for proper representation through lawyers and the other party is not willing to provide for the funding of the opponent.  He presented an interpretation of relevant German court jurisprudence and also

comparatively that of other jurisdictions to the effect that the impecuniousness of a party to an arbitration agreement will make the agreement incapable of being performed, which fact should also be recognized by the arbitral tribunal.

78.    Mr. Slota's letter of January 15, 2025 also related what he described as the Administrator's assessment as to the reasons that led to Respondent's insolvency and over-indebtedness within the meaning of the German Insolvency Code (*Insolvenzordnung*) and her conclusion that Respondent's insolvency estate did not have sufficient funds to continue the arbitration proceedings.  The letter related the amount that Respondent had up to that point paid in connection with the arbitration. That amount was said to be € 1,546,638, which included € 1,125,100 to Tannenbaum Helpern Syracuse & Hirschtritt LLP, Respondent's U.S. counsel from inception of the arbitration until it reported that it was no longer authorized to act in December 2024, the deposits paid to the American Arbitration Association against arbitrator compensation and other fees and other litigation costs.  The letter also lays out what are said to be unpaid invoices related to the arbitration amounting to € 539,344 (principally owed to Tannenbaum Helpern Syracuse & Hirschtriff LLP) and a calculation of expected costs of € 735,000 to bring the arbitration case to a conclusion, whereas the Administrator's assessment as of January 9, 2025 of unencumbered assets of Respondent's insolvency estate amounted only to € 376,184.

79.    Mr. Slota's letter of January 15 also contended that Claimant's German counsel had received on October 22, 2024 a statement from Respondent's tax advisor detailing what consideration Respondent received as a result of selling the majority of its assets to Trelleborg Germany in 2022.  After satisfaction of Respondent's liabilities, the amount of € 1,462,000 was transferred to Respondent's account and that further partial amounts were transferred later.  In sum, Mr. Slota made the argument that, given the cash remaining available to Respondent following its assest sale to Trelleborg Germany, it was the fact of Respondent's paying for the costs of the arbitration to date that had rendered it insolvent.  Finally, Mr. Solta related that the damages sought pursuant to Respondent's counterclaims had been reduced from € 4,645,456 plus interest to € 922,941.

80.    Also consistent with the timetable established in Procedural Order No. 8, Claimant submitted a reply to Mr. Slota's letter on January 29, 2025.  Claimant's reply included a memorandum from Dr. Perkams of its German counsel Addleshaw Goddard in which Dr. Perkams disputed the conclusion that the incapability defense raised by Respondent

prevented it from participating in the arbitration. Dr. Perkams maintained that the principal reason for this conclusion is that German law "has no relevance at all" to the validity of the agreement to arbitrate, which was subject to the law of the State of New York, like the Sales Representation Agreement in a larger sense. Neither party had disputed the applicable law at any point during the proceedings. Dr. Perkams also maintains that the law of the State of New York would also be the relevant one even if the principles of German private international law were applied to the circumstances. His conclusion was that the validity of the agreement to arbitrate depends solely on the law of the State of New York.

81.    Further, Dr. Perkams asserted that even if hypothetically one were to take the incapability defense into account, the agreement to arbitrate would still not be "incapable of being performed" within the German understanding of the phrase. His analysis is that § 1032 of the German Civil Procedure Code cited by Mr. Slota only applies to German court proceedings, which is not the case here, and to court proceedings commenced before the arbitral tribunal has been appointed. He also pointed out that one of the core prerequisites for the application of the incapability defense is that Respondent would have to prove that it is unable to pay the costs associated with the arbitration and that Claimant is not willing to fund the costs of the arbitration for Respondent. He highlighted that Claimant's counsel's letter of January 29, 2025 made it clear that Claimant was willing to fund the deposits against arbitrator compensation that were invoiced to Respondent that Respondent had not paid. Further he related that the principals of Claimant by letter dated January 31, 2025 offered to travel to Germany to confer with the Administrator over ways to limit the costs of the arbitration.

82.    As additional analysis of the applicability of § 1032 of the German Civil Procedure Code, Dr. Perkams noted that one of the pre-requisites of the incapability defense is that German state court proceedings be a financially viable alternative to Respondent as compared to arbitration. Dr. Perkams disputed that German court proceedings would be a viable alternative to the instant arbitral proceedings, pointing out that if new proceedings were brought by Claimant in a German court, both Parties would have to start from scratch, triggering several procedural rounds engendering significant legal costs, including with relation to expert opinions needed to prove New York law in a German court. While the principle under German law (§ 114 of the Civil Procedure Code) that an impecunious

litigant could receive a form of legal aid from the state could theoretically apply to this situation, Dr. Perkams disputed that this would apply in this case, first of all for the reason that that litigant would have to have sufficient prospects of success, particularly since this is a complex case governed by foreign law. Also, another prerequisite of the defense is that the alternative to arbitration, *i.e.* initiating proceedings before German courts, would be a viable and realistic option for Claimant. Dr. Perkams qualified as "grossly unfair" and akin to a denial of justice if Claimant were forced to abandon the significant costs and efforts already invested in the arbitration and to start over in a foreign legal order where it would take several years before the dispute would be resolved in the first instance, and even longer if there were to be appeals.

83.    In addition to reiterating these points, Claimant's New York counsel's January 29, 2025 letter laid out their analysis of how the AAA Commercial Arbitration Rules, those applicable to this case, address the issue of a non-participating respondent. Rule R-32 provides that "[u]less the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or to obtain a postponement." Rule R-59 allows for a party, in this case Claimant, to advance whatever required payments for arbitrator compensation or expenses are to be incurred in connection with the hearing. Claimant's counsel stated its intent to fund the arbitrators' fees and expenses that might be required to bring the proceeding to a conclusion. In this regard, Claimant cited the part of Rule R-32 that does not permit an arbitrator to issue an award solely upon a party's default, but to "require the party who is present to submit such evidence as the arbitrator may require for the making of an award." Claimant reaffirmed its willingness to proceed to the evidentiary hearing to present its witnesses and proofs on this basis to seek an award.

84.    As to Respondent's counterclaim, Claimant submitted that the scheduled evidentiary hearing should be limited to the merits of Claimant's breach of contract claim, not Respondent's counterclaim. This position was founded on Rule R-59(a), which allows an arbitrator to take specific measures relating to a party's non-payment (as applied here, of the AAA's most recent invoice to Respondent for deposits against arbitrator compensation), which includes "limiting a party's ability to assert or pursue its claim."

85.    Claimant's counsel concluded their January 29, 2025 letter by asserting how prejudicial it would be at that stage of the proceedings to deny Claimant the opportunity to submit

additional proofs, to substantiate that Respondent breached the Sales Representation Agreement and to obtain an award of damages. Counsel argued that the enforceability of such an award was not a question currently before the Tribunal and in any event that questions over enforceability would not be a reason for the Tribunal to decline to hold a hearing and issue an award. Claimant's submission was that the AAA Commercial Arbitration Rules allow for Claimant to see the proceeding to a conclusion, emphasizing that Claimant intended to advance the arbitrators' fees and expenses as necessary to do so. Claimant's counsel characterized Respondent's raising the incapability defense at the stage of the proceedings it did as inherently suspect, and a continuation of Respondent's strategy of delaying the proceedings and perhaps even deliberately forcing Respondent into insolvency by incurring excessive legal costs in the U.S., such as by Respondent's U.S. counsel's over-staffing its representation.

### K. <u>Administrator's Disputing of Claimant's Claims</u>

86.    On February 7, 2025, the Tribunal received from Mr. Slota the scheduled report on the status of the insolvency proceedings as well as a response to Claimant's letter dated January 29, 2025. Mr. Slota reported that an examination hearing (*Prüfungstermin*) in Respondent's insolvency proceedings was held with the Bochum District Court as scheduled and that the Administrator disputed in full the amount claimed by Claimant in this arbitration (reported as € 29,289,974.36). Mr. Slota maintained that according to §179 of the German Insolvency Code (attached in translation to his filing), Claimant was allowed to file suit against the Administrator to have its claim recognized and that the Bochum District Court had exclusive local and international jurisdiction for such an action. For the reasons stated in Respondent's January 15, 2025 submission, Mr. Slota repeated the assertion that the Administrator is not bound by the agreement to arbitrate in the Sales Representation Agreement, commenting that Claimant's submissions of January 29, 2025 did not lead to any other conclusion. More particularly, Mr. Slota maintained that the incapability defense was not specific to German court proceedings but a more general principle of German law which has to be considered at any stage of the proceedings, including by an arbitral tribunal. While acknowledging that German law does not have an explicit rule that arbitration proceedings have to be stayed on the insolvency of a party such

as in §362 of the U.S. Bankruptcy Code, he argued that the overriding principle of German insolvency law was that all creditors of an insolvent German company are required to pursue their claims against the insolvency estate solely in accordance with the rules of German insolvency law.  Mr. Slota repeated the request that the arbitral proceedings be permanently stayed, especially since the insolvency proceeding was now formally opened, which was not the case when the Tribunal had declined Respondent's previous request for a stay.

87.    Mr. Slota further requested that if the Tribunal was not willing to order a permanent stay of the arbitral proceedings, that they be suspended under Rule R-59 of the AAA Commercial Arbitration Rules.  He concluded by stating that if the Tribunal were not willing to order a permanent stay or suspension or termination of the arbitral proceedings, the Administrator would notify the bankruptcy court in Bochum of a possible insufficiency of assets under §208 of the German Insolvency Code, which would lead to a court order suspending the insolvency proceedings and providing for an accelerated distribution of the funds remaining in the estate.

## L.  Tribunal's Determinations on the Continuation of the Arbitration

88.    As invited by the Tribunal and in anticipation of the February 12, 2025 procedural conference scheduled under Procedural Order No. 8, Claimant's counsel on February 10, 2025 submitted a response to Mr. Slota's February 7, 2025 letter.  The response attached another letter from Claimant's German counsel, Dr. Perkams, in which he reiterated his view that Respondent's filing for insolvency and the opening of insolvency proceedings did not affect the validity of the arbitration agreement, maintaining that the arbitration agreement is governed by New York law, which is the sole law to which the Tribunal should look as to whether the agreement to arbitrate could be avoided or had become incapable of being performed.  Dr. Perkams also disputed that there is any principle of German law that would require a permanent stay of the arbitral proceedings.  He pointed to case law of the German Federal Court that would require an arbitral proceeding to be temporarily stayed to allow an insolvency administrator to comply with the mandatory rules of German insolvency law, which temporary stay would include the time required for an insolvency administrator to assess the claims filed against the estate and to decide

whether to dispute or accept the claims. Dr. Perkams maintained that this procedure had been respected in this arbitration and now that the Administrator had made a determination to dispute Claimant's claim, there was no further need to stay this arbitration. He concluded that even though § 208 of the German Insolvency Code mentioned by Mr. Slota does allows an insolvency administrator to inform the competent court of an insufficiency of assets, the Administrator would have been and still was free to react to Claimant's offer to find ways to structure the arbitration proceedings to remain affordable for Respondent.

89.    The procedural conference scheduled for February 12, 2025 took place with the participation of all members of the Tribunal, Claimant's U.S. counsel and German counsel, Dr. Perkams, and Mr. Slota on behalf of Respondent. Mr. Slota informed the Tribunal that the Administrator chose not to participate and requested that he inform the Tribunal of her positions. The Tribunal engaged the Parties in discussion, questioning both German counsel on pertinent subjects, including the availability of court-funded counsel to represent Respondent in the event Claimant were to initiate suit in the court in Bochum. The Tribunal ruled at the conclusion of the February 12 conference that it was declining to renew the stay it had previously entered, which by its terms had continued only until the February 12 conference, and that consequently the arbitration hearing would proceed as scheduled.

90.    Later that day the Tribunal followed up with all participants with an e-mail summarizing the rulings and agreements made during the conference as follows:

    (i)    The stay of this proceeding that the Tribunal previously entered expired the morning of February 12, 2025 and the Tribunal determined not to continue the stay or otherwise suspend or terminate this proceeding.

    (ii)    Consequently, the hearing on the merits would be conducted as previously scheduled on March 3-5 and a hearing on damages, if necessary, will be conducted on May 29 (with May 30 held in reserve).

    (iii)    The Tribunal expressed its sensitivity to Respondent's financial circumstances, and suggested several steps that the Parties might agree upon to reduce the cost of the upcoming hearing. These include conducting the proceeding entirely by the Zoom remote videoconference platform, eliminating any travel expense and facilitating the conduct of witness examinations by Respondent's German counsel if appropriate (it having been noted that the fees of German counsel are typically less than US counsel); dispensing with a formal transcript and relying on a Zoom AI-generated transcript; eliminating any post-hearing briefing and instead

conducting a closing argument (likely on a date to be selected after the hearing); and reducing the length of the requested reasoned award to something in the neighborhood of ten pages.

(iv)   Claimant confirmed its agreement to fund Respondent's share of pending or future AAA invoices for tribunal compensation or AAA administrative fees, though not fees associated with the increased amount of Respondent's counterclaim as Respondent's counsel has reported Respondent will not be pursuing that amount of damages.

(v)    The Parties agreed to meet and confer on means to reduce the cost of participation in the arbitration proceeding, such as those identified at the conference by the Tribunal and summarized in item (iii) above, and, if Respondent decided to continue to participate in the arbitration, to update the dates in Procedural Order No. 6 for the Parties to object to exhibits and witness statements and to file pre-hearing briefs. Claimant's counsel was directed to submit a joint report on behalf of both Parties describing the outcome of the Parties' discussions by not later than the close of business on Tuesday, February 18, 2025.

(vi)   If the outcome of the meet/confer was that Respondent would participate in the arbitration, then the Parties were directed to comply with Procedural Order No. 6 with respect to the revised dates to be identified in the February 18 joint report.

(vii)  If the outcome of the meet/confer was that Respondent would continue to adhere to its position that it would not participate in the arbitration, then the Tribunal would conduct a conference with Claimant's counsel at 9:00 U.S. Eastern time on Friday, February 21, 2025 to address the scope of the unilateral hearing.

91.    The Tribunal's e-mail also summarized the analysis that supported its determination to decline to renew the stay and to conduct the evidentiary hearing and complete the arbitration proceeding, as follows:

a.   No court order has been entered prohibiting this arbitration from proceeding.

b.   The sole basis for Respondent's request that the proceeding be suspended or terminated is its position that under German law the arbitration agreement is no longer binding because it is not capable of being performed due to Respondent's impecuniousness.

c.   The predicate of that aspect of German law is the understanding that an arbitration proceeding is materially more costly to an impecunious party than a court proceeding in Germany because of the availability of legal aid to parties in Germany; as Prof. Wagner has explained in an article supplied by Respondent (RL-4), there is no basis under German law to avoid an arbitration

agreement unless the court proceeding is shown to be much less expensive to the impecunious party.

d.   Respondent did not make a compelling showing that legal aid would in fact be available to it in the event the arbitration is suspended and Claimant brings its claims in a German court, either at all or in an amount sufficient to enable Respondent to defend itself, particularly in light of the complexity of Claimant's claims and the fact that they are governed by New York law, necessitating retention of counsel competent in that law.  Respondent's written submissions to the Tribunal identified the criteria that would need to be satisfied for legal aid to be provided without offering an opinion that on the specific facts and circumstances here a court would likely find the criteria satisfied; in contrast, Claimant's written submission included a clear statement of opinion of Claimant's German counsel that it was unrealistic to expect that legal aid would be made available in a case of this type; at the conference Claimant's counsel also noted that the amount of any legal aid subsidy, if granted, would likely be insufficient to compensate lawyers capable of defending Respondent in a complex case governed by foreign law.

e.   Much of the cost of the arbitration had already been incurred, including substantial deposits for the Tribunal's compensation; indeed, although it is possible that additional deposits may be required (which Claimant has agreed to fund), it is also possible that, particularly if cost-saving measures are agreed upon by the Parties, some of the current deposits may be refunded to the Parties.

f.   Under all these circumstances, and given the undisputed fact that a German court proceeding would impose far greater cost on Claimant and take far more time than continuing the pending arbitration, which is scheduled to conclude by early summer, 2025, at the latest, fairness requires a greater showing than Respondent has advanced to warrant excusing Respondent's compliance with the arbitration agreement.

## M. Respondent's Cessation of Participation in the Arbitration

92.   On February 18, 2025, Mr. Slota on behalf of Respondent provided a letter informing the Tribunal that Respondent would not participate in any further session, hearing or conference of this arbitration proceeding, reiterating Respondent's previously stated arguments as to why it is not bound by the arbitration agreement in the Sales Representation Agreement, characterizing the suggestions made by the Tribunal to reduce costs of further proceedings as "unsuitable and in particular unacceptable for the Respondent."  Mr. Slota asked that the Tribunal respect what he described as objectively justified decisions under German law by Mr. Vögt, Respondent's CEO, to file for insolvency, following a duty under

German law when the company concerned had run out of funds, and of the Administrator confirming that Respondent suffered a lack of liquidity and over-indebtedness while finding that the current arbitration proceedings were the very reason for the insolvency. Mr. Slota affirmed that it was the Administrator's professional judgment that she could no longer participate in the arbitration without violating the interests of the insolvency estate and of the creditors of Respondent. Mr. Slota noted again that Claimant would be free to file its claim with the Bochum District Court and repeated his view that Respondent expected to be entitled to legal aid under German law should Claimant bring its claim in the Bochum District Court, in particular because the Parties' legal fees would be determined by reference not to the nominal amount of Claimant's claims but on the amount that a creditor might expect to receive from the insolvent estate and in the light of all of Respondent's submissions to date "rejecting the excessive and unjustified claims raised by Claimant." He concluded by stating that the Administrator was reserving her right to file for a lack of assets (*Masseunzulänglichkeit*) under §208 of the German Insolvency Code. The Tribunal acknowledged receipt of this communication, regretting Respondent's decision, and confirmed that a procedural conference to discuss the conduct of the evidentiary hearing would proceed as scheduled on February 21, 2025.

93.    The Tribunal proceeded with the procedural conference on February 21, 2025 with Claimant's counsel Mr. Rosenzweig and Mr. Fiero appearing for Claimant and without the participation of the Administrator or her counsel, consistent with Mr. Slota's letter of February 18, 2025. The Tribunal followed up with an e-mail to the Parties, including Mr. Slota, to confirm that the hearing on the merits would begin on March 3, 2025 at the AAA hearing center in New York and that the Tribunal would hear the testimony of Claimant's expert witness on damages on March 12, 2025 due to his unavailability the first week of March.

### N.  The Evidentiary Hearing

94.    On March 3, 2025, the Tribunal heard the testimony in person at the AAA hearing center in New York of Claimant's two principal witnesses, Mr. Geno Camali, CEO of Claimant, and Mr. Eugene Camali, who helped fund IST NA, based on their previously submitted witness statements. The Tribunal further heard the testimony by Zoom videoconference

of Mr. William Schumacher, Senior Vice President for Commercial Banking of M&T Bank, IST NA's lender, also based on his previously submitted witness statement. The Tribunal made numerous inquiries of the witnesses to clarify and seek explanation of various aspects of their written witness statements and the exhibits submitted with them, as well as Jurgen Vögt's witness statement and Respondent's exhibits, which had been submitted prior to the hearing originally scheduled for October 2024. This first phase of the hearing was concluded on March 3, 2025. A transcript prepared by Ms. Roberta Caiola, a shorthand reporter employed by U.S. Legal Support, Inc. was made of the hearing. No representative of Respondent appeared at the hearing but the transcript was provided to Respondent's counsel.

95.    On March 4, 2025, as the Tribunal had previously authorized in Procedural Order No. 6, Mr. Keven Flaherty of the forensic accounting firm Matson Driscoll & Damico LLP submitted a Supplemental Damages Report (the "**Supplemental Flaherty Report**") in light of Respondent's tardy production of documents pertaining to the analysis of damages. The procedural order required that the supplemental report "be based on information produced by Respondents after the date of Claimant's first expert report and is not to constitute a full 'rebuttal' expert report, which was not contemplated in Procedural Order No. 1."

96.    On March 12, 2013, the Tribunal proceeded to hear Mr. Flaherty in person at the AAA hearing center in New York and to question him on the methodology and conclusions contained in his supplemental report. Claimant's counsel attended this hearing, as well as Claimant's representatives Mr. Geno Camali and Mr. Eugene Camali. No representative of the Administrator or Respondent attended the hearing although they were informed of its scheduled time and place. At the end of the hearing, the Tribunal determined certain next steps that would be undertaken in the proceedings, including (1) allowing Claimant to file by March 24, 2025 the requests to remove the confidentiality designations from documents produced by Respondent which had originally been set for October 25, 2025 under Procedural Order No. 5 but were not submitted due to the stay of the proceeding decided at the time, as described above, and (2) setting April 11, 2024 as the date for Claimant to submit a post-hearing brief and its application for shifting of its costs and attorney's fees.

97.    On March 14, 2025, the Tribunal received a letter from the Administrator in which she informed the AAA that she had communicated to the Insolvency Court in Bochum what she described as an "insufficiency of assets" concerning Respondent within the terms of the German Insolvency Code, the consequence of which would be the ranking of Respondent's liabilities and a prohibition on enforcement and set off of Respondent's assets under that statute.   The communication also included a schedule of creditors of Respondent, including the Administrator's own fees and sums owed to the AAA for arbitration costs (presumably unpaid invoices for deposits against arbitrator compensation) and legal fees owed to the Tannenbaum Helpern Syracuse & Hirschtritt firm.

**O.  Claimant's Request to De-Designate Respondent-Produced Documents as Confidential**

98.    On March 24, 2025, Claimant's counsel confirmed a request made by the Tribunal at the close of the March 12, 2025 hearing that the Tribunal be afforded 60 days to issue the final award in this arbitration from the date the Tribunal closed the hearing records.  Claimant's counsel also timely submitted on that date their application to remove the confidentiality designation from some 25 documents produced by Respondent in the summer of 2024, which followed the request previously made by Claimant on September 6, 2024 concerning those documents.  Claimant's submission attached as an exhibit a copy of the Protective Order and a copy of Respondent's U.S. counsel's September 16, 2024 opposition to such request with regard to such 25 documents.   On March 25, 2026, Mr. Slota, the Administrator's counsel, having been copied on Claimant's submission (as with all other correspondence in this case subsequent to his notice of non-participation of February 18, 2025), submitted a letter on behalf of the Administrator opposing Claimant's de-designation application on the grounds that (1) all but two of the documents indicated by Claimant's counsel contained personal data that are protected by the European GPDR under a reservation made by Germany to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters of March 18, 1970 and (2) the documents contained confidential business information that qualify as trade secrets under the German Trade Secrets Act.

99. On March 26, 2025, the Tribunal informed Claimant as well as the Administrator and Mr. Slota that it was denying Claimant's application to remove the confidentiality designation from the 25 specified documents on the grounds that the Protective Order provided protection for all documents that are "confidential" within the meaning of the Protective Order. That would include all documents containing sensitive commercial data such as, among other things, confidential or proprietary commercial or business information, financial data, and documents related to mergers and acquisitions to the extent containing confidential financial data, as well as the terms of the Trelleborg Acquisition Agreement. The Tribunal rejected Claimant's contention that the Protective Order limited confidentiality protection to documents containing "proprietary" information, as well as Claimant's contention that documents relating to mergers and acquisitions matters must also be "proprietary" to warrant protection. The Tribunal, having decided to deny Claimant's application without reference to Mr. Slota's letter of March 25, 2025 in opposition, did not address the questions raised therein.

## P. __Claimant's Post-Hearing Submissions and the Closing of the Hearing Record__

100. Claimant timely submitted on April 11, 2025 its post-hearing brief with proposed decretal paragraphs for the award. Its brief was accompanied by an affirmation of its counsel, Mr. Rosenzweig, identifying the time (and accompanying hourly rate) he devoted "solely to the discovery disputes with Respondent" as described in the post-hearing brief. The affirmation also identified the administrative fees and costs Claimant had paid to the AAA. Claimant also submitted an affirmation of its German counsel, Dr. Perkam, identifying the time he spent on issues concerning European data privacy and the scope of attorney-client privilege in Germany in connection with certain of the discovery disputes.

101. The hearing record was closed as of April 30, 2025.

## VI.    FACTUAL BACKGROUND

102. Claimant IST NA was created on April 17, 2019 as a joint venture owned in equal shares by Geno Camali and Respondent IST GmbH. Ex. J-5 (Operating Agreement of I.S.T. North America LLC). The joint venture was created to serve as Respondent's sales representative. Geno Camali was the entity's sole manager. J-5 § 10.1(a).

103.   Respondent's business was to manufacture and sell equipment and materials used in the rehabilitation of damaged underground sewer pipes.  IST GmbH's products were used for "trenchless" pipe repairs, which allowed the buried pipes to be rehabilitated without the need to excavate the surface to reach the pipes; instead, the trenchless repair process encompassed the insertion of a new liner inside the existing pipe, "curing" the liner to transform it into a rigid, durable new pipe, and then cutting openings in the new liner to restore access to the other existing pipes that branch from the repaired pipe as part of its distribution network.

104.   The trenchless rehabilitation technology involved liners, typically resin-impregnated felt or fiberglass, and the use of two key pieces of equipment: a "light train" that directed ultraviolet light onto the liner's surface to cure it, and a robotic power cutter that cut the portions of the liner that blocked the lateral openings to the branch pipes.  Direct Testimony of Eugene Camali on behalf of Claimant, Sept. 20, 2024 ("**G. Camali Witness Stmt.**") ¶ 5.

105.   The new venture, IST NA, entered into the Sales Representation Agreement with IST GmbH on the day the joint venture was created.  J-6.  That Agreement appointed IST NA as IST GmbH's "exclusive representative for the sale of equipment and parts manufactured by Company, including, without limitation, the equipment and parts listed in Exhibit A…and any and all other equipment and parts manufactured by Company currently or at any future time."  It also authorized IST NA to service the products it sold. J-6 § 3.5(a).  The territory was specified as the United States; the Agreement also provided that "[e]xpansion of the Territory to include Canada will take place on January 1, 2020…."  J-6 § 2.3.

106.   Respondent's products were to be sold to Claimant at the prices stated in the Agreement, subject to "reasonable price adjustments…based on changes in …costs and market conditions." J-6  § 3.1.  The price schedule referenced and annexed to the Agreement was blank, however, and IST NA relied on IST GmbH's obligation to sell its products at "the most favorable pricing provided to any representative or customer." *Id.* G. Camali Witness Stmt.  ¶ 40.

107.   IST NA covenanted to "obtain a minimum of $1 million in financing for Equipment purchases" and to "submit a commitment letter for such financing to Company within 60 days after the date of this Agreement" and a binding financing agreement within 120

days.  J-6 § 4.4.  IST GmbH covenanted to specific shipping times depending on the nature and volume of IST NA's orders.  J-6 § 3.4.  IST GmbH also committed at the outset to ship certain specified equipment valued at $415,000 on consignment.  J-6 § 3.6.

108.   The Sales Representation Agreement had no stated term.  Instead, it authorized either Party to terminate if the other committed a material breach that was not cured within 30 days of notice by the terminating party.  The Agreement also allowed IST GmbH to terminate the exclusivity provision, but not the contract as a whole, if IST NA failed to purchase at least $2 million from IST GmbH in any calendar year starting with 2022.  J-6 §§ 8.2, 8.1.  In case of termination by Claimant because of Respondent's material breach, or by Respondent because of Claimant's failure to achieve sales targets, IST GmbH was obligated to "re-purchase any Equipment purchased by Representative and not re-sold by Representative, at the price paid by Representative for such Equipment (if new) and at fair market value (if used).  J-6 § 8.3.[5]

109.   The Parties' relationship got off to a rocky start.  IST NA's "grand opening," on June 28, 2019, was attended by various prospective customers, Mr. Vogt and other employees of Respondent and Claimant's bankers, but was marred by multiple flaws.   One of the large pieces of equipment, a "large light train" used to cure pipe liners with UV light, could not be turned on for lack of a key component.  During the demonstration of a smaller UV light train, "several of the light modules burned out during the demonstration" even though the demonstration was conducted by IST GmbH's head of UV equipment.  And IST GmbH's failure to have supplied all of the consignment equipment and parts to which it had committed in the Agreement led to an inadequate display of replacement parts that was "embarrassing."  G. Camali Witness Stmt. ¶ 46.

110.   IST NA's grand opening event was also attended by a former U.S.-based sales representative, Renewal Technologies, who advised Geno Camali that its contract with IST GmbH had not yet been terminated.  *Id.* ¶ 48.  Section 3.8 of the Sales

---

[5] Section 8.3 provides that the inventory re-purchase obligation arises "[i]f this Agreement is terminated by Company pursuant to Section 8.1 or by Representative pursuant to Section 8.2," but we note that Section 8.1 does not authorize termination of the Agreement by the Company; instead, that section solely states that "Company may terminate the exclusivity of Representative's representation" if sales targets are not achieved.  The Parties did not raise this potential anomaly and it plays no part in our analysis of the claims and counterclaims in this proceeding.

Representation Agreement had required IST GmbH to "terminate its existing agreement with the company named Renewal Technologies, effective no later than 45 days after the date of this Agreement [*i.e.,* early June 2019]." Indeed, Respondent did not formally terminate its relationship with that representative until January 13, 2020, some nine months after the entry into the Sales Representation Agreement. *Id.* ¶ 50; C-11 (e-mail from IST GmbH to Pipeline Renewal Technologies, XX [sic].11.2017).

111. IST NA's sales were disappointing. The equipment it sold at times proved unreliable and, according to IST NA, suffered from both hardware and software issues. This was particularly the case with the newer version models of both the light train ("nUVision") and cutter ("Gen-2") that IST GmbH wanted IST NA to be selling in the United States. Units needed to be returned to Germany for repairs and there were delays in getting replacement units shipped back. IST GmbH frequently blamed the problems on lack of training or incompetence by IST NA's technicians.

112. Later internal communications within IST GmbH and with its suppliers, ultimately produced in this proceeding by Respondent to Claimant, demonstrated that problems with the nUVision and Gen-2 cutter equipment were being focused upon by IST GmbH and were also the subject of customer complaints in markets other than the United States, suggesting that the problems were not caused by IST NA. G. Camali Witness Stmt. ¶¶ 100, 108, 110, 116-20, 123-26, 136; C-72 (e-mail, June 29, 2022, J. Vogt to K. Schropp [Gen-2 software supplier]). Indeed, as long as a year after the Sales Representation Agreement was executed, one IST GmbH employee wrote to another, including the head of the nUVision program, that "every Nuvision chain is a prototype so far" and "there are no parts lists showing which parts are needed." C-26 (e-mail, April 28, 2020, T. Kronberger to C. Korbi, cc: T. Reutemann and others); G. Camali Witness Stmt. ¶ 74.

113. Notwithstanding these disappointing developments, IST NA entered into the Memorandum of Understanding early in 2001 with IST GmbH under which it purchased the latter's half interest in IST NA. The MOU recites that IST NA required additional liquidity while IST GmbH wished to limit its investments outside Germany. Apart from the financial terms, which are discussed above at Par. 15, the MOU reaffirmed the Sales Representation Agreement, relaxed slightly the sales targets IST NA must achieve to retain exclusivity, confirmed IST GmbH's obligation to deliver products at the lead times specified in the MOU, and provided that "the scope of IST's sales representation under

the Sales Representation Agreement is hereby expanded to include consumables," expressly clarifying that the consumables exclusivity included "branded private label products (such as liners and calibration hoses)…."  J-7 §§ 3, 6, 7. The MOU was executed in January, 2021 but specified an effective date of December 31, 2020.  G. Camali Witness Stmt. ¶ 158.

114.    As noted, the Sales Representation Agreement provided that IST NA's exclusive territory would be expanded to include Canada as of January 1, 2020.  J-6 § 2.3.  The MOU, entered into a year later, also references IST NA's rights to the Canadian market. J-7 § 3.

115.    It appears that the Parties contemplated that IST NA would effect its expansion into the Canadian territory by acquiring IST GmbH's existing Canadian subsidiary. C-132,  G. Camali to J. Vogt, Aug. 23, 2019 (referring to potential acquisition); Vogt Witness Stmt. ¶ 89 ("In March 2019, prior to executing the SR Agreement, Mr. Camali and I agreed that the expansion into Canada would be carried out by having ISTNA purchase and take over IST Canada, an independent legal entity and division of IST Germany that was formed in 2017").

116.    Nonetheless, IST NA did not make any effort to sell to Canadian customers as of the start of 2020 because IST GmbH's existing Canadian subsidiary remained active and, more important, was saddled with operational problems and significant debt.  According to Geno Camali, "Jorg…pleaded with me to postpone the expansion into Canada while he cleaned up the debt and collected on accounts receivable to pay back his bank."  G. Camali Witness Stmt. ¶ 230.  Mr. Camali acknowledged that he "complied with that request as I had enough going on at the time with Respondent's non-functioning equipment…."  *Id.*  In a draft e-mail to the Canadian subsidiary in the summer of 2019, Mr. Camali noted that the entity's financial condition was uncertain, which "makes it unacquirable in it's [sic] current state …." C-132.

117.    IST GmbH had begun suffering financial difficulties by  2021.  Mr. Vogt attributes IST GmbH's financial challenges to a combination of increasing debt, slumping sales caused by the COVID-19 pandemic, IST NA's "large overdue balance" and "management problems experienced by certain of [IST GmbH's] distributors."  Vogt Witness Stmt. ¶ 117.  To address its financial challenges, it considered initiating insolvency proceedings but preferred to find an equity investor.   *Id.*

118.    Separately, sometime in 2020 IST GmbH's majority shareholder, Matthias Wettstein, had been arrested in Germany for tax fraud in connection with a different business.  Mr. Vogt informed Geno Camali of that event around the time it occurred, and reported that he was looking for a new shareholder to purchase Mr. Wettstein's shares.  G. Camali Witness Stmt. ¶ 154.  Among the potential investors Mr. Vogt spoke with was Trelleborg Industrial Solutions, a manufacturer of consumables for pipe rehabilitation projects that is part of Trelleborg AB, a major Swedish company.  *Id.* ¶ 156.  Shortly before year-end 2020 Trelleborg AB had entered into a non-binding offer to acquire all of Respondent's outstanding stock for € 14 million.[6]  *Id.* ¶ 165 (*citing* C-92, Dec. 28, 2020 "Non-Binding Indicative Offer" from Trelleborg AB to M. Wettstein and J. Vogt).   That proposal apparently did not proceed, as Mr. Vogt invited Geno Camali to consider investing in IST GmbH on July 31, 2021, providing a non-disclosure agreement and financial information, but that was not pursued.  Vogt Witness Stmt. ¶¶ 121-22; R-37 (e-mail, July 31, 2021, J. Vogt to G. Camali).  According to Mr. Vogt's testimony, "[a]round approximately October 2021," IST GmbH and Trelleborg Germany entered into a six-month agreement to assess the feasibility of a transaction.  *Id.* ¶ 123.

119.    Mr. Vogt alerted Geno Camali to a potential transaction with Trelleborg Germany in the winter of 2022.  Vogt Witness Stmt. ¶ 125.  The Trelleborg Group at some point expressed an interest in purchasing IST NA and engaged in due diligence but ultimately decided against doing so.  G. Camali Witness Stmt. ¶ 170; Vogt Witness Stmt. ¶ 142.

120.    Ultimately the transaction with Trelleborg Germany was structured as a purchase of substantially all of IST GmbH's assets rather than a purchase of the stock held by Mr. Wettstein, Mr. Vogt and any other shareholder(s).  The transaction was memorialized, as defined in Par. 14 above, as the Trelleborg Acquisition Agreement dated October 11, 2022.  J-4.  According to Mr. Vogt the agreement closed on November 31 [sic], 2022.  Vogt Witness Stmt. ¶ 124.

121.    The transaction encompassed the transfer of substantially all of IST GmbH's assets to Trelleborg Germany, so that Trelleborg Germany was able to announce publicly on the

---

[6] The timing of Trelleborg Industrial Solutions' offer at year-end 2020 to purchase all of IST GmbH's stock is inconsistent with the statement in Mr. Vogt's witness statement that 'in late 2021" IST GmbH "began a search for a new investor to take over the company…."  Vogt Witness Stmt. ¶ 119.

date the agreement was signed that it "acquires sewer and drainage pipe rehabilitation market leader." Ex. C-99 (Trelleborg press release, Oct. 11, 2022).   In seeking IST NA's consent to the transfer of IST GmbH's supply obligations to Trelleborg Germany, IST GmbH reported that Trelleborg Germany was purchasing "the manufacturing equipment, specifications, formulations and all intellectual property to produce engineered equipment and consumables used in trenchless pipeline repair and rehabilitation." Ex. C-100 (Letter, Oct. 20, 2022, IST GmbH to IST NA).  The acquisition agreement provided for IST GmbH's employees to become employees of Trelleborg Germany.  According to Geno Camali, IST GmbH's personnel "continued to occupy the same office space and used the same phone numbers as they had always done while in the employ of the Respondent."  G. Camali Witness Stmt. ¶ 175.

122.    As Mr. Vogt acknowledges in his written testimony, "Following the Asset Purchase, IST Germany ceased its manufacturing and sales activity, and I accepted a position with Trelleborg Germany as a Group Product Manager."  Vogt Witness Stmt. ¶ 128. Consistent with that testimony, the Trelleborg Acquisition Agreement provides in Sec. 12.9: "Jörg Vogt and Mathias Wettstein hereby inform the Buyer that, after Completion of this Agreement, Jörg Vogt and Mathias Wettstein intend to liquidate the Seller in an orderly manner…." Ex. J-4.

123.    Of significance to this dispute, the Trelleborg Acquisition Agreement expressly excluded the Sales Representation Agreement with IST NA and MOU from the assets sold to Trelleborg Germany. Ex. J-4 § 1.1 (definition of "Assignable Contracts" expressly exempts "the contracts relating to…IST North America, LLC"); Sch. 1.1.3a, p. IST GmbH00000787 (crossed out reference to IST NA contract); G. Camali Witness Stmt. ¶ 174.

124.    Geno Camali declined to sign the requested consent for Trelleborg Germany to fulfill IST NA's equipment orders, instead conditioning that consent on Trelleborg Germany committing to honor all of IST GmbH's obligations under the Sales Representation Agreement.  Ex. C-101A (draft agreement dated November 2, 2022); G. Camali Witness Stmt. ¶ 181.  Trelleborg Germany declined to accept that request.

125.    Thereafter, the Parties continued discussing their relationship for several months, and IST NA placed and paid for certain orders for equipment that Trelleborg Germany fulfilled.

According to Geno Camali's testimony at the hearing, however, Trelleborg Germany insisted on up-front payments and materially delayed deliveries.  Tr. 133:3-138:11.

126.    IST NA initiated this arbitration proceeding on March 21, 2023.  IST NA sent IST GmbH a notice of default with demand to cure its alleged breaches of the Sales Representation Agreement on May 7, 2023. Ex. C-108.  IST GmbH included a notice of intention to terminate the Sales Representation Agreement for material breach with its answer and counterclaims dated May 5, 2023.  Both sides sent each other reports that they had terminated the Agreement on June 9, 2023.  Ex. C-109; Ex. R-54; G. Camali Witness Stmt. ¶ 188; Vogt Witness Stmt. ¶¶ 154-55.  IST NA ceased operations on June 13, 2023. G. Camali Witness Stmt. ¶ 188.

## VII.    ANALYSIS

### A.    <u>**The Breach of Contract Claims**</u>

127.    Claimant contends that Respondent breached the Sales Representation Agreement and MOU in eleven respects identified in its Amended Demand for Arbitration.  Claimant also contends that Respondent breached the implied covenant of good faith and fair dealing. The alleged breaches of contract include delivering defective products, failing to deliver products in a timely manner, selling products in the United States in violation of Claimant's exclusive rights, failing to provide Claimant the exclusive rights to sell and service Respondent's products in Canada, and selling substantially all of Respondent's assets to Trelleborg Germany without securing Trelleborg Germany's commitment to honor all of the terms of the Sales Representation Agreement.

128.    Before considering Claimant's breach claims, it is necessary to address IST GmbH's contention that IST NA itself breached the Agreement.  One of the elements a claimant must establish to sustain a breach of contract claim is that the claimant substantially performed its own obligations under the contract.  Respondent IST GmbH claims two categories of material breaches by IST NA: first, that IST NA failed to obtain the financing and commitment letter that it was obligated to supply at the outset of the

Parties' relationship, and second that it failed to pay invoices due to IST GmbH in a timely manner.[7]

129. Neither of Respondent's allegations of IST NA's material breaches is supported by the evidentiary record. First, although Respondent is correct that IST NA did not provide a financing commitment letter to IST GmbH as required by Section 4.4 of the Sales Representation Agreement, the record shows that it nonetheless obtained the required financing in a reasonably timely manner. Section 4.4 obligated IST NA to "obtain a minimum of $1 million in financing for Equipment purchases" and to demonstrate that by submitting to IST GmbH a commitment letter within 60 days and a binding agreement within 120 days of the date of the Agreement, which was dated April 19, 2019. IST NA had secured the necessary financing from M&T Bank within a few weeks of the August 19, 2019 contractual deadline: a binding Revolving Loan Agreement was executed on August 29, 2019 and a Master Credit Agreement was executed as of September 12, 2019. Exs. C-1, C-2. Geno Camali provided the executed loan documents to IST GmbH. Tr. 139:14-140:25. According to the testimony of the bank's officer, William Schumacher, who provided a written witness statement on September 6, 2024 (while Respondent was still participating in this arbitration) and who appeared at the hearing, by remote videoconference, for questioning by the Tribunal on March 3, 2025, the bank lent a total amount of $1,245,356.48 to IST NA pursuant to the two credit agreements.

130. In light of this clear factual record, the written testimony of Mr. Vogt that: "[i]n breach of its obligations under Section 4.4 of the SR Agreement, ISTNA failed to procure $1 million in financing and submit a commitment letter to IST Germany. This was a material provision of the agreement" appears misleading at best. Vogt Witness Stmt. ¶ 27. The record demonstrates that IST NA substantially complied with the Agreement's financing obligation.

131. Second, Respondent's claim that Claimant failed to pay more than € 1 million in a timely manner also founders on the evidence. Respondent asserted a counterclaim for an

---

[7] Respondent also alleges that it was damaged in the amount of more than € 3 million because it needed to respond to Claimant's contentions that Respondent's equipment was defective when, in Respondent's view, the equipment's failures were attributable to improper configuration and handling by Claimant's technical personnel. Respondent's pleading does not identify any contract provision that the alleged misconduct by Claimant allegedly breached. In any event, as discussed below we conclude that Respondent has not substantiated those allegations.

account stated, relying on two "balance confirmations" that it transmitted to Claimant on October 31, 2022, after it had sold its assets to Trelleborg Germany.  Ex. R-10.  The confirmations identify invoices past due since as early as April, 2020 totaling € 1,016,957.35.  But nearly € 400,000 of the purportedly past due amount is attributable to invoices dated in 2020 before the Parties executed the MOU, which expressly provided a payment schedule for all amounts then outstanding.  Geno Camali testified at the hearing that IST NA timely complied with all of the payment provisions of the MOU except for the final installment of $295,000 that becomes due at year-end 2025.  Tr. 123:20-125:6; 125:18-126:17.  And another nearly € 400,000 of Respondent's allegedly past due claim is based on invoices in December, 2021 for two items that IST NA had consistently challenged as unrelated to any of its purchases (€ 247,932 for the Granite nUVision system that IST GmbH had sold directly and € 131,733 for the Starlight UV system that had been delivered on consignment pending a future sale).  G. Camali Witness Stmt. ¶¶ 199-201.  Mr. Camali's testimony is clear that IST NA paid its invoiced obligations other than invoices for products that it viewed as defective.  G. Camali Witness Stmt. ¶ 203.

132.  Accordingly, the evidentiary record does not demonstrate that IST NA materially breached the Agreement by failing to make timely payments for which it was obligated. The record also demonstrates that IST NA promptly objected to IST GmbH's "balance confirmations," rendering Respondent's account stated counterclaim unavailing.

133.  Since the record supports IST NA's substantial performance of its obligations under the Sales Representation Agreement and the MOU, we turn to Claimant's evidence of Respondent's alleged breaches.  We need not address in detail all of Claimant's myriad claims of breach because the evidence is essentially undisputed that Respondent repudiated its contracts with Claimant.

134.  The key facts of Respondent's repudiation are undisputed:

- IST GmbH sold substantially all of its assets to Trelleborg Germany pursuant to the Trelleborg Acquisition Agreement that it signed on October 11, 2022 and closed on or about November 30, 2022;

- IST GmbH ceased operations promptly after the acquisition, and was no longer able to produce or sell products to IST NA;

- IST GmbH did not assign the Sales Representation Agreement and MOU to Trelleborg Germany;

- Trelleborg Germany did not commit to be bound by those agreements, including their exclusivity provisions; and

- At the time of the acquisition, the Sales Representation Agreement and MOU were in full force and effect.

135.    These undisputed facts provide compelling support for the conclusion that IST GmbH repudiated its agreements with IST NA under New York law.  Claimant points to two Appellate Division cases that are closely on point, *EPAC Technologies, Inc. v. John Wiley & Sons, Inc.*, 225 A.D. 3d 53 (1st Dep't 2024) and *Computer Possibilities Unlimited, Inc. v. Mobil Oil Corporation*, 301 A.D.2d 70 (1st Dep't 2002).  In both cases a contracting party, after it had become bound to provide services or products to its counter-party (text book printing in *EPAC*, and computer software in *Computer Possibilities*), entered into a new contract with a third party that impeded its ability to perform its existing contract.  In *EPAC*, the printing company sold to a third party the printing assets it needed to fulfill a material part of its contractual obligations to its customer; in *Computer Possibilities*, the software developer entered into a new distribution agreement with a third party that conferred complete control over the product's pricing to the third party.  In both cases the New York Appellate Division unhesitatingly found that the execution of the new, intervening contract constituted a repudiation of the existing contracts.

136.    So too is the case here.  Indeed, the facts at issue in this case demonstrate an even more compelling case for finding repudiation than the facts in the Appellate Division cases.  In *EPAC*, for example, the printing company had retained significant printing assets and claimed it remained able to fulfill its obligations to its counter-party, albeit via a different, less sophisticated printing system.  In *Computer Possibilities,* the record showed that although the software company had delegated complete pricing discretion to its new distributor (thereby negating its ability to ensure that its software would be sold at the prices specified in its existing agreement), the new distributor had voluntarily honored the existing prices.  In contrast to *EPAC*, here IST GmbH ceased producing any of the products it was obligated to sell to IST NA.  And in contrast to *Computer Possibilities,*

here Trelleborg Germany plainly chose not to honor IST NA's contractual entitlement to exclusivity even temporarily.

137. It is a straightforward principle of New York contract law "that a party repudiates a contract 'where [that] party, before the time of performance arrives, puts it out of his power to keep his contract.' (citations omitted) Stated otherwise, a party repudiates a contract when it 'voluntar[il]y disable[s] itself from complying' with its contractual obligations.'" *Computer Possibilities,* 301 A.D.2d at 77; *accord, EPAC,* 225 A.D. 3d at 59. That principle squarely applies to IST GmbH's choice to sell most of its assets to Trelleborg Germany and cease its own operations while making no effort to ensure that its contractual obligations to IST NA would be honored by the acquiror of its assets.

138. Indeed, it is ironic that among Respondent's defenses is that it did *not* assign its contracts with IST NA to Trelleborg Germany. Respondent's Answer, Defenses, and Counterclaims, to Claimant's Amended Statement of Claim ¶ 47 ("…Respondent did not assign the Sales Agreement to Trelleborg Germany. In fact, the Asset Purchase Agreement carved out Claimant and states under 'Excluded Liabilities' that, '[t]he contracts relating to … IST North America, LLC … shall not be included among the Assignable Contracts.' Therefore, the Sales Agreement was not assigned to Trelleborg.") If IST GmbH had assigned the contracts to Trelleborg Germany, and Trelleborg Germany had accepted the assignment, there would not have been any repudiation by IST GmbH. Those hypothetical circumstances would have required IST NA's consent, which could not have been reasonably withheld. But that is not what transpired here.

139. Instead, Trelleborg Germany sought IST NA's consent to supplying products but failed to agree to IST NA's express request to honor the existing exclusivity provisions of its contracts with IST GmbH. Mr. Vogt in his witness statement chastises Geno Camali for conditioning his consent "on the terms of the added addendum which provided, among other things, that Trelleborg Germany *agree to be bound by every last term of the SR Agreement*." Vogt Witness Stmt. ¶ 136 (emphasis added). But IST NA was entitled to have IST GmbH's acquiror commit to be bound by its existing contracts with IST GmbH, as absent that commitment IST GmbH was breaching the contracts. Respondent's other arguments that IST NA "impliedly consented" to the Trelleborg Germany acquisition, waived any right to consent, and that its refusal to consent "was unreasonable as a matter of law," Respondent-Counterclaimant's Prehearing Brief, Oct. 4, 2024 ("**Respondent's**

**Prehearing Br.**") ¶¶ 196-99, are all markedly unpersuasive in light of the evidentiary record.

140.    Respondent also contends that its transaction with Trelleborg Germany is unobjectionable because its contracts with IST NA had no specified termination date and IST GmbH cannot be held to be obligated to continue to produce equipment in perpetuity. Respondent's Prehearing Br. ¶¶ 190, 193; Vogt Witness Stmt. ¶¶ 132.  According to Mr. Vogt, "ISTNA's exclusivity rights only extended insofar as IST Germany continued to manufacture equipment and parts, and since there is no dispute that IST Germany acted in good faith by discontinuing its manufacturing operations, ISTNA's allegations are without merit." *Id.* ¶ 133.  It is true that the Sales Representation Agreement and MOU had no specified time period but instead continued in force absent termination for material breach. It is therefore at least theoretically conceivable that IST GmbH at some point could have chosen to go out of business without necessarily giving rise to contractual liability to IST NA.  But Respondent's contention is unpersuasive as applied to the undisputed facts here, because IST GmbH did not simply discontinue its manufacturing operations but instead sold them, lock, stock and barrel, to another entity that continued those very same operations, including with Mr. Vogt remaining in charge, while carefully excluding IST NA's exclusive contract from the rest of the transferred assets.  These circumstances do not raise the question of what the consequences would be for the Sales Representation Agreement and MOU if IST GmbH had simply gone out of business in good faith.

141.    Finally, we note that the conclusion that IST GmbH repudiated its contractual obligations to IST NA is amply reinforced by a contemporaneous e-mail that Mr. Vogt sent to Trelleborg Germany on November 4, 2022, when the two companies were discussing the effect on IST NA of their impending operations following the closing of the acquisition a few weeks later.  Ex. C-104.  Mr. Vogt's e-mail included the following comments:

I thought a lot last night about Geno/IST NA and from my point of view we have to make a decision what we want to do in the future in the US.

I´m 100% sure that we do not have a bigger legal problem, especially not Trelleborg.

Genos concerns are mostly regarding not being part of Trelleborg very soon and losing his contract also.

He really expected until last week that IST NA will be part of Trelleborg as soon as possible – your decision not to do it right now is absolutely understandable and Geno has to accept.

The legal risk for Trelleborg is that Geno will not pay his open debt about 400K but he will also know that he will not be our dealer anymore when he will not pay - so there is some room to negotiate and finally I would agree to change his 4 Schropp cutters to Spering cutters when available (That's discussed already with Geno).

If the agreement will stay with old IST, Trelleborg is legally out if any discussions. Additionally he will not do anything against old IST when he will get info that IST old is under liquidation and there is nothing to get.

* * * * *

But the main problem is not a possible compensation claim from Geno its more or less the questions what you/we want to do in the future with Geno.

If we think he is not necessary to fulfill our US plans and we can make it also with Trelleborg USA or somebody else then its ok for me and we can go the hard way.

If we think it's worth go the next steps with Geno and IST NA we have to offer something from my point of view.

From Genos point of view we took him the illusion to be part of Trelleborg shortly and additionally we will tell him that his agreement will not be transferred -  it's a nightmare what falls upon him and in this context you can`t expect him to do a great job for us in the future.

After all Geno has invested 2.5 Mio euros in demo equipment in the meantime and that's only because he is exclusive in the US.

So finally Trelleborg is on the driver seat and every decision is ok for me but please do not expect that Geno will do anything for IST in the future when we will take everything away from him without offering him anything concrete for the future same time. Even than it will be difficult but I see an option if we explain it to him understandably.

142.     Mr. Vogt's comments demonstrate the validity of Claimant's repudiation claim.  He

acknowledges that the combination of dashing Geno Camali's expectation that Trelleborg

Germany will acquire IST NA and telling him "that his agreement will not be

transferred" -- in contrast to "*the illusion*" that had been conveyed to him -- is "a

*nightmare*" for Mr. Camali.  He explains that Geno had invested more than € 2.5 million

in IST GmbH's demonstration equipment "*only because he is exclusive in the US*."  The

e-mail is also notable for Mr. Vogt's assurance to his new employer that "Trelleborg is on

the driver seat and every decision is ok for me but please do not expect that Geno will do

anything for IST in the future *when we will take everything away from him....*" (emphases added).[8]

143. Mr. Vogt's e-mail appears to have been an accurate description of the events. Nonetheless, his cynical assessment that IST NA "will *not do anything* against" IST GmbH once he discovers that his counter-party, IST GmbH, is "under liquidation *and there is nothing to get*" proved inaccurate.  Ex. C-104 (emphases added).

144. We address below the lost profits damages to which IST NA is entitled by virtue of Respondent's repudiation of the Sales Representation Agreement and MOU.  We note here, however, that Claimant's decision to discontinue purchasing IST GmbH's products from Trelleborg Germany in 2023 and thereafter does not constitute a failure to mitigate its damages.  We are persuaded by Geno Camali's testimony that the terms on which Trelleborg Germany was fulfilling IST NA's orders were unacceptable, including the extent of delays in deliveries and conditioning faster shipment activities on prepayments that IST NA initially made but ultimately lacked the financial capacity to sustain.  Tr. 133:3- (G. Camali).

145. Our conclusion that Respondent is liable for anticipatory breach by virtue of its transaction with Trelleborg Germany moots any need to address Claimant's claim for breach of the implied covenant of good faith and fair dealing.  It also entitles Claimant to an award obligating Respondent to re-purchase Claimant's unsold inventory at the time of termination of the Sales Representative Agreement as provided in Section 8.3 ("[i]f this Agreement is terminated …by Representative pursuant to Section 8.2 [uncured material breach], then Company shall re-purchase any Equipment purchased by Representative and not re-sold by Representative, at the price paid by Representative for such Equipment (if new) and at fair market value (if used)").  Claimant's damages expert quantified such inventory as totaling $787,179.  Since the record does not identify whether Claimant retains custody and control of such equipment, however, our award conditions the re-purchase on Claimant's confirming to Respondent that it continues to

---

[8] Ex. C-104 was presaged the day before by an email to Mr. Vogt from Felix Schaefer, an outside consultant who was helping to manage the acquisition process. Ex. C-103.  In that email Mr. Schaefer acknowledged to Mr. Vogt that "of course, he [Geno Camali] wants to keep his contract, especially the exclusivity, but Trelleborg will not do that.  They would like to offer him a new contract, but no longer exclusive, but with a verbal agreement that he will not use any other distribution partner as long as the performance is right."

possess the equipment and committing to transfer ownership to Respondent upon receipt of the re-purchase price.

146. Respondent's repudiation does not resolve the separate questions of whether Respondent also breached the Agreement (prior to the repudiation created by the sale to Trelleborg Germany) by delivering defective goods and by dishonoring the exclusivity provisions and the provision extending IST NA's exclusive to Canada.  We therefore address those issues in the next sections of this Final Award.

### B. <u>The Claim Concerning Defective Equipment</u>

147. The Parties vigorously disputed whether the problems IST NA experienced with some of Respondent's equipment, particularly its "Gen-2, Blue Line" cutters and its nUVision product, were caused by production and design defects, as Claimant alleges, or mis-handling, improper configuration and flawed servicing by IST NA, as Respondent urges.  Although Respondent's written witness statements (of Messrs. Spering, Reutemann and Vogt) support Respondent's position, none of those witnesses appeared at the hearing for cross-examination, and the contemporaneous documentary exhibits are substantially inconsistent with Respondent's factual allegations.  It is noteworthy that Mr. Vogt repeatedly told Geno Camali that IST GmbH's products were performing without problems around the world and that the only dissatisfied customers were those served by IST NA in the United States when the documents reveal that was not the case, as discussed above at Par. 112.  It is also significant that Respondent's internal documents referenced the troublesome nUVision product as a "prototype."  Moreover, Geno Camali's testimony, which we found credible, rejected Mr. Vogt's criticisms of IST NA's competence in dealing with Respondent's equipment.  Consequently, we find that Claimant sustained its allegations that Respondent's products were flawed.

148. We note that Claimant's damages expert noted in his initial damages report that damages associated with IST NA's claims for defective products and inventory buy-back "are not additive to the extent lost profits are considered …. [h]owever, without consideration of lost profits these costs do represent damages to the claimant."  Kevin M. Flaherty, Expert Report, July 29, 2024 ("**Initial Flaherty Report**") p. 5. He reiterated that point at the evidentiary hearing on March 12, 2025.  Tr. 430:10-431:8.  We understand the expert's

testimony to refer to an award of lost profits for the period 2019-22, when IST NA was in business, but not that damages for defective products and unsold inventory would be subsumed within an award of lost profits with respect to periods after the repudiation had forced IST NA to cease its operations. As discussed below, we decline to award lost profits to Claimant for the period 2019-22, which is the period in which Claimant purchased the inventory at issue in the buy-back claim and received the defective equipment. We conclude, therefore, that Claimant is entitled to an award for the re-purchase of the equipment as described above in Par. 145 (subject to the conditions set out in the pertinent decretal paragraph of this Final Award) and in the separate amount of the cost of the defective equipment. The damages expert quantified the latter amount at $792,084.

## C. **The Exclusivity Issues**

149.  IST NA has shown that IST GmbH sold "consumables" in the United States after January 1, 2021, the effective date of the MOU that modified the Sales Representation Agreement to encompass consumables. Respondent does not deny that it made its own sales after the MOU was effective but contends that the MOU only conferred an exclusive on IST NA with respect to consumables that were "private label."

150.  The pertinent provision of the MOU is Section 3, which provides:
> The Sales Representation Agreement continues in full force and effect except as modified by this Memorandum. In particular, and without limitation, IST NA continues as IST Germany's exclusive representative for the sale of equipment and parts manufactured by IST Germany, subject to Paragraph 7 below and Appendix 1.[9] In addition, the scope of IST's sales representation under the Sales Representation Agreement is hereby expanded to include consumables.
> In addition, should IST NA purchase branded private label products (such as liners and calibration hoses) from IST Germany, IST Germany assures exclusivity of representation by IST NA for sale of these branded private label products in the United States and Canada.

151.  At the hearing, Geno Camali testified that he understood this provision applied exclusivity to non-private label consumables as well as branded private label products. He explained that IST GmbH itself manufactured the non-private label consumables at

---

[9] Section 7 modifies the sales targets that IST NA must achieve to preserve "[t]he exclusivity for the sale of Equipment," with the revised sales targets set out in Appendix 1. In turn Appendix 1 provides that "[c]onsumables can only count toward 50% of the sales target."

issue, which were of smaller dimension than the liners produced by third parties that could be branded with the name of others. He also testified that prior to the MOU IST NA had sold IST GmbH-produced consumables. Tr. 147:25-149:9. In Mr. Camali's view, one purpose of the MOU was to extend the exclusive nature of IST NA's sales representative status to consumables and consequently the text of the first paragraph of Section 3, quoted above, implicitly extended its "exclusive representative" status "to include consumables."

152.    In response to the Tribunal's questions, Mr. Camali also explained that the explicit reference to "exclusivity" in the second paragraph of Section 3 in the context of sale of private label products served to ensure that IST GmbH would not attempt to create a loophole in the agreement by declining to extend exclusivity to consumables that it supplied but did not itself manufacture. Tr. 168:3-25.

153.    Mr. Vogt's witness statement expresses the opposite interpretation of Section 3, contending that exclusivity was limited solely to private label consumables. In support of that interpretation he cited portions of the negotiating history of the provision, in which it appears IST GmbH resisted extending exclusivity to consumables.

154.    The documentary exhibits demonstrate, at a minimum, that the Parties had differing understandings of Section 3 long before this arbitration commenced. An e-mail exchange between Messrs. Camali and Vogt dated November 9-10, 2021 includes Mr. Vogt's statements that "We do not have any exclusivity for consumables. Our original agreement is only for UV and robots and in the new MOU we added consumables but nonexclusive…..you will have exclusivity for your private labelled consumables – that's ok for me and we will stay with it and will not sell our products with your private label name to anybody else." In response, Mr. Camali stated: "It is unfortunate that we both read the agreement differently. My understanding is that the verbiage added consumables into the exclusive sales agreement." Ex. R-33.

155.    Mr. Eugene J. Camali, Geno Camali's father, testified at the hearing that he personally negotiated the MOU with Mr. Vogt. His testimony was persuasive that obtaining exclusivity for sales of consumables was a critical objective of the MOU and the basis on which he agreed to fund the buy-out of IST GmbH. Tr. 302:19-304:15; 313:5-14. We are also persuaded that Respondent's interpretation (that Section 3's expansion of the scope of IST NA's authority to sell IST GmbH's products to include the consumables

that IST GmbH itself manufactured was on a non-exclusive basis) is not commercially sensible in view of the fact noted above -- and undisputed on this record -- that IST NA was already selling IST GmbH-produced consumables in the United States on a non-exclusive basis prior to execution of the MOU. Accordingly, we conclude that Respondents' sales of consumables in the United States after December 31, 2020, the effective date of the MOU, breached its obligations under that agreement.

156. In the end, however, Claimant's damage expert, in his supplemental report filed on March 4, 2025, the day after the first session of the evidentiary hearing, represented that all of the consumables that he had identified that were sold by IST GmbH in violation of the MOU's exclusivity provision, and for which Claimant is seeking damages, were private label. Supplemental Flaherty Report p. 4; Claimant I.S.T. North America LLC's Post-Hearing Submission, April 11, 2025 ¶ 26. There is no dispute between the Parties that such sales were required to be exclusive to IST NA, which is accordingly entitled to associated compensatory damages.

157. Consequently, we find that IST GmbH's direct sales of consumables to customers in the United States after the effective date of the MOU breached the exclusivity provision of that contract. Claimant's damages expert calculated the profit associated with that amount of lost sales as totaling $433,558. Supplemental Flaherty Report p. 1, Sch. 1 and Sch. 4A. But that amount included sales of consumables by IST GmbH in the United States market in calendar year 2020, and IST NA's exclusive under the MOU did not begin until 2021. In response to the Tribunal's questions at the evidentiary hearing on March 12, 2025, Claimant's damages expert, Mr. Flaherty, recalculated the total amount of lost profits associated with the diverted sales of consumables in 2021 and 2022 to be $341,487. Tr. 439:14-442:7. We award that amount, plus pre-award interest as discussed below.

158. Apart from the issue with exclusivity of consumables, IST NA also demonstrated that IST GmbH had violated the undisputed exclusivity provision by making equipment sales in the United States. Respondent's Mr. Vogt contends that there were only two such sales, that both were conducted under special circumstances and, significantly, with Geno Camali's consent. Vogt Witness Stmt. ¶¶ 114-15. At the evidentiary hearing on March 3, the Tribunal examined Geno Camali concerning Mr. Vogt's testimony. Mr. Camali's responses to the Tribunal questions clearly refuted Mr. Vogt's written testimony on this

point, and given Mr. Vogt's failure to appear for cross-examination, we have no reason to decline to credit Mr. Camali's testimony.  Tr. 180:21-183:7.

159.    Mr. Flaherty quantified the amount of lost profits associated with IST GmbH's direct sales of equipment in the United States in breach of the exclusivity provision of the Sales Representation Agreement from 2019-2022 to be $779,297.  Supplemental Flaherty Report p. 4 and Sch. 4A.  We award that amount, plus pre-award interest as discussed below.

### D.  **The Canadian Territory Issue**

160.    The Sales Representation Agreement, effective as of April 19, 2019, provided that IST NA's appointment and its exclusive right to sell and service IST GmbH's products "is for a territory consisting initially of the United States and expanding to include Canada….Expansion of the Territory to include Canada will take place on January 1, 2020…."  J-6 § 2.3.  The evidentiary record demonstrates that the Parties discussed a plan in which IST NA would take over the German company's existing Canadian subsidiary, although they differ on whether it was expected that IST NA would need to pay to purchase that company when the time came. *Compare* Vogt Witness Stmt. ¶¶ 89, 94 ("expansion into Canada would be carried out by having ISTNA purchase and take over IST Canada, an independent legal entity and division of IST Germany….Mr. Camali is fully aware that he never paid the $2 million required to expand ISTNA's operations into the Canadian market") *with* Tr. 204:4-7 (G. Camali: "He started making up that he wanted me to pay for the territory.  It's nonsensical, what he wanted").

161.    Despite this fundamental disagreement, the Parties appear to agree that IST GmbH was attempting to improve IST Canada's financial condition in the pertinent time period, and that Geno Camali assisted in improving the subsidiary's management and operations.  As noted above in Par. 116, the record shows that Mr. Camali acknowledged towards the end of 2019 that the Canadian entity was "unacquirable" at that time, and he agreed to Mr. Vogt's request "to postpone the expansion into Canada."  G. Camali Witness Stmt. ¶ 230.  At the evidentiary hearing on March 3, in response to the Tribunal's questions on this topic, Geno Camali testified that although "[t]here were no conditions of any kind.  Canada was automatically mine January 1, 2020," and "[i]t was included in the territory,"

"[i]t was my decision to hold off on expanding up there" because IST GmbH was pledging to improve IST Canada's financial condition.  Tr. 207:3-25.

162.    We conclude that although under the terms of the Sales Representation Agreement IST NA was entitled to enforce an exclusive right to sell Respondent's products in Canada as of January 1, 2020, it made a business decision not to do so at that time.  Far from showing any efforts by IST NA to make sales in Canada or demands to IST GmbH to cease its activities in Canada, the record shows that IST NA refrained from doing so, instead assisting Respondent in its efforts to try to improve the financial condition and performance of the Canadian subsidiary while knowingly permitting that German-owned entity to continue to operate in the Canadian market after January 1, 2020.  Having chosen not to assert its rights to that market in the period 2020-2022, IST NA waived any right to seek to enforce those rights in this proceeding in that period.  Respondent's Prehearing Br. ¶¶ 165-66 (quoting *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.,* 257 F. Supp. 3d 348, 359 (S.D.N.Y. 2017) ("[w]aiver may be established by affirmative conduct or failure to act…."); *Kamco Supply Corp. v. On the Right Track, LLC,* 149 A.D. 3d 275, 281 (2d Dep't 2017) (the waiver doctrine is "designed to prevent the waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then … suing for noncompliance…")).  We therefore decline to award damages to Claimant in respect of IST GmbH's sales in the Canadian market in the period 2020-2022.

E.  **Respondent's Affirmative Defenses and Counterclaims**

163.    Respondent pleaded six defenses and two counterclaims in its Answer, Defenses, and Counterclaims.  We have addressed three of the defenses above: Claimant's alleged material breaches, a failure to mitigate damages, and waiver.  Two others appear to be inapplicable boilerplate ("failure to state a cause of action upon which relief can be granted" and "impossibility of performance").  We discuss in the next section, concerning lost profits damages, Respondent's final affirmative defense, that Claimant's claims are barred by Section 9.8 of the Sales Representation Agreement, which bars claims "for special, indirect and consequential damages."

164. Respondent failed to establish either of its counterclaims.  Its counterclaim for the account stated, seeking damages in the amount of its balance confirmations of more than € 1 million, is unavailing for the reasons discussed above at Pars. 131-32.  Its counterclaim for damages caused by Claimant's claims that the products were defective and needed to be repaired or replaced also suffer from a lack of proof, as discussed above at Par. 147.

F. **Lost Profits Damages**

165. Claimant seeks lost profits to compensate it for Respondent's repudiation of the Sales Representation Agreement.[10]  It has submitted two reports of its expert Kevin Flaherty: the Initial Flaherty Report, which estimated Claimant's lost profits for the fifteen-year period from 2019 through 2033 at a present value of $30,368,301 and also calculated damages amounts associated with the defective equipment, the buy-back obligation, and Mr. Camali's unpaid salary; and the Supplemental Flaherty Report, which drew upon additional sales records produced by Respondent that had not been produced before he had prepared his initial report.  The supplemental report identified two alternative calculations of lost profits for the eleven-year period 2023-33, totaling present values of $5,859,845 and $10,175,258 respectively.  That report also quantified the newly-disclosed sales conducted by IST GmbH in the United States and Canadian markets during 2019-2022.

166. We consider at the outset Respondent's invocation of Section 9.8 of the Sales Representation Agreement, which provides: "[t]he parties waive claims against each other for special, indirect and consequential damages."  Respondent contends that lost profits are unrecoverable "special" and "consequential" damages.  Respondent's Prehearing Br. ¶¶ 219-222.  Although Respondent's brief cites seemingly pertinent New York cases addressing the limits on the recovery of lost profits as "general" damages, each of Respondent's cases pre-dates the seminal decision of the New York Court of

---

[10] Claimant also seeks damages to compensate for Geno Camali's inability to receive his full salary as Claimant's chief executive officer for the period 2020-2033, which the Initial Flaherty Report at p. 5 quantified as having a present value of $2,147,179.  We do not award such damages as Mr. Camali is a not a party or claimant in this proceeding, and IST NA did not suffer damages measured by Mr. Camali's non-receipt of salary.

Appeals in *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.,* 22 N.Y. 3d 799 (2014), which Claimant relies upon. Claimant's Pre-Hearing Br. ¶¶ 65-71. *Biotronik* instructs that lost profits are recoverable by a distributor who establishes the manufacturer breached an exclusive distribution agreement even where the distribution contract prohibited recovery of "any indirect, special, consequential, incidental or punitive damage…." 22 N.Y.3d at 803. We view the facts and circumstances at issue in this case to be directly analogous to those in *Biotronik.* Consequently, because the Parties' Agreement does not expressly prohibit the award of lost profits or define lost profits as consequential damages, Section 9.3 does not preclude Claimant's entitlement to lost profits. As in *Biotronik*, the loss of anticipated profits is the natural and probable consequence of Respondent's breach where "'[t]he purpose of the agreement was to resell.'" Claimant's Pre-Hearing Br. ¶ 70 (quoting *Biotronik*).

167.   The balance of Respondent's arguments are focused on infirmities it purports to identify in the Initial Flaherty Report (Respondent had ceased its participation in this proceeding before the Supplemental Flaherty Report was submitted, though not before that supplemental report had been authorized in October, 2024 by Procedural Order No. 6). Respondent submitted a report of its own damages expert, Dr. Christopher W. Young, to rebut the Initial Flaherty Report. Rebuttal of the Expert Report of Kevin M. Flaherty CPA, CVA and Affirmative Calculation of Damages For: I.S.T. Innovative Sewer Technologies, GmbH, Aug. 23, 2024 ("**Young Rbtl. Report**").

168.   The Young report contended that the Initial Flaherty Report suffered from myriad flaws, some of them fundamental. Among other issues, it contended that the proper methodology to assess damages caused by Respondent's alleged breach is to calculate the reduction in IST NA's enterprise value rather than to determine its purported lost profits over a multi-year period. The Young report applied a discounted cash flow valuation analysis to IST NA and opined that IST NA's value as of 2019, based on its projected earnings to 2023, was $737,561. Young Rbtl. Report p. 30, ¶ 12; pp. 37-39, ¶ 25. Yet courts in New York frequently calculate and award lost profits as compensatory damages in circumstances in which a business venture has been thwarted by a counter-party's material breach, including when a manufacturer has deprived a sales agent or distributor from being able to sell its products. *Biotronik* and the numerous decisions it relies upon illustrate this proposition, as do the cases cited in Claimant's Pre-hearing Br. ¶¶ 59-72.

169.    Other criticisms in the Young Rbtl. Report of the Initial Flaherty Report are better
grounded.  We agree with Dr. Young that there is inadequate basis to award lost profits
damages based on projections for the time period of 2019-22 when IST NA was in
operation and its actual results are known.  We also agree that the calculation of Mr.
Camali's unpaid salary as a separate category of damages is unwarranted, as noted above
at Par. 165 n. 10.

170.    The balance of Dr. Young's critiques appear to be based on the various assumptions that
necessarily underlie any calculation of lost profits, which are inevitably premised on
predictions of future revenues and expenses.  Such calculations entail numerous
judgments by an expert concerning such components as the time period over which the
profits are to be determined, the reliability of the available projections, the net profit
margin, the rate of annual sales growth for periods for which no projections are available,
the discount rate applied to determine the present value of future income streams, and the
like.  For example, the Young Rbtl. Report claims that a discount rate of 40% is
appropriate because IST NA was akin to a "startup or venture capital firm[]."  P. 29, ¶ 11.
In contrast, Mr. Flaherty applied a discount rate of 8.75%, claiming that is "the cost of
equity of firms operating in the engineering/construction industry."  Initial Flaherty Rpt.
Sch. 1, Note 1.  Tr. 438:2-439:8 (Flaherty response to Tribunal questions about Young
Rbtl. Report critique of discount rate).

171.    The Tribunal subjected Mr. Flaherty to about three hours of questioning during his
appearance in person in New York on March 12, 2025.  His responses to the Tribunal's
questions supported a conclusion that the numerous judgments he made in his March
report of the pertinent assumptions were within the zone of reasonableness, including his
net profit assumption of 11%, discount rate of 8.75% and growth rate of 5.45%, each of
which appears reasonable.

172.    In particular, the growth rate assumption was well-supported: Mr. Flaherty identified the
rate in reliance upon an independent report published in 2024 by a market research firm,
IMIR Market Research Pvt. Ltd., entitled "Global Cured-In-Place Pipe Market, Study,
Opportunities, and Forecast (2024-2032)," ("**IMIR Report**") Ex. CEX-18.  That market

study focused on the precise market in which IST NA participated[11] and projected an overall cumulative annual growth rate for the cured-in-place pipe market in the United States of 5.5% from 2019 to 2032 and in Canada of 6.3% for that 14-year period. *Id.* p. 166. Mr. Flaherty used the market's study's annual forecasts in that period to calculate the growth rate for the 11 years from 2024-2032 at 5.45% in the United States. Supplemental Flaherty Report, Sch. 5.

173.    The Young Rbtl. Report had criticized Mr. Flaherty's initial report for applying a 3% growth rate without any support; the Supplemental Flaherty Report addressed that criticism by abandoning the prior 3% assumption and relying instead on the higher growth projection that is fully supported by the IMIR Report. The Young Rbtl. Report also referenced a separate market research report published in 2024 by IBIS World on the Sewer and Pipeline Rehabilitation Industry that purportedly projected flat revenues for the industry through 2029. Young Rbtl. Report p. 26 ¶ 6. Yet neither Dr. Young nor Respondent provided a copy of the IBIS World report, and a scan of the excerpts of it available on the internet is inconsistent with the flat projection, as it states: "Over the next five years, the Sewer & Pipeline Rehabilitation industry in the United States is expected to grow." https://www.ibisworld.com/united-states/industry/sewer-pipeline-rehabilitation/4709/#RelatedIndustries. In any event, it appears the IMIR and IBIS World reports may be reconciled as the former apparently addresses a subset of the market studied in the latter; the IMIR study reports about $1 billion in industry revenue in 2024 while the IBIS World study reports $12.8 billion. Young Rbtl. Report p. 26 ¶ 6.

174.    The two alternatives presented in the Supplemental Flaherty Report both excluded a calculation of lost profits based on unrealized projections for the 2019-2022 period, which Dr. Young had criticized, and substituted for it IST NA's actual performance in

---

[11] The IMIR Report describes the focus of its study, the "Cured-In-Place-Pipe" industry, as "an important sub-sector of the trenchless technology market…." that involves "a jointless, seamless, pipe-within-a-pipe system used in the rehabilitation of pipes" and "entails the pulling of a felt or fiberglass tube impregnated with resin into the damaged pipe and inflating it; the lining hardens by contacting hot water, steam or ultraviolet light, fitting tightly within the host pipe." CEX-18 p. 35 § 1.1. This description matches that of IST NA's business provided by Geno Camali. G. Camali Witness Stmt. ¶ 5 ("[t]renchless pipe repairs involve the insertion of resign-impregnated felt or fiberglass liners into an existing damaged underground pipe that is then inflated and cured in place by using either hot water or a mixture of steam and air (the traditional method) or ultraviolet (UV) light curing technology….")

those years, adjusted only to the extent Claimant established, based on Respondent's tardily-produced sales reports, that sales of equipment (and, after January 1, 2021) consumables had been diverted from IST NA by the direct sales conducted in the United States by IST GmbH.  No assumptions or judgments are at issue in the calculation of the diverted sales in the 2019-22 period.

175.    Next, the Supplemental Flaherty Report offered a calculation of lost profits for the remaining 11-year period that was predicated on the actual 2019-22 sales (including the diverted sales) as a baseline, projecting them forward based on the IMIR Report's 5.45% growth rate for the cured-in-place pipe market and applying net profit margin and other matters derived from projections that had been produced by the Trelleborg Group (as distinguished from projections supplied by Mr. Camali, which the Young Rbtl. Report had criticized).  Supplemental Flaherty Report p. 5.  This calculation, present valued to mid-2024, results in lost profits damages of $5,859,845.  Supplemental Flaherty Report Sch. 2A and Note 3.  Mr. Flaherty noted that using the actual 2019-22 revenues (adjusted to include the value of the diverted sales) as the baseline was conservative since sales in that period "may be impacted by the lack of support provided by IST GmbH to IST NA…"  Supplemental Flaherty Report p. 6.

176.    For that reason he offered a second alternative calculation of lost profits that applied a baseline of revenues for 2023 based upon Mr. Vogt's projection in 2019 of 2019 revenues, adjusted by the 5.45% industry growth rate for the four years to 2023, resulting in a 2023 revenue forecast of $6,088,562, with subsequent annual increases at 5.45% through 2033.[12]  That resulted in an overall quantification of lost profits through 2033, present valued to mid-2024, of $10,175,258.  The second calculation is therefore roughly double the first calculation provided in the Supplemental Flaherty Report, and both calculations are a fraction of the lost profits Mr. Flaherty supported in his initial report, which totaled $30,368,301 present valued to July 1, 2024.  Initial Flaherty Report Sch. 1 and Note 1.

---

[12] In contrast, the first alternative calculation of lost profits in the Supplemental Flaherty Report calculates 2023 revenue of $3,337,854, calculated by averaging IST NA's actual revenues for 2020-22 (including diverted sales) and applying the 5.45% growth rate to that numerical three-year average.  Schedule 2A, Note 1.

177.    Both of the lost profits calculations in the Supplemental Flaherty Report include profits attributable not only to equipment sales in the United States but also to sales of consumables, and to sales of both equipment and consumables in Canada.  We conclude that all such categories of lost profits are warranted.  As noted, we have determined that under the MOU IST NA was entitled to enjoy an exclusive opportunity to sell consumables as of January 1, 2021.  Although we have determined that IST NA waived the opportunity to make exclusive sales in Canada as of the date specified in the Sales Representation Agreement (January 1, 2020), it does not follow that it had waived that contractual entitlement permanently; accordingly, it is appropriate to include lost profits from the Canadian market starting in 2023.

178.    Of the three calculations of lost profits offered by Claimant in the two reports of its damages expert, we determine that the first alternative calculation set out in the Supplemental Flaherty Report meets the "reasonable certainty" standard for proof of damages under New York law.  *See Ashland Management Incorporated v. Janien,* 82 N.Y. 2d 395, 403 (1993).  As discussed above, its underlying assumptions are reasonable and its analysis is clear and rooted in the evidentiary record.  We also think it appropriate to select the most conservative of Mr. Flaherty's calculations because of the challenges of projecting business operations for an 11-year period.  We find that period acceptable because the Sales Representation Agreement had no fixed end date and, as shown by the testimony of the Messrs. Camali and corroborated by the IMIR Report, the cured-in-place-pipe industry appears to have robust prospects for the foreseeable future in light of the aging municipal infrastructure in the pertinent markets.

179.    Consequently, we award IST NA lost profits damages of $5,859,845.


## VIII.    INTEREST

180.     To ensure fair compensation to IST NA, pre-award interest is appropriate on the damages we are awarding arising from IST GmbH's breach of IST NA's exclusivity rights with respect to equipment, $779,297 (as provided above in Par. 159), and consumables, $341,487 (as provided in Par. 157), and its supply of defective products, $792,084 (as provided in Par. 148).   Such amounts total $1,912,868.

181. We award interest on that sum starting December 1, 2022, the day after the Trelleborg Acquisition Agreement closed, when IST GmbH repudiated IST NA's contract. Par. 120. Although an arbitral tribunal has discretion to set interest at a rate appropriate to ensure fair compensation, it is common in New York for arbitral tribunals to apply the statutory rate applicable in commercial cases litigated in New York courts of 9% simple interest per annum and we see no reason to depart from that practice here. Accordingly, we award pre-award interest totaling $441,243.71 for the period December 1, 2022 to the date of issuance of this Final Award.

182. We are aware that Claimant's damages expert, Mr. Flaherty, calculated pre-award interest of $1,265,726 on the lost profits amount that we have awarded of $5,859,845. Supplemental Flaherty Report Sch. 2A. The awarded principal sum reflects the present value of profits that IST NA could reasonably have expected to earn over the period 2023 through 2033. Although the awarded amount reflects the present value of that income stream as of July 1, 2024, Mr. Flaherty has calculated interest beginning on October 10, 2022 (the date the Parties executed the Trelleborg Acquisition Agreement). *Id.* We do not see a basis to award interest for a period that predates the present value date, as if IST NA had received the $5.859 million on July 1, 2024 it would have been made whole and no compensatory purpose is served by providing pre-award interest before that date.

183. Consequently, we award pre-award interest on the lost profits damages amount of $5,859,845 at 9% simple interest per annum starting July 1, 2024, the date of the present valuation, to the date of issuance of this Final Award, which amounts to $516,669.68.

184. In the event that the full damages amount of $7,772,713 has not been paid by the due date set in this award, interest shall continue to accrue on the unpaid amount at 9% simple interest thereafter; if the full amount is unpaid the daily interest amount is $1,916.56.

185. Finally, we do not award pre-award interest at this time on the amount to be paid by IST GmbH to IST NA to re-purchase the unsold inventory, as provided above at Par. 145. Instead, in the event that transaction takes place, the Parties can calculate the pre-award and post-award interest applying the 9% per annum simple rate, running from December 1, 2022.

## IX.    COSTS OF THE ARBITRATION AND DISCLOSURE DISPUTE

186.    Claimant seeks an award of $194,469.21 for arbitration costs it has paid to the American Arbitration Association in connection with this proceeding for arbitrator fees, filing fees and administrative expenses.  Pursuant to AAA Rule R-49(c) the Tribunal is authorized to "apportion such fees, expenses and compensation among the parties in such amounts as the arbitrator determines is appropriate."  Nonetheless, the arbitration provision in the Sales Representation Agreement, Section 9.7, expressly states: "The parties shall share equally the expense of such arbitration."  Notably, AAA Rule R-49(a) provides that the Tribunal's authority to "grant any remedy or relief that the arbitrator deems just and equitable" is subject to the award falling "within the scope of the agreement of the parties."  Consequently, we are constrained by the Parties' agreement to decline Claimant's request.  Claimant is entitled, however, to reimbursement of any amount it paid to the AAA in respect of Respondent's equal share of the fees, expenses and arbitrator compensation that Respondent failed to pay, as provided by AAA Rule R-59 ("[i]f arbitrator compensation or expenses or the AAA's administrative fees have not been paid in full, the AAA may so inform the parties so that one of them may advance the required payment").

187.    Claimant also seeks an award of $159,623.62 reimbursing it for its reasonable and documented attorney's fees incurred "in connection with Respondent's willful noncompliance with its discovery obligations."  Claimant's Post-Hearing Submission, April 11, 2025 ¶¶ 37-52.  Claimant points to "a protracted pattern of recalcitrance and defiance of the Tribunal's orders…calculated to hide documents that were highly relevant to the claims in these proceedings…."  *Id.* ¶ 51.  Claimant notes that AAA Rule 24(d) empowers arbitrators to issue orders to enforce disclosure obligations and, "in the case of willful non-compliance with any order…[to] mak[e] special allocations of costs…arising from such non-compliance."

188.    Claimant is correct that the Tribunal was called upon repeatedly to compel Respondent to comply with disclosure requests, and that the Tribunal frequently rejected the positions Respondent asserted to justify its failures to produce documents responsive to Claimant's legitimate requests.  Nonetheless, on at least one occasion the Tribunal approved one aspect of Respondent's invocation of a privilege, Procedural Order No. 4, p. 2, 2d par. More important, it appears that Respondent ultimately complied with the Tribunal's orders compelling it to produce documents.  The Supplemental Flaherty Report, for

example, is based on documents, however tardily produced, that enabled Claimant to establish Respondent's breach of the exclusivity provisions of their contract. And Respondent also ultimately produced documents, such as Ex. C-104, quoted extensively above at Par. 141, that were damaging to Respondent's position in this proceeding.

189.   Consequently, we decline to penalize Respondent's conduct here as willful noncompliance.

## X.   AWARD

Based upon the foregoing, we **DECIDE** and **AWARD** as follows:

1.   Claimant IST NA's claim for breach of the Sales Representative Agreement dated April 17, 2019 as amended by the Memorandum of Understanding dated January 1, 2020 is GRANTED.

2.   The Counterclaims asserted by Respondent IST GmbH are DENIED with prejudice.

3.   Within thirty (30) days from the date of transmittal of this Final Award to the Parties, Respondent IST GmbH shall pay to Claimant IST NA the sum of US$8,730,626.39, which includes lost profits damages of US$5,859,845, compensation for defective equipment of US$792,084, compensation for diverted sales of equipment and consumables of $1,120,784, and pre-award simple interest at the rate of nine percent (9%) per annum calculated from December 1, 2022 through the date of issuance of this Final Award totaling US$957,913.39.

4.   IST GmbH shall pay post-award interest of US$1,916.56 per day for each day beginning thirty-one (31) days from the date of transmittal of this Final Award until the earlier of the date on which this Final Award has been paid in full or judgment has been entered on this Final Award by a court of competent jurisdiction.

5.   In the event that within sixty (60) days from the date of transmittal of this Final Award IST NA supplies written evidence to IST GmbH sufficient to show its continued possession of its unsold inventory and commits to transfer ownership of such inventory to IST GmbH upon receipt of payment, IST GmbH shall pay to IST NA within thirty (30) days of receipt of such written evidence the sum of US$787,179 plus simple interest at the rate of nine percent (9%) per annum for the period December 1, 2022 to the date of payment, and IST NA shall thereupon immediately transfer ownership of such unsold inventory to IST GmbH.

6. The administrative fees and expenses of the AAA/ICDR totaling US$54,089.21 and the compensation and expenses of the arbitrators totaling US$303,666.50 shall be borne equally by the Parties. Therefore, IST GmbH shall reimburse Claimant IST NA the sum of US$24,172.84, representing that portion of said fees and expenses attributable to IST GmbH's share that was paid by IST NA.

7. This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration. Except as expressly provided in this Final Award, any other claims and requests for relief, including in the form of claims, counterclaims, affirmative defenses or otherwise, made by either Party, are hereby dismissed.

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in the City of New York, New York, United States of America.

Place of Arbitration: New York, New York U.S.A.
Date:   June 23, 2025

_____
Frederick R. Fucci, Co-Arbitrator


_____
Michele S. Riley, Co-Arbitrator


_____
Richard F. Ziegler, Chair

6. The administrative fees and expenses of the AAA/ICDR totaling US$54,089.21 and the compensation and expenses of the arbitrators totaling US$303,666.50 shall be borne equally by the Parties. Therefore, IST GmbH shall reimburse Claimant IST NA the sum of US$24,172.84, representing that portion of said fees and expenses attributable to IST GmbH's share that was paid by IST NA.

7. This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration. Except as expressly provided in this Final Award, any other claims and requests for relief, including in the form of claims, counterclaims, affirmative defenses or otherwise, made by either Party, are hereby dismissed.

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in the City of New York, New York, United States of America.

Place of Arbitration: New York, New York U.S.A.
Date:   June 23, 2025

_____
Frederick R. Fucci, Co-Arbitrator


_____
Michele S. Riley, Co-Arbitrator


_____
Richard F. Ziegler, Chair

6.  The administrative fees and expenses of the AAA/ICDR totaling US$54,089.21 and the compensation and expenses of the arbitrators totaling US$303,666.50 shall be borne equally by the Parties. Therefore, IST GmbH shall reimburse Claimant IST NA the sum of US$24,172.84, representing that portion of said fees and expenses attributable to IST GmbH's share that was paid by IST NA.

7.  This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  Except as expressly provided in this Final Award, any other claims and requests for relief, including in the form of claims, counterclaims, affirmative defenses or otherwise, made by either Party, are hereby dismissed.

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in the City of New York, New York, United States of America.

Place of Arbitration: New York, New York U.S.A.
Date:   June 23, 2025

_____
Frederick R. Fucci, Co-Arbitrator


_____
Michele S. Riley, Co-Arbitrator


_____
Richard F. Ziegler, Chair

I, Frederick R. Fucci, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Date: June 23, 2025

Frederick R. Fucci, Co-Arbitrator

State of NEW YORK          )
                           ) SS:
County of NEW YORK         )

On this 23 day of June, 2025, before me personally came and appeared Frederick R. Fucci, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

Ethan M. Krasnoo
Notary Public State of New York
No. 01KR6318211
Qualified in New York County
Commission Expires January 20, 2027

I, Michele S. Riley, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Date: June 23, 2025

_Michele S. Riley_
Michele S. Riley, Co-Arbitrator

State of ~~STATE~~ NEW YORK        )
                                   ) SS:
County of ~~COUNTY~~ NEW YORK      )

On this 23rd day of June, 2025, before me personally came and appeared Michele S. Riley, to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that she executed the same.

_____
Notary Public

JOSHUA SUH
Notary Public - State of New York
NO. 01SU0026046
Qualified in Queens County
My Commission Expires Jun 20, 2028

69

I, Richard Ziegler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Date: June 23 2025

Richard Ziegler, Chair

State of STATE N, Y,                    )
                                        ) SS:
County of COUNTY KINGS )

On this 23 day of June, 2025, before me personally came and appeared Richard Ziegler, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

KAMAL P. SONI
Notary Public, State of New York
No. 01SO6089949
Qualified in Kings County
Commission Expires March 31, 2027