**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| I.S.T. NORTH AMERICA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>TRELLEBORG PIPE SEALS MILFORD INC., TRELLEBORG SEALING SOLUTIONS US INC., TRELLEBORG PIPE SEALS US, INC., TRELLEBORG CORPORATION, TRELLEBORG AB, TRELLEBORG SEALING PROFILES GMBH, CRISTOFFER LJUNGBACK, ANDREAS RENULF, SIMON BURKE, JOHN DOE 1-10, and XYZ COMPANIES 1-10,<br><br>Defendants. | Civil Action No. 1:25-cv-08349<br><br>Civil Action<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF I.S.T. NORTH AMERICA, LLC'S**
**MEMORANDUM OF LAW IN OPPOSITION**
**TO THE U.S. DEFENDANTS' MOTION TO DISMISS**

_____

**COLE SCHOTZ P.C.**
*Attorneys for Plaintiff I.S.T. North America, LLC*
1325 Avenue of the Americas
New York, New York 10019

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iv

TABLE OF DEFINED TERMS .................................................................................... vii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................. 4

      A.    The Parties and the Commercial Context ................................................... 4

      B.    The Exclusivity Agreement and ISTNA's Joint Venture .......................... 5

      C.    Trelleborg's Strategic Interest and the Concealed Transaction
           Structure .................................................................................................... 6

      D.    Representations Made to ISTNA by the U.S. Defendants .......................... 7

      E.    Acquisition of ISTNA's Confidential Information Under False
           Pretenses ................................................................................................... 7

      F.    The SAPA and Bad Faith Repudiation of ISTNA's Contracts –
           Trelleborg's "Illusion" and ISTNA's "Nightmare" .................................. 8

      G.    Post-Closing Conduct and Direct Market Replacement ............................ 9

      H.    The Tribunal Finds Repudiation Caused by Bad Faith Conduct and
           Awards $10 Million in Damages ............................................................. 10

ARGUMENT ................................................................................................................. 10

  I.     Defendants' Threshold "Repackaging" Argument Improperly Rewrites
        The Complaint And Falls Totally Flat .................................................... 11

  II.    The Misrepresentation-Based Claims Are Meticulously Detailed And
        Actionable As Alleged ............................................................................ 14

  III.   The Tortious Interference Claims Are Legally Sound And Supported By
        Extensive Factual Allegations ................................................................. 17

      A.    The Complaint Plausibly Alleges Tortious Interference with the
           Exclusivity Agreement ............................................................................ 17

      B.    The Complaint States A Claim for Tortious Interference with
           Prospective Economic Relations by Identifying Specific Customers

and Particularizing Defendants' Malicious Conduct and Wrongful
Means .................................................................................................... 20

IV.    The U.S. Defendants, As With All Of The Trelleborg Parties, Aided And
Abetted Ist Germany's Breaches Of Fiduciary Duty ........................................... 22

V.     Defendants' "Group Pleading" Argument Is Irrelevant, Premature, And
Meritless ............................................................................................................... 24

VI.    ISTNA Is Entitled To Seek Punitive Damages As A Remedy For Its Fraud
And Aiding And Abetting Tort Claims ............................................................... 28

CONCLUSION ........................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
  2018 WL 1273343 (S.D.N.Y. Mar. 5, 2018) ..........................................................................27

*Amusement Indus., Inc. v. Stern*,
  693 F. Supp. 2d 301 (S.D.N.Y. Mar. 1, 2010) .......................................................................28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................................11

*Williamson ex rel. At Home Bondholders' Liquidating Trust v. Verizon
  Communications, Inc.*,
  2013 WL 227691 (S.D.N.Y. Jan. 22, 2013) ...........................................................................27

*Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*,
  692 F.3d 42 (2d Cir. 2012)................................................................................................11, 12

*Cambridge Capital LLC v. Ruby Has LLC*,
  565 F. Supp. 3d 420 (S.D.N.Y. 2021)...............................................................................15, 16

*Capax Discovery, Inc. v. AFD RSD Investors, LLC*,
  285 F. Supp. 3d 579 (W.D.N.Y. 2018) ...................................................................................12

*Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC*,
  2008 WL 1710910 (S.D.N.Y. Apr. 10, 2008)..........................................................................28

*Clean Coal Techs., Inc. v. Leidos*,
  377 F. Supp. 2d 303 (S.D.N.Y. 2019).....................................................................................21

*Cont'l Indus. Grp., Inc. v. Altunkilic*,
  788 F. App'x 37 (2d Cir. 2019) ..............................................................................................17

*Credit Suisse Sec. (USA) LLC v. W. Coast Opportunity Fund, LLC*,
  2009 WL 2356881 (Del. Ch. July 30, 2009)...........................................................................25

*Dane v. UnitedHealthcare Ins. Co.*,
  974 F.3d 183 (2d Cir. 2020)....................................................................................................10

*DirecTV Latin Am., LLC v. Park*,
  691 F. Supp. 2d 405 (S.D.N.Y. 2010).....................................................................................16

*Ergowerx International, LLC v. Maxell Corp. of America*,
  18 F. Supp. 3d 430 (S.D.N.Y. 2014).......................................................................................23

iv

*Fletcher v. Atex, Inc.*,
  68 F.3d 1451 (2d Cir. 1995)......................................................................................26

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
  206 F. Supp. 3d 869 (S.D.N.Y. 2016)......................................................................21

*Herman v. Duncan*,
  2019 WL 2137335 (S.D.N.Y. May 19, 2019) .........................................................23

*High Falls Brewing Co., LLC v. Boston Beer Corp.*,
  852 F. Supp. 2d 306 (W.D.N.Y. 2011) ..............................................................19, 20

*Kottler v. Deutsche Bank AG*,
  607 F. Supp. 2d 447 (S.D.N.Y. 2009)................................................................22, 24

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006)......................................................................................24

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
  306 F. Supp. 3d 629 (S.D.N.Y. 2018)......................................................................20

*Overton v. Art Fin. Partners LLC*,
  166 F. Supp. 3d 388 (S.D.N.Y. 2016)......................................................................25

*Palin v. N.Y. Times Co.*,
  940 F.3d 804 (2d Cir. 2019)......................................................................................11

*Particle Health Inc. v. Epic Sys. Corp.*,
  2025 WL 2581579 (S.D.N.Y. Sept. 5, 2025)......................................................17, 19

*Planet Payment, Inc. v. Nova Inform. Sys, Inc.*,
  2011 WL 1636921 (E.D.N.Y. Mar. 31, 2011) .........................................................20

*Prospect Funding Holdings, LLC v. Vinson*,
  256 F. Supp. 3d 318 (S.D.N.Y. 2017)......................................................................20

*RBG Management Corp. v. Village Super Market, Inc.*,
  692 F. Supp. 3d 135 (S.D.N.Y. 2023)......................................................................21

*Red Apple Media, Inc. v. Batchelor*,
  729 F. Supp. 3d 350 (S.D.N.Y. 2024)......................................................................18

*Rich v. Fox News Network, LLC*,
  939 F.3d 112 (2d Cir. 2019)......................................................................................18

*Roche Diagnostics GmbH v. Enzo Biochem, Inc.*,
  992 F. Supp. 2d 213 (S.D.N.Y. 2013)......................................................................19

v

*Scientific Components Corp. v. Sirenza Microdevices, Inc.*,
    2006 WL 6937123 (E.D.N.Y. July 11, 2006)........................................................................23

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
    542 F.3d 354 (2d Cir. 2008).............................................................................................13, 14

*Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*,
    842 F. Supp. 2d 502 (S.D.N.Y. 2012).............................................................................26, 27

*St. John's Univ., N.Y. v. Bolton*,
    757 F. Supp. 2d 144 (E.D.N.Y. 2010) ...................................................................................17

*State St. Glob. Advisors Tr. Co. v. Visbal*,
    431 F. Supp. 3d 322 (S.D.N.Y. 2020)............................................................................17, 18

*TradeWinds Airlines, Inc. v. Soros*,
    2012 WL 983575 (S.D.N.Y. 2012)..........................................................................25, 26, 27

*Trahan v. Lazar*,
    457 F. Supp. 3d 323 (S.D.N.Y. 2020)............................................................................ *passim*

*In re TransCare Corp.*,
    592 B.R. 272 (Bankr. S.D.N.Y. 2018)............................................................................24, 25

*U.S. v. Golden Acres, Inc.*,
    702 F. Supp. 1097 (D. Del. 1988).........................................................................................26

*United Features Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
    216 F. Supp. 2d 198 (S.D.N.Y. 2002)...................................................................................23

## Statutes

Rule 8.............................................................................................................................18, 21, 24

Rule 9(b) ...................................................................................................................................15

Rule 12(b)(6)..............................................................................................................................10

67903/0001-52215866

## TABLE OF DEFINED TERMS

| Defined Terms[1] | Definition |
|---|---|
| "Complaint" | The Complaint and Jury Demand, being filed herewith as Exhibit A to the Declaration of Brandon Fierro, Esq. in Opposition to the Motion. "¶" refers to Paragraphs in the Complaint. |
| "Diakos Decl." | The Declaration of Joanna A. Diakos in Support of the Motion (ECF No. 33). |
| "ISTNA" | Plaintiff I.S.T. North America, LLC |
| "Mot." | The Memorandum of Law in Support of the U.S. Defendants' Motion to Dismiss (ECF No. 34). |
| "Motion" | The Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). |
| "MOU" | The Memorandum of Understanding entered into between ISTNA and IST Germany in December 2020. |
| "SAPA" | The Share and Asset Purchase Agreement entered into between Trelleborg and IST Germany on October 11, 2022. |
| "U.S. Defendants" | Defendants Trelleborg Pipe Seals Milford, Inc., Trelleborg Sealing Solutions US, Inc., Trelleborg Pipe Seals US, Inc., Trelleborg Corporation, and Cristoffer Ljungback. |

---

[1] All capitalized terms not defined herein have the meaning assigned to them in Plaintiff's Complaint filed October 8, 2025.

ISTNA respectfully submits this memorandum of law in opposition to the Motion to Dismiss filed by the U.S. Defendants.

## PRELIMINARY STATEMENT

Through misstatements of law, gross mischaracterizations of fact, and deliberate efforts to obfuscate the circumstances underlying this dispute, the U.S. Defendants attempt, without success, to distance themselves from the truth of their corrupt and fraudulent business practices, which form the genesis of a multi-faceted conspiracy targeted at defrauding ISTNA and usurping its business. These Defendants seek to prevent ISTNA's meritorious claims and further conceal their back-alley business practices by advancing hyper-technical and strained legal arguments, none of which are remotely sufficient to insulate them from the liability for their fraudulent and deceitful conduct. In so doing, the U.S. Defendants now ask the Court to dismiss a detailed, evidence-backed Complaint by mischaracterizing it as a routine contract dispute or benign corporate activity. It is neither. At its core, this action concerns a deliberate and deceptive campaign of corporate espionage and fraud, orchestrated by the Trelleborg Group and executed through its U.S. subsidiaries and executives in New York, to eliminate ISTNA's contractual rights and raid its business. The Motion should be denied.

As explained below, ISTNA spent years building the domestic market for specialized trenchless pipe repair technology pursuant to an exclusive relationship with its German manufacturing partner, IST Germany. That relationship was memorialized in a New York-law Exclusivity Agreement and implemented as a joint enterprise in which ISTNA invested millions of dollars, developed customer relationships, and acted as the sole face of the technology in the United States and Canada. When Trelleborg decided it wanted that market for itself, it did not negotiate for ISTNA's rights or compete on the merits. Instead, it pursued a covert strategy – the Takeover of IST Germany – to deceitfully destroy those rights while usurping the economic

1

benefits.  Based on the facts and evidence set forth in the Complaint, an arbitral Tribunal found that IST Germany willfully and maliciously repudiated the Exclusivity Agreement and did so "with the assistance and at the behest of Trelleborg," awarding ISTNA $10 million in damages.  The U.S. Defendants and all Trelleborg affiliates were aware of these proceedings but neglected to participate, instead choosing silence.

Central to the misconduct were misrepresentations made in New York by two U.S. Defendants, Cristoffer Ljungback and Andreas Renulf, who met ISTNA's founder, Geno Camali, for dinner in Piermont, New York, on August 10, 2022.  At that dinner, they made specific, affirmative representations: that Trelleborg was acquiring IST Germany "in its entirety"; that the transaction structure in place at that time included ISTNA's Exclusivity Agreement; and that "nothing was going to change" for ISTNA's business, which was entirely dependent on being supplied by IST Germany.  Those assurances were not hopeful generalities or expressions of future intent.  As the Complaint alleges, they were false when made and omitted material, contrary facts. Indeed, at the very moment those statements were delivered, Trelleborg was finalizing an asset-purchase structure that expressly excluded ISTNA's Exclusivity Agreement and stripped IST Germany of the assets necessary to perform it.  Ljungback, an executive of the U.S. Defendants, personally conveyed those false assurances in New York.

The Motion attempts to sidestep these allegations by recasting the case as one "based on" on the NDA that ISTNA executed with a different Defendant, Trelleborg AB.  The attempt fails. The Complaint does not assert a claim for breach of the NDA, does not seek to enforce it, and does not measure damages by reference to it.  The NDA is simply pleaded as one mechanism by which Defendants obtained ISTNA's sensitive business information while concealing their true intentions.  These claims are separate and apart from the NDA.  Indeed, Defendants themselves

2

elsewhere argue that ISTNA's tortious interference claims are "based almost entirely on" a different agreement, the SAPA. Both positions cannot be true. The Complaint alleges a coherent course of conduct in which deception and misuse of information worked together to achieve a single objective: extinguishing ISTNA's contractual rights and replacing ISTNA in the market. Accordingly, the U.S. Defendants are also wrong to contend that this case should be forced into arbitration. It would be unjust, unfair, and unprecedented to require ISTNA to arbitrate claims predicated on an arbitration clause in an NDA that is not alleged to have been breached.

Nor is this a case of "mere asset purchase" that incidentally rendered performance impossible. The Complaint alleges, and documentary evidence confirms, that the exclusion of the Exclusivity Agreement was the point of the transaction, not an unintended consequence. Damning internal emails produced in the Arbitration expose the existence of the Trelleborg-IST Germany conspiracy and confirm that IST Germany willfully repudiated the Exclusivity Agreement with the assistance and at the behest of Trelleborg – an evidentiary finding that formed the basis of a $10 million arbitration award in favor of ISTNA. In one such email, that is detailed in the Complaint, the conspirators actually comment on their efforts to orchestrate an "illusion" for purposes of specifically defrauding ISTNA and acknowledging that their scheme will result in a "nightmare" for ISTNA. That email provides, in part:

From Genos point of view we took him the illusion to be part of Trelleborg shortly and additionally we will tell him that his agreement will not be transferred - it's a nightmare what falls upon him and in this context you can`t expect him to do a great job for us in the future.

After all Geno has invested 2.5 Mio euros in demo equipment in the meantime and that's only because he is exclusive in the US.

So finally Trelleborg is on the driver seat and every decision is ok for me but please do not expect that Geno will do anything for IST in the future when we will take everything away from him without offering him anything concrete for the future same time. Even than it will be difficult but I see an option if we explain it to him understandably.

The U.S. Defendants' effort to distance themselves from this conduct fares no better. Their "group pleading" arguments are irrelevant and unavailing, because the Complaint articulates and supports with facts the bases for the claims against each named Defendant. In any event, the Complaint alleges that the Trelleborg entities operated as a single economic unit, held themselves out as a unified group, and used U.S. subsidiaries and executives to execute the scheme in the United States. After the acquisition closed, the U.S. Trelleborg entities stepped directly into ISTNA's shoes, including by contacting ISTNA's customers, taking over sales and service functions, hiring away ISTNA's workforce, and announcing that products would "no longer be available via" ISTNA. Having carried out the misconduct in the U.S. market and reaped the benefits, the U.S. Defendants cannot legitimately disclaim responsibility at the pleading stage.

In the end, the Motion is less about the absence of well-pleaded facts and more about their distortion. ISTNA's fifty-five page Complaint provides a step-by-step description of how a bad faith conglomerate desperate for control was willing to use its U.S.-based affiliates to surreptitiously destroy a start-up innovator to control a market and line its pockets. Defendants can defend their actions at the appropriate time. But they have not identified a cogent basis to dismiss the Complaint now. The Motion should be denied.

## BACKGROUND

### A.    The Parties and the Commercial Context

ISTNA was founded by Geno Camali to develop, market, sell, and service trenchless pipe repair technology in the United States and Canada. (¶10-11). Beginning in 2019, ISTNA became the exclusive North American sales and service representative for IST Germany, a German manufacturer of trenchless pipe repair equipment. ISTNA and IST Germany were joint venture parties and fiduciaries, and to that end ISTNA invested substantial capital and resources to establish and grow the North American market for IST Germany's products, including building

4

customer relationships with municipalities and infrastructure contractors, developing service capabilities, and maintaining inventory and technical personnel.  (¶¶10-11).

Defendants are affiliated entities and executives within the global Trelleborg group. The U.S. Defendants – Trelleborg Pipe Seals Milford Inc., Trelleborg Sealing Solutions US Inc., Trelleborg Pipe Seals US, Inc., Trelleborg Corporation, and Cristoffer Ljungback – are alleged to operate as part of an integrated multinational enterprise that presents itself publicly and commercially as a unified organization.  This Trelleborg "Group" conducts business through inscrutable trade names (like "Seals & Profiles"), interchangeable operations across entities, overlapping executives, and centralized control, while using executives of certain subsidiaries and affiliates – like Ljungback and Foreign Defendant Andreas Renulf – to speak and conduct business on behalf of the entire Group.  (¶¶51-81).

### B.    The Exclusivity Agreement and ISTNA's Joint Venture

On April 17, 2019, ISTNA and IST Germany entered into a written Exclusivity Agreement governed by New York law.  (¶108).  Under that agreement, ISTNA was appointed IST Germany's "exclusive representative for the sale of equipment and parts manufactured by [IST Germany]" in the United States, a territory later expanded to include Canada.  (¶110).  The agreement covered not only existing products, but also "any and all other equipment and parts manufactured by [IST Germany] currently or at any future time."  (¶110).

The Exclusivity Agreement imposed affirmative obligations on IST Germany, including production, delivery, pricing, and technical support obligations, and contained a strict anti-assignment provision.  (¶¶111-114).  It did not permit IST Germany to divest itself of the ability to perform while leaving ISTNA bound to the relationship.  (¶¶113-114).  ISTNA and IST Germany operated as a de facto joint venture with respect to the development and commercialization of IST Germany's trenchless pipe repair technology in North America.  (¶ 104).

5

ISTNA invested capital, personnel, facilities, and expertise based on the understanding that IST Germany would manufacture equipment and consumables exclusively for sale through ISTNA in North America. (¶¶12, 30, 118, 178). Mr. Camali placed substantial, necessary, and justifiable, trust in IST Germany and Vogt, its founder. (¶¶252-53). This interdependent arrangement – reflected in the Exclusivity Agreement, the MOU, and the parties' course of dealing – functioned as a coordinated enterprise founded on trust. (¶2, 11, 108, 118).

### C.    Trelleborg's Strategic Interest and the Concealed Transaction Structure

By 2020, Trelleborg had identified the North American trenchless pipe repair market as their largest strategic growth opportunity. Specific Trelleborg senior executives, including Jean Paul Mindermann, stated that acquiring IST Germany would provide an immediate entry into the U.S. market. (¶¶123-130). At the same time, Trelleborg recognized that ISTNA's exclusive contractual rights posed a material obstacle: as long as the Exclusivity Agreement remained in force, ISTNA controlled sales, service, and customer relationships for IST Germany's technology in the United States and Canada. (¶124).

The Complaint alleges that Trelleborg pursued a strategy designed to eliminate ISTNA's rights while preserving Trelleborg's ability to exploit the same market. Beginning in late 2020, Trelleborg engaged in negotiations with IST Germany to acquire its business while concealing from ISTNA both the existence of those negotiations and the intended structure of the transaction. Internally, Trelleborg allegedly planned a transaction that would transfer IST Germany's assets to Trelleborg while excluding ISTNA's Exclusivity Agreement, thereby rendering IST Germany incapable of performing its contractual obligations to ISTNA. (¶¶123-139).

6

### D.   Representations Made to ISTNA by the U.S. Defendants

While these negotiations proceeded, Trelleborg executives engaged directly with ISTNA and its founder in the United States.  The Complaint alleges that these interactions were intended to reassure ISTNA that its contractual rights were secure and to prevent ISTNA from objecting to or interfering with the planned acquisition.  (¶¶133-153).

On August 10, 2022, Ljungback and Renulf – Trelleborg's head of M&A – met with Mr. Camali for dinner in Piermont, New York.  At that dinner, Ljungback and Renulf made a series of specific representations, including that Trelleborg was acquiring IST Germany in its entirety; the transaction in place at the time would "ensur[e] continuity of operations" for ISTNA because it would include the Exclusivity Agreement; "nothing was going to change" with respect to ISTNA's rights under the Exclusivity Agreement; and that the parties would issue a joint press release to announce the acquisition.  (¶¶154-161, 233-241).

These statements were knowingly or recklessly false or misleading when made.  At the time of the Piermont dinner, Renulf had already cut out and excluded ISTNA's contract, and each of the named Defendants, including each of the U.S. Defendants, knew of this fact.  (¶¶154-161). Ljungback – who Defendants concede is an executive with and agent of the U.S. Defendants – personally conveyed these statements in New York while the asset-purchase structure was already being put in place and knew or should have known that the statements were false and omitted material facts.  (¶¶20, 154-158).

### E.   Acquisition of ISTNA's Confidential Information
###      Under False Pretenses

In parallel, Trelleborg sought and obtained ISTNA's confidential business information, including customer lists, pricing data, and strategic plans, pursuant to a nondisclosure agreement executed in June 2022.  According to the Complaint, Trelleborg represented that this information

7

would be used solely to evaluate a potential acquisition or investment in ISTNA and to plan for ISTNA's integration into the Trelleborg organization.

The Motion repeatedly characterizes this action as one "based on the NDA." (Mot. at pp. 8-10). The Complaint alleges otherwise. The U.S. Defendants are not even parties to the NDA (Defendant Trelleborg AB is). Moreover, the NDA is merely pleaded as a mechanism through which Trelleborg obtained sensitive information, not as the basis for any claim or as a contract that was breached.

### F.   The SAPA and Bad Faith Repudiation of ISTNA's Contracts – Trelleborg's "Illusion" and ISTNA's "Nightmare"

On October 11, 2022, Trelleborg consummated a SAPA with IST Germany. Under the SAPA, Trelleborg acquired IST Germany's operating assets, technology, and ongoing business, while expressly excluding the Exclusivity Agreement and related obligations to ISTNA. (¶¶133, 145, 160). This structure left IST Germany as a non-operational shell. (¶17).

As alleged in the Complaint (but ignored in the Motion), there is documentary proof that Trelleborg executives and agents knew their "takeover" would cause IST Germany to breach ISTNA's contracts. For example, on November 4, 2022, when Trelleborg executives and IST Germany CEO Jorg Vogt were discussing the impact of the Takeover on IST, Mr. Vogt, soon to be a Trelleborg employee, wrote as follows, which comments Burke and Renulf, executives of the Foreign Defendants, agreed with:

8

From Genos point of view we took him the illusion to be part of Trelleborg shortly and additionally we will tell him that his agreement will not be transferred - it's a nightmare what falls upon him and in this context you can`t expect him to do a great job for us in the future.

After all Geno has invested 2.5 Mio euros in demo equipment in the meantime and that's only because he is exclusive in the US.

So finally Trelleborg is on the driver seat and every decision is ok for me but please do not expect that Geno will do anything for IST in the future when we will take everything away from him without offering him anything concrete for the future same time. Even than it will be difficult but I see an option if we explain it to him understandably.

(¶177).    These comments demonstrate bad faith, including because Vogt acknowledges to Trelleborg executives that it will be a "nightmare" for Mr. Camali when Trelleborg tells him that it is acquiring IST Germany's assets but not acquiring ISTNA and (ii) Mr. Camali was under an "illusion" to the contrary the whole time.  Vogt also emphasizes that Trelleborg "is [in] the driver['s] seat" and "will take everything away from" Mr. Camali.  (¶¶30, 178).

Incredibly, this is not the only email that admits to Defendants inducing a breach of the Agreement to undermine ISTNA's exclusivity.  Just the day prior to the "nightmare" email, Trelleborg's outside merger consultant, Felix Schaefer, wrote about Mr. Camali (to Vogt) that

Of course, he wants to keep his contract, especially the exclusivity, but Trelleborg will not do that. They would like to offer him a new contract, but no longer exclusive, but with a verbal agreement that he will not use any other distribution partner as long as the performance is right.

(¶32, 174).  This is yet more proof – not allegations, but proof – that Defendants knew about ISTNA's agreements and actually intended for those agreements to be repudiated.

### G.    Post-Closing Conduct and Direct Market Replacement

Following the SAPA, Trelleborg – through its entities and executives, including those operating in the United States – began servicing the same North American customers previously served by ISTNA.  According to the Complaint, Trelleborg contacted ISTNA's customers, informed them that products would no longer be available through ISTNA, and represented that Trelleborg would now provide sales, service, and support directly.  (¶¶5, 147, 195, 227).

9

On July 20, 2023, Simon Burke on behalf of the U.S. Defendants emailed ISTNA's customers stating that "products will no longer be available via IST North America" and that "Trelleborg will support and service all existing and new end customers ... directly in the USA." (¶90-91).  The Complaint alleges that the U.S.-based Trelleborg entities benefitted directly from this transition, capturing revenue and goodwill generated by ISTNA before the breach.  The U.S. Defendants in particular tried to and succeeded in "taking" ISTNA's entire salesforce, an act the Complaint alleges was motivated entirely by malice and had the effect of dramatically prejudicing ISTNA's current and future customer relationships.  (¶¶198-99).

### H.    The Tribunal Finds Repudiation Caused by Bad Faith Conduct and Awards $10 Million in Damages

ISTNA initiated and pursued arbitration against IST Germany pursuant to the Exclusivity Agreement.  In a final award issued on June 23, 2025, a three-member arbitral tribunal found that IST Germany had willfully and maliciously breached and repudiated the Exclusivity Agreement. (*See* Diakos Decl. Ex. B).  The Tribunal concluded that IST Germany sold its business "lock, stock, and barrel" to Trelleborg while "carefully excluding ISTNA's exclusive contract," and that this conduct constituted bad-faith repudiation rather than a legitimate cessation of business.  (¶¶6, 25, 172).  The Tribunal further found that IST Germany's breach was carried out "with the assistance and at the behest of Trelleborg," and awarded nearly $10 million in damages.  (¶¶6, 209, 214, 222, 257).  Demonstrating how intimately involved the Tribunal believed Trelleborg to be, the name "Trelleborg" is mentioned more times in the Award than the Award has pages (73).

### ARGUMENT

The standards governing a motion to dismiss under Rule 12(b)(6) are well settled.  The court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences," *Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020), and then determines whether

the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* That standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *Palin v. N.Y. Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019), but is "not akin to a 'probability requirement.'" *See id.* (quoting *Iqbal*, 556 U.S. at 678).

As demonstrated below, the Motion should be denied. The Complaint states plausible claims for fraud, negligent misrepresentation, tortious interference with contract, tortious interference with prospective business relations, and aiding and abetting breach of fiduciary duty against the U.S. Defendants. At best, the Motion raises fact-laden defenses that cannot be resolved at the pleading stage. At worst, these Defendants mischaracterize the Complaint in a transparent and misguided attempt to try this case on the pleadings. Either way, dismissal is unwarranted.

## I.    DEFENDANTS' THRESHOLD "REPACKAGING" ARGUMENT IMPROPERLY REWRITES THE COMPLAINT AND FALLS TOTALLY FLAT

Defendants' threshold contention – that this action is merely an effort to "repackage" into tort claims an alleged breach of an NDA (Mot. pp. 8-10) – rests on a fundamental mischaracterization of Plaintiff's allegations. The Complaint does not seek to enforce an NDA against the U.S. Defendants (or any Defendant). Nor does ISTNA assert a claim for its breach or allege damages measured by its nonperformance. Instead, the NDA is pleaded as a means by which the U.S. Defendants (and the rest of the Trelleborg Group) accomplished a broader course of misconduct involving deception, contractual interference, and market usurpation. (¶¶140-181). New York law draws a clear and well-established distinction between tort claims that merely duplicate contractual duties and tort claims that arise from independent, and wrongful, conduct. *See Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 59 (2d

Cir. 2012) ("Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct."). The Complaint falls squarely in the latter category.

As an initial matter, Defendants' argument fails because the Complaint does not assert a cause of action for breach of the NDA. Nor does it allege that Defendants' liability turns on whether the NDA was violated, how it should be interpreted, or what remedies it provides – indeed, whether Defendants breached the NDA is not relevant, at all, to ISTNA's recovery here. Rather, ISTNA pleads that the NDA was one of several means by which Defendants induced disclosure of sensitive business information while concealing their true intentions. (¶¶140-181). The gravamen of the claims is not misuse of information in violation of a contractual confidentiality obligation, but the use of deception and concealment to dismantle ISTNA's contractual rights and replace ISTNA in the North American market. The misuse of confidential information helps explain the deception.

New York courts routinely reject "repackaging" arguments where, as here, the plaintiff does not seek to enforce the contract at issue but alleges tortious conduct that is merely facilitated by the existence of a contract. *Aladdin Cap. Mgmt.*, 692 F.3d at 59 (tort claims non-duplicative where they "arise out of the independent characteristics of the [parties'] relationship")); *see also Capax Discovery, Inc. v. AFD RSD Investors, LLC*, 285 F. Supp. 3d 579, 587 (W.D.N.Y. 2018) (rejecting "repackaging" argument where tort claims were not "wholly duplicative" of contract). The relevant inquiry is not whether a contract exists in the background, but whether the defendant is alleged to have breached a legal duty independent of the contract. *Trahan v. Lazar*, 457 F. Supp. 3d 323, 355 (S.D.N.Y. 2020) (rejecting repackaging argument where the complaint alleged "tortious conduct" "not covered" by the contract). The Complaint repeatedly alleges such duties.

Indeed, with respect to ISTNA's fraud claims against Ljungback and the other Defendants, the "repackaging" argument would collapse the well-settled distinction between breach of contract and fraudulent inducement.  New York law will find "repackaging" only where "a valid agreement" "governs the subject matter of the dispute." *Xeriant*, 762 F. Supp. 3d at 353.  The law, however, recognizes that a defendant who makes misrepresentations of present fact or conceals material information in order to induce action or forbearance may be liable in tort, even where the parties' relationship involves contracts.  *Id.* at 357.  That principle applies with particular force where, as here, the misrepresentations concern matters irrelevant to the contract itself, such as the defendant's existing intentions, the structure of an ongoing transaction, and whether a counterparty's contractual rights are being preserved or deliberately excluded.

Defendants' "repackaging" argument is particularly misplaced as applied to ISTNA's tortious interference claims, which are not premised on Defendants' duties under the NDA at all. Rather, they are premised on Defendants' alleged intentional procurement of IST Germany's repudiation of the Exclusivity Agreement and the use of wrongful means to interfere with ISTNA's ongoing customer relationships.  (¶¶121-139, 162-181).  Indeed, Defendants themselves undercut their own theory by arguing elsewhere in their Motion that the tortious interference claim is "based almost entirely on the SAPA."  (Mot. at pp.11-12).  That position is irreconcilable.

Finally, there is no legal (or logical) support for Defendants' attempt to shoehorn this action into arbitration by invoking the NDA's arbitration clause.  It is axiomatic that a party cannot be required to arbitrate a dispute that it has not agreed to submit to arbitration.  *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008) ("the black letter rule [is] that the obligation to arbitrate depends on consent").  The only rare circumstances when a nonsignatory can force arbitration is if the claims against the nonsignatory are intimately founded in and "intertwined"

with the underlying contractual obligations.  *See id.*  Here, as noted, the NDA is merely ancillary

to the claims in this case, which even the U.S. Defendants concede (elsewhere in this brief) are

grounded in "fraud," "tortious interference," and "breach of fiduciary duty" in connection with the

"SAPA."  (Mot. at 27).  Thus, arbitration is not required and cannot be compelled.  *See Sokol*

*Holdings*, 542 F.3d at 361-62.[2]

## II.   THE MISREPRESENTATION-BASED CLAIMS ARE METICULOUSLY DETAILED AND ACTIONABLE AS ALLEGED

Defendants Ljungback and Renulf sat Mr. Camali down for dinner in Piermont and lied to

his face to conceal the fact that Trelleborg was actively taking steps to extinguish the Exclusivity

Agreement.  And they did so on behalf and as agents of the U.S. Defendants and with knowledge

that their statements were false.  (¶¶154-161).  These facts support textbook claims of fraudulent

misrepresentation and concealment and negligent misrepresentation.[3]  Defendants, however,

attack these claims as not sufficiently detailed and based on nonactionable statements of intent.

(Mot. pp. 11-14, 22-24).  Nothing could be farther from the truth.

To the contrary, the fraud claims are premised on specific representations and omissions

concerning facts that already existed at the time they were made, not premised on vague assurances

---

[2] The U.S. Defendants' position is logically absurd.  Were ISTNA to have filed an arbitration, the U.S. Defendants, would surely have argued to dismiss the fraud and other tort claims against them on the grounds that they were not arbitrable.  Thus, according to the U.S. Defendants, ISTNA has no forum in which to seek recourse against the U.S. Defendants or any other Trelleborg entity for their wrongdoing.  This cannot be the law.

[3] "To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff."  *Trahan*, 457 F. Supp. 3d at 350.  Negligent misrepresentation "involves most of the same elements as fraud, with a negligence standard substituted for the *scienter* requirement."  *Id.* at 354 (quotation and marks omitted).

67903/0001-52215866

or aspirational statements. As alleged, during the August 10, 2022 Piermont dinner, Ljungback and Renulf represented, among other things, that Trelleborg was in the process of acquiring IST Germany in its entirety; that the acquisition would not impair IST Germany's ability or obligation to supply ISTNA; that Trelleborg was honoring ISTNA's Exclusivity Agreement; and that ISTNA would be integrated into Trelleborg's U.S. operations. (¶¶154-161, 234-240, 244-248).

The Complaint alleges that these statements were false when made because Trelleborg was, ***at that very moment***, actively finalizing a transaction structure that expressly excluded the Exclusivity Agreement and stripped IST Germany of the assets necessary to perform it. (¶¶3, 17, 21, 131-132). Whether the acquisition was structured as an asset purchase rather than an acquisition "in its entirety," whether ISTNA's contract was being preserved or deliberately excluded, and whether Trelleborg intended to honor or repudiate existing exclusivity obligations were not predictions or speculation about the future. They were statements about the then-present state of negotiations and Defendants' existing intentions, coupled with the concealment and omission of material facts directly contrary to the assurances given. This is more than sufficient to allege fraud. *See Trahan*, 457 F. Supp. 3d at 353-54.[4]

Defendants' contention that the alleged misrepresentations are nonactionable statements of future intent (Mot. at 22-24) misstates both the allegations and the law. The Complaint alleges that when Ljungback and Renulf stated that Trelleborg would honor the Exclusivity Agreement

---

[4] These allegations also comfortably satisfy Rule 9(b), which only requires a complaint to allege facts particularizing the "who, what, where, when, and why" of the misstatements and omissions. *Cambridge Capital LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 464-65 (S.D.N.Y. 2021). The Complaint does so, in spades. (¶¶83-87, 154-161, 218, 228, 234-237, 245). The Motion makes the absurd argument that the Complaint "group" pleads by ascribing these misstatements to both Ljungback and Renulf. (Mot. at 21-22). This is a picayune quibble with no basis in law, because so long as a complaint puts a defendant "on notice of their role in the alleged fraud scheme," which ISTNA's Complaint surely does, it is not a basis to dismiss if "in many instances all defendants are lumped together." *Trahan*, 457 F. Supp. 3d at 354.

and that the acquisition would not impair ISTNA, they knew those statements were false because the exclusion of the Agreement had already been decided. (¶¶33, 154-161, 235). That is not a claim based on disappointed expectations. Rather, it alleges a knowing misrepresentation of ***then-existing*** reality. Such allegations state a claim for fraud at the pleading stage. *See DirecTV Latin Am., LLC v. Park*, 691 F. Supp. 2d 405, 434 (S.D.N.Y. 2010) ("a duty to disclose may arise if" "one party possesses superior knowledge, not readily available to the other, and knows the other is acting on the basis of mistaken knowledge[]")

Even if the alleged misstatements were simple promises of future performance – and they are not – dismissal would still not be warranted in these circumstances. *First*, a statement of future intent is actionable where the speaker, at the time the statement is made, has no intention of performing it. *See, e.g.*, *Trahan*, 457 F. Supp. 3d at 351 (upholding as an actionable misstatement that speaker "had no intent of performance" where there were plausible allegations of "conspiracy" to harm plaintiff). Plaintiff alleges that no Defendant – U.S. Defendants included – ever intended to consummate an acquisition of ISTNA (¶¶132-134, 230, 235, 236), so statements about how such an acquisition would work and Defendants' plans for it are necessarily false and misleading. *Second*, statements that imply the absence of existing contrary facts are actionable where those facts do, actually, exist. *See Ruby Has*, 565 F. Supp. 3d at 465. This is because once someone chooses to speak on a subject, he or she must provide full and fair disclosure of the facts necessary to make that statement not misleading. *See id.* ("create[ing] a materially misleading impression" by omitting to disclose facts contrary to the statement "will support claims for . . . fraud" (quotation omitted)). The opposite occurred here. Ljungback and Renulf affirmatively stated that (for example) the impending Takeover "would not alter IST Germany's ability or obligation to supply

ISTNA," (¶157(a)), while omitting to disclose that the then-existing structure of the transaction excluded the Exclusivity Agreement and would effectively strip IST Germany for parts. (¶ 160).

### III.   THE   TORTIOUS   INTERFERENCE   CLAIMS   ARE LEGALLY SOUND AND SUPPORTED BY EXTENSIVE FACTUAL ALLEGATIONS

Nowhere is Defendants' attempt to torture the Complaint to fit their counternarrative clearer than in connection with ISTNA's claims that the U.S. Defendants' tortiously and in bad faith interfered with the Exclusivity Agreement and ISTNA's prospective business relations. Taken at face value, the Complaint alleges copious facts to plausibly allege each cause of action.

### A.   The Complaint Plausibly Alleges Tortious Interference with the Exclusivity Agreement

Tortious interference requires a valid contract, defendant's knowledge of the contract and procurement of a breach, and damages. *Cont'l Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 41 (2d Cir. 2019). ISTNA has plausibly alleged facts sufficient to satisfy each element.

*First*, the Complaint that Defendants – including the U.S. Defendants – were aware of the contractual relationship between ISTNA and IST Germany as well as the Exclusivity Agreement itself. (¶¶121-139, 157, 162-178, 217). A plaintiff is not required to prove that the defendant had "perfect or precise knowledge of the terms and conditions of the contract[] in issue." *Particle Health Inc. v. Epic Sys. Corp.*, 2025 WL 2581579, at *19 (S.D.N.Y. Sept. 5, 2025) (quotation omitted). Rather, the defendant need only have "some knowledge" of the relevant contract. *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 348 (S.D.N.Y. 2020). "[I]t is sufficient . . . to allege facts from which the court might reasonably infer that [a defendant] had such knowledge." *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 172-73 (E.D.N.Y. 2010). Here, there can be no reasonable debate that the Individual Defendants met and spoke with Mr. Camali numerous times to discuss the Exclusivity Agreement, and indeed its existence and maintenance

17

was the core issue the parties discussed.  (¶20-21, 83-87, 140-141, 154-157).  Beyond that, the Complaint cites multiple emails in which the Defendants referenced ISTNA's "agreement" and how important it was to Mr. Camali and ISTNA.  Such allegations go far beyond what is required to plausibly establish knowledge on each Defendants' – including the U.S. Defendants' – part. *State St. Glob. Advisors*, 431 F. Supp. 3d at 349.

*Second*, ISTNA alleges breach – and the U.S. Defendants do not (and cannot) plausibly argue otherwise.  ISTNA repudiated the Exclusivity Agreement through its nonperformance, and the Tribunal in the Arbitration in fact found (after a full proceeding and evidentiary hearing) that the Exclusivity Agreement was breached in numerous ways, including by effect of the Takeover. (¶¶25, 33, 168-181, 213, 220).  Trelleborg "plainly" caused IST Germany "not to honor ISTNA's contractual entitlement to exclusivity even temporarily."  (¶25).

*Third*, ISTNA alleges facts to show that Defendants intentionally procured IST Germany's breach.  The intent element is satisfied where, "taken together, the[] pleadings constitute a sufficient allegation that [the defendant] knew that the interference was certain or substantially certain to occur as a result of [its] action."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019).  Allegations of intent need not be "the most detailed . . . to satisfy the minimal notice pleading standard of Rule 8(a)."  *Red Apple Media, Inc. v. Batchelor*, 729 F. Supp. 3d 350, 376 (S.D.N.Y. 2024).  ISTNA alleges all Defendants caused IST Germany's breach and copious facts to support that claim.  These include the specific representations made by each of the Individual Defendants to Mr. Camali to hide the true nature of the Takeover from him (¶¶154-161, 233-241), the deliberate act of excluding the Exclusivity Agreement from the SAPA, and the carrying on of an "illusion" to hide the "nightmare" that would befall ISTNA when – after the deal was done – Mr. Camali discovered his contract had been repudiated.  (¶¶29, 163-166, 177-178,

181).  Few inducements are more obvious, and the Complaint's allegations – based on evidence from the Arbitration – are more than sufficient to plead intentional procurement.  *See Particle*, 2025 WL 2581579, at *19 (finding intent adequately alleged where third party told counterparty access to data would be restored if it ended its relationship with plaintiff).[5]

The U.S. Defendants shamelessly whitewash their conduct by suggesting that they "merely enter[ed] into an agreement" that rendered IST Germany unable to perform its contract.  (Mot. 13 (citing Restatement (Second) of Torts § 766, comment n (1979)).  Nonsense.  The Complaint details that the Takeover's objective was to stop IST Germany from supplying ISTNA and in that way put ISTNA out of business.  (¶¶21, 121, 195-202).  That is quintessential tortious interference. *Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) ("the defendant's objective was to procure such a breach").  That is galaxies removed from the tepid and innocuous circumstances presented in the Motion, where – for instance – a third party buys specific goods from a counterparty that were meant to be sold to the plaintiff.  (Mot. 13 (citing, inter alia, *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 328 (S.D.N.Y. 2017)).  Defendants, including the U.S. Defendants, *targeted* ISTNA and the Exclusivity Agreement.  The repudiation was the point, not a by-product.  (¶¶121-181).

U.S. Defendants so badly misapply the law on this issue that their cases, if anything, help Plaintiffs.  Thus, for instance, the court in *High Falls Brewing Co., LLC v. Boston Beer Corp.*, 852 F. Supp. 2d 306, 311 (W.D.N.Y. 2011) (cited Mot. 13-14), explains that tortious interference is

---

[5] The U.S. Defendants do not challenge ISTNA's allegations that their conduct was improper, unjustified, and malicious, nor could they, given the Complaint's detailed factual allegations of a knowing and bad faith conspiracy to intentionally harm ISTNA and Mr. Camali personally.  (¶¶25, 28-29, 126, 177-179, 192-194).  In any event, the question of "whether the actions of one party . . . were improper or justified" is fact-intensive and "ought not be decided at" the motion to dismiss stage.  *Particle Health*, 2025 WL 2581579, at *19 (citation omitted).

sufficiently alleged on facts showing a defendant "is certain, or substantially certain, that his actions will result in a breach of contract" – ISTNA's exact allegations here. (¶¶121-181). Of course, the claim in *High Falls* was dismissed (that is why Defendants cite it), but that is only because the breach was incidental to the transaction, 852 F. Supp. 2d at 312-13, the exact opposite of the case ISTNA has brought. *High Falls*, like the U.S. Defendants' other cases, merely stands for the unremarkable and inapposite proposition that there is no tort where a defendant allegedly "engaged in conduct with a third party that happened to constitute a breach of the third party's contract with the plaintiff." *Prospect Funding*, 256 F. Supp. 3d at 327-28; *see also Planet Payment, Inc. v. Nova Inform. Sys, Inc.*, 2011 WL 1636921, at *12 (E.D.N.Y. Mar. 31, 2011) (cited Mot. 14) (dismissing tortious interference with contract claim where "defendant's action" was "merely incidental" to the "breach" (quotation omitted)).[6]

### B. The Complaint States A Claim for Tortious Interference with Prospective Economic Relations by Identifying Specific Customers and Particularizing Defendants' Malicious Conduct and Wrongful Means

To plead tortious interference with prospective economic relations a plaintiff must allege "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 643 (S.D.N.Y. 2018). The Complaint details specific customers, including Aegion/MTC, SAK, and PermaLiner, with whom ISTNA had an ongoing

---

[6] U.S. Defendants' throwaway causation argument fails. (Mot. at 15-16) Whether the Exclusivity Agreement was already in breach at the time of their tortious interference is irrelevant and the equivalent of saying "two wrongs make a right," because the arbitral Tribunal found multiple *independent* breaches, including that IST Germany both sold defective products and then repudiated. (Diakos Decl. Ex. B at ¶¶ 2, 23(A)-(F), 134).

business relationship and how Defendants, including the U.S. Defendants, contacted those customers directly, improperly raised their prices, and then "cut[] ISTNA out altogether" by informing them Trelleborg would not service them after the Takeover. (*E.g.*, ¶¶226-28 (detailing Ljungback's conduct)). This is more than sufficient to state a claim under Rule 8's liberal notice pleading standards. *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 911 (S.D.N.Y. 2016) (sustaining claim where defendant knew of the plaintiffs' "business relationships," "orchestrated a conspiracy to harm" them, and "succeeded in doing so").[7]

In spite of these facts, the Motion focuses on the intent element, suggesting that the Complaint does not allege the U.S. Defendants "employed wrongful means." (Mot. 18). Not so. The "wrongful means" standard involves conduct that is alleged to be unlawful, including malicious or "egregious" conduct, *RBG Management Corp. v. Village Super Market, Inc.*, 692 F. Supp. 3d 135, 149 (S.D.N.Y. 2023), that "transcend[s] mere breach of contract." *Clean Coal Techs., Inc. v. Leidos*, 377 F. Supp. 2d 303, 323-24 (S.D.N.Y. 2019) (Failla, J.) (sustaining claim). Trelleborg deliberately and for its own personal gain inflicted a "nightmare" upon ISTNA and Mr. Camali. The U.S. Defendants also specifically and independently undertook actions that prevented ISTNA from servicing its customers, including by taking ISTNA's entire sales force, refusing to fix or replace equipment, and by directly emailing ISTNA's customers and telling them to stop doing business with ISTNA and instead conduct it with Trelleborg Pipe Seals Milford and Trelleborg Pipe US (two U.S. Defendants). (¶¶195-202). These well-pleaded facts establish malice and wrongful purpose sufficient at the pleadings stage. *See Clean Coal Techs.*, 377 F.

---

[7] U.S. Defendants extensively cite the decision in *Gym Door*, (Mot. 16-18), but ignore that Judge Koetl sustained the claim in that case. 206 F. Supp. 3d at 919.

Supp. 3d at 323-24 (sustaining claim where defendant made "intentionally false communications in the service of personal gain" and the "cultivation of false expectations").

## IV.   THE U.S. DEFENDANTS, AS WITH ALL OF THE TRELLEBORG PARTIES, AIDED AND ABETTED IST GERMANY'S BREACHES OF FIDUCIARY DUTY

To plead a claim for aiding and abetting breach of fiduciary duty, a complaint must allege "(1) a breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach."  *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009).  There is no reasonable debate that IST Germany's and Trelleborg's scheme to use an "illusion" to create a "nightmare" for ISTNA flagrantly breaches any and all fiduciary duties.  Defendants, however, contend that ISTNA fails to plead (i) the existence of a fiduciary relationship with IST Germany or (ii) that the U.S. Defendants were involved in or aware of Trelleborg's breaches of that duty.  (Mot. pp. 24-26).  Neither argument withstands scrutiny.

*IST Germany was ISTNA's fiduciary*.  The Complaint alleges facts showing that IST Germany owed ISTNA fiduciary duties.  IST Germany's relationship with ISTNA went well beyond that of a typical arms'-length supplier and distributor.  Rather, it was a joint venture that gave rise to fiduciary obligations grounded in trust, confidence, and joint enterprise.  (¶¶10-11, 104).  IST Germany entrusted ISTNA with exclusive control over its North American market, relied on ISTNA to develop and maintain customer relationships on its behalf, and depended on ISTNA to provide technical support, servicing, and market-facing functions that directly affected IST Germany's reputation and long-term commercial success.  (¶104).  ISTNA, in turn, invested substantial capital and resources in reliance on IST Germany's exclusive commitments and acted as IST Germany's sole representative in the United States and Canada.  (¶¶12, 30, 178).  Taken together, these allegations describe a relationship of trust and confidence in which IST Germany

22

assumed fiduciary responsibilities to act loyally and in good faith toward ISTNA in connection with the North American business. *E.g.*, *Herman v. Duncan*, 2019 WL 2137335, at \*14-15 (S.D.N.Y. May 19, 2019) ("a fiduciary relationship may be found in any case 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed'" (quoting *United Features Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002)))). But IST Germany, working hand-in-hand with Defendants, then sold its partner up the river. (¶¶121-181).

This was no garden-variety commercial relationship, as the U.S. Defendants suggest. (Mot. 25). IST Germany exercised influence over pricing, product availability, and strategic decisions while requiring ISTNA to share sensitive business and customer information, thereby placing ISTNA in a position of vulnerability and dependence. (¶¶163-166, 254). These allegations go well beyond what is necessary to plead a fiduciary relationship.

Nor does the fact that IST Germany served as ISTNA's supplier govern. Rather, it is the nature of the parties' relationship – as alleged in the Complaint, not as recast and tortured in the Motion – that controls. *See Herman*, 2019 WL 2137335, at \*14 ("[I]t is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." (quoting *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 19-20 (N.Y. 2005))). ISTNA details how Mr. Camali "reposed" "confidence" in IST Germany and Jorg Vogt and was utterly and totally dependent upon their purported "superior expertise [and] knowledge" to sustain and grow his business. *See United Features*, 216 F. Supp. 2d at 218 (quotation omitted)). This is a paradigmatic fiduciary relationship.[8]

---

[8] None of the U.S. Defendants' cited cases on this issue help their cause. *Ergowerx International, LLC v. Maxell Corp. of America*, 18 F. Supp. 3d 430, 451-52 (S.D.N.Y. 2014) (cited Mot. at 26) is irrelevant because it applies New Jersey, not New York, law. Meanwhile, *Scientific*

*Defendants, including specifically the U.S. Defendants, participated in the breach*.  "[A] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator."  *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009) (quoting *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 294 (2d Cir. 2006)). Just as one example, each of the Individual Defendants, including Ljungback, participated in the "illusion" pulled on Mr. Camali and ISTNA, including by covering up (at, for instance, the Piermont dinner (¶¶154-161)), the fact that the Exclusivity Agreement would not survive the Takeover and in fact had already been removed from the SAPA.  *See Lerner*, 259 F.3d at 294 ("[s]ubstantial assistance" includes "affirmatively assist[ing]" or "help[ing] conceal" a breach). More fundamentally, each of the U.S. Defendants unquestionably knew that IST Germany was repudiating the Exclusivity Agreement, which was a core breach of its fiduciary duty.  (¶¶217-221).  This unrebutted and unrebuttable "actual knowledge of [IST Germany's] breach of duty may provide the basis for an aiding and abetting claim."  *See Lerner*, 459 F.3d at 294.

## V.    DEFENDANTS' "GROUP PLEADING" ARGUMENT IS IRRELEVANT, PREMATURE, AND MERITLESS

The U.S. Defendants' attack on the Complaint as "group pleading" (Mot. 8) is irrelevant and meritless.  "Group pleading" addresses situations where a complaint lumps "all of the defendants together" and provides "no factual basis to distinguish their conduct" in an attempt to circumvent Rule 8 and avoid giving a defendant "fair notice what the plaintiff's claim is and the ground upon which it rests."  *In re TransCare Corp.*, 592 B.R. 272, 288 (Bankr. S.D.N.Y. 2018) (quoting, inter alia, *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)).  Here,

---

*Components Corp. v. Sirenza Microdevices, Inc.*, 2006 WL 6937123, at *20-21 (E.D.N.Y. July 11, 2006) (cited Mot. at 26), actually supports ISTNA, because it says that an actionable fiduciary duty "must spring from circumstances extraneous to, and not constituting elements of, the contract . . . ," which is exactly what ISTNA alleges.  (¶¶10-11, 30, 104, 118, 135).

24

however, the Complaint states plausible claims against the U.S. Defendants based on specific and detailed factual allegations *about their own conduct*. (*E.g.*,¶¶83-85, 121-128, 154-161 (explaining how Ljungback concealed the breach of fiduciary duty by covering up the true nature of the Takeover)). This is **specific**, as opposed to **group**, pleading. *See TransCare*, 592 B.R. at 289 (rejecting group pleading argument, sustaining complaint that alleged "specific conduct attributable to" each identified defendant). U.S. Defendants' extensive discussion of alter ego liability (*see* Mot. 4-8) is misplaced and irrelevant for similar reasons. The Complaint does not state an alter ego liability claim or seek to pierce the corporate veil to hold the U.S. Defendants accountable – their executives sat across a table and made misstatements and omissions of material fact about the Takeover to Mr. Camali's face. (¶¶154-161). They can be held accountable on their own accord. *See supra* pp. 16-19.

To the extent, however, that the Court deems it necessary to disregard the corporate form to sustain a claim against any of the U.S. Defendants (though it need not do so), the Complaint pleads detailed facts showing how each part of the Trelleborg "Group" was an alter ego. Under Delaware law, courts are permitted to pierce the corporate veil where a company and its controller operated as a "single economic unit" and there is "an element of injustice or unfairness present." *TradeWinds Airlines, Inc. v. Soros*, 2012 WL 983575, at *6 (S.D.N.Y. 2012) (Keenan, D.J.) (quoting, inter alia, *NetJets Aviation, Inc. v. LHC Commc'ns*, LLC 537 F.3d 168, 177 (2d Cir. 2008)). Alter ego theories "are generally fact intensive," *see Credit Suisse Sec. (USA) LLC v. W. Coast Opportunity Fund, LLC*, 2009 WL 2356881, at *3 n.23 (Del. Ch. July 30, 2009), and whether to disregard the corporate form is a question "generally submitted to the jury." *Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 404 (S.D.N.Y. 2016).

67903/0001-52215866

Here, the Complaint alleges that the various named Trelleborg entities "simply functioned as a façade for [their] dominant shareholder," Trelleborg AB. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995). This is not an "implausible" or "speculative" allegation nor is it a "mere conclusion[] of law." *TradeWinds*, 2012 WL 983575, at \*6. Rather, ISTNA alleges (among other things) that Trelleborg AB executive Mindermann used the U.S. Defendants as "mere instrumentalities" to carry out Trelleborg's business in the United States (including the business it stole from ISTNA) (¶¶15, 51-64,126-128); operated each portion of the Trelleborg Group so each had "no independent economic existence" (¶¶53-55, 60-63); shared resources across entities and functions, by (for example) saying that Trelleborg's "Seals and Profiles" business would be operated out of Pipe Seals Milford's New Hampshire offices (¶¶70-71); and used common executives across various entities in the "Group," including Ljungback, Renulf, and Katarina Olsson (¶¶46, 48, 64). This "combination" of factors is sufficient to plead a basis for disregarding the corporate form under Delaware law as applied by New York courts. *See TradeWinds*, 2012 WL 983575, at \*6-7; *see also Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 522 (S.D.N.Y. 2012) (piercing veil at summary judgment where there was extensive "mingling of operations" between entity and owners).

Here again, the U.S. Defendants try to turn the Complaint on its head. Thus, for example, ISTNA pleads that Trelleborg uses the "Seals & Profiles" business to blur the lines between entities and avoid corporate responsibility (¶¶65-81), classic alter ego claims. *E.g.*, *U.S. v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1106 (D. Del. 1988) (piercing where the entity was "merely a façade for defendants' operations"). The U.S. Defendants, however, contort these facts, suggesting that the Complaint only alleges that the affiliation between Defendants is part of an "advertising strategy."

(Mot. at 6-7).  Not so.[9]  Elsewhere, the Complaint also alleges that the members of the "Group" share executives (like U.S. Defendant Ljungback and general counsel Katarina Olsson).  (¶¶46, 64).  Here again, the U.S. Defendants "miss the forest for the trees," (Mot. at 6), because the mere fact that companies share executives will not pierce the veil but the use of shared executives and the lack of formalities and the lack of a separate economic existence, taken together (among other things), will.  *TradeWinds*, 2012 WL 983575, at *6.[10]

The Complaint also alleges a palpable element of injustice or unfairness.  *See Soroof*, 842 F. Supp. 2d at 522.  Trelleborg AB and its affiliates used the corporate form to perpetrate a deliberate scheme to extinguish ISTNA's exclusive contractual rights while preserving the economic benefits of ISTNA's business for themselves.  Specifically, U.S. Defendant Ljungback – acting on behalf of the Trelleborg group and its U.S. entities – made representations in New York that Trelleborg would honor ISTNA's Exclusivity Agreement and integrate ISTNA into its U.S. operations, while Trelleborg was simultaneously finalizing an asset-purchase structure that excluded the Agreement and rendered performance impossible.  (¶157 (c)).  Moreover, the SAPA was engineered to transfer all assets necessary to perform the Exclusivity Agreement while leaving the contractual obligations behind in a non-operational shell.  (¶¶167-173).  And, following the transaction, the U.S. Defendants assumed ISTNA's customers, sales, and service functions, capturing the goodwill and revenue developed by ISTNA while disavowing responsibility for the

---

[9] For this reason, *Williamson ex rel. At Home Bondholders' Liquidating Trust v. Verizon Communications, Inc.*, 2013 WL 227691, at *3 (S.D.N.Y. Jan. 22, 2013) (cited Mot. at 6-7), is distinguishable.  There, the plaintiff sought to piece the veil simply because AT&T and its subsidiaries used the "common trade name" AT&T.

[10] *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 2018 WL 1273343, at *6 (S.D.N.Y. Mar. 5, 2018) (cited Mot. 5, 7), is distinguishable, because it stands only for the unremarkable proposition that alleging corporate relatedness and the sharing of back-office employees, without more, cannot support an alter ego claim.

27

conduct that made that Takeover possible.  (¶¶89-94, 195).  This goes well beyond unjust and unfair.

## VI.    ISTNA IS ENTITLED TO SEEK PUNITIVE DAMAGES AS A REMEDY FOR ITS FRAUD AND AIDING AND ABETTING TORT CLAIMS

Finally, the U.S. Defendants make an extraordinary demand to dismiss ISTNA's request for punitive damages (a form of relief, not a claim).  (Mot. at 27 (citing *Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC*, 2008 WL 1710910, at *6-7 (S.D.N.Y. Apr. 10, 2008)).  The argument borders on the frivolous, because ISTNA brings claims for fraud and aiding and abetting breach of fiduciary duty for which punitive damages are appropriate and available.  *See, e.g.*, *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 317-18 & n.5 (S.D.N.Y. Mar. 1, 2010) (collecting cases, distinguishing *Cerveceria Modelo*).  Indeed, courts routinely and uniformly reject motions (like the U.S. Defendants') to dismiss punitive damages requests, including because a demand for a specific form of damages is not a "claim" and thus it would be premature and inappropriate to "address [the issue] . . . before [plaintiff's] . . . claims have been decided." *Amusement Indus.*, 693, F. Supp. 2d at 318 n.5 (quoting *Burrell v. State Farm & Cas. Ins. Co.*, 226 F. Supp. 2d 427, 440 (S.D.N.Y. 2002)).

The argument also aptly demonstrates how inconsistent and incredible the U.S. Defendants' positions are.  On the one hand, they say that "every claim advanced by ISTNA is rooted in alleged misuse of information governed by the NDA."  (*See* Mot. at 9.)  But on the other, they also say that the "fraud," "tortious interference," and "aiding and abetting breach of fiduciary claims," are rooted in the "SAPA."  (*See id.* at 27.)  Both are not, and cannot be, true.

## CONCLUSION

The Motion should be denied.

Dated: New York, New York
      January 20, 2026

COLE SCHOTZ P.C.

By: */s/ Brandon Fierro*
    Joseph Barbiere, Esq.
    Eric S. Latzer, Esq.
    Brandon M. Fierro, Esq.
    Mia D. Guttmann, Esq.
    Attorneys for Plaintiff I.S.T. North
    America, LLC
    1325 Avenue of the Americas
    19th Floor
    New York, New York 10019
    (212) 752-8000

29

## <u>WORD COUNT CERTIFICATION</u>

Pursuant to Local Civil Rule 7.1 of the United States District Courts for the Southern and Eastern Districts of New York, the undersigned hereby certifies that this Memorandum of Law contains 8,631 words, exclusive of the parts exempted by the rule, as determined by Microsoft Word.

DATED: New York, New York
        January 20, 2026

                                          _/s/Brandon Fierro_____
                                          Brandon Fierro